**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------------------------------x

GARY TATINTSIAN, on his own behalf and for the
benefit of ShopLink Inc.,

                         Plaintiff, Counterclaim-
                         Defendant,

   -against-

MIKHAIL VOROTYNTSEV and ELENA
VOROTYNTSEV,

                         Defendants,
                         Counterclaim-Plaintiff,
   and,

SHOPLINK INC.,
                         Nominal Defendant,
                         Counterclaim-Plaintiff.
----------------------------------------------------------------x
MIKHAIL VOROTYNTSEV,

                         Third-Party Plaintiff,
   -against-

DMITRIY KHMALADZE, ITADAPTER
CORPORATION, INC., YOUNIS ZUBCHEVICH and
DIABETICA RESEARCH SOLUTIONS, INC.,

                         Third-Party Defendants.
----------------------------------------------------------------x
SHOPLINK INC.,

                         Cross-Claim-Plaintiff,

   -against-

YOUNIS ZUBCHEVICH,

                         Cross-Claim-Defendant.
----------------------------------------------------------------x

Case No. 16-CV-7203 (GHW)(JLC)

**ANSWER, CROSS-CLAIMS AND**
**AMENDED COUNTERCLAIMS**

JURY TRIAL DEMANDED

## ANSWER

ShopLink Inc. ("ShopLink"), by and through its attorneys, for its Answer, respectfully alleges as follows in accordance with the numbered paragraphs in the Complaint:

1.       ShopLink denies paragraph 1 except admits that Vorotyntsev is the CEO and sole board member of ShopLink.

2.       ShopLink denies paragraph 2.

3.       ShopLink denies paragraph 3.

4.       Paragraph 4 contains no allegation to which a responsive pleading is necessary.

5.       Paragraph 5 is a legal conclusion to which no responsive pleading is necessary.

6.       The first sentence of paragraph 6 is a legal conclusion to which no responsive pleading is necessary.  ShopLink denies the second sentence of paragraph 6 except admits that Vorotyntsev resides in this District and states that he carried out the business of ShopLink in this district.

7.       ShopLink admits it entered contracts with Plaintiff in New York.  The remaining allegations in Paragraph 7 are legal conclusions to which no responsive pleading is necessary.

8.       ShopLink denies paragraph 8.

9.       ShopLink lacks knowledge sufficient to admit or deny Paragraph 9.

10.      ShopLink admits paragraph 10.

11.      ShopLink denies paragraph 11, except admits that Elena Vorotyntsev is a Russian citizen who resides at 139 Wooster Street, New York, NY 10012.

12.      ShopLink admits the allegation in the first sentence of paragraph 12, admits that ShopLink maintains a mailing address of 511 Avenue of the Americas, Suite 372, New York, NY 10011, and denies the remaining allegations in paragraph 12.

13.     ShopLink states that it is a start-up company developing software to help companies market and sell goods through social media and that IT Adapter LLC is an operational affiliate of ShopLink that was formed to deploy ShopLink's technology.  ShopLink denies the remaining allegations in paragraph 13.

14.     ShopLink denies paragraph 14, except admits it has generated no revenue.

15.     ShopLink admits the first sentence of paragraph 15, states that Elena Vorotyntsev possessed a debit card associated with the ShopLink Bank Account and admits that IT Adapter LLC also has a bank account.  ShopLink denies the remaining allegations in paragraph 15.

16.     ShopLink admits the first sentence of paragraph 16, and states more specifically that Vorotyntsev and Plaintiff met 18 years ago.  ShopLink admits the second sentence of paragraph 16, except to the extent that the dealings described below (Counterclaims and Cross-Claims, ¶¶ 10-28) constitute "communicat[ing] regularly" and/or "business dealings."

17.     ShopLink denies paragraph 17 except admits that Vorotyntsev discussed ShopLink with Plaintiff in the summer of 2015.

18.     ShopLink denies paragraph 18, except admits that Dmitriy Khmaladze has attempted to convert ShopLink's intellectual property and states that Plaintiff has induced Khmaladze to engage in that conduct.

19.     ShopLink denies paragraph 19, except admits that between approximately May 2013 – January 2016, ShopLink raised funds from approximately seven investors.

20.     ShopLink admits Plaintiff signed a Subscription Agreement on or about April 8, 2016.  The remaining allegations in paragraph 20 purport to describe a written document that speaks for itself and all characterizations thereof are denied accordingly.

21.     ShopLink admits the parties entered a Letter Agreement on or about April 8, 2016, and that, on or about August 11, 2016 Plaintiff purchased an additional 100,000 Shoplink shares.  The remaining allegations in paragraph 21 purport to describe a written document that speaks for itself and all characterizations thereof are denied accordingly.

22.     ShopLink denies the allegations in paragraph 22, except admits that Vorotyntsev and Plaintiff met with ShopLink's prior counsel at Pryor Cashman on or about April 8, 2016.

23.     The allegations in paragraph 23 purport to describe a written document that speaks for itself and all characterizations thereof are denied accordingly.

24.     ShopLink denies paragraph 24.

25.     The first sentence in paragraph 25 purports to describe a written document that speaks for itself and all characterizations thereof are denied accordingly. ShopLink denies the remaining allegations in paragraph 25.

26.     The allegations in paragraph 26 purport to describe a written document that speaks for itself and all characterizations thereof are denied accordingly.

27.     The allegations in paragraph 27 purport to describe a written document that speaks for itself and all characterizations thereof are denied accordingly.

28.     ShopLink lacks knowledge sufficient to admit or deny Paragraph 28.

29.     ShopLink denies paragraph 29.

30.     ShopLink denies paragraph 30.

31.     ShopLink denies paragraph 31.

32.     ShopLink denies paragraph 32.

33.     ShopLink denies paragraph 33.

34.    ShopLink lacks knowledge sufficient to admit or deny the first sentence of paragraph 34.  The second sentence of paragraph 34 purports to describe a written document that speaks for itself and all characterizations thereof are denied accordingly.

35.    ShopLink denies paragraph 35.

36.    ShopLink admits the first sentence of paragraph 36 and denies the second sentence of paragraph 36.

37.    The allegations in paragraph 37 purport to describe a written document that speaks for itself and all characterizations thereof are denied accordingly.

38.    ShopLink denies paragraph 38, except admits that ShopLink properly (*see* ECF Doc. No. 37) transferred $100,000 to Vorotyntsev's counsel in the ordinary course of business to comply with ShopLink's by-laws.  ShopLink admits that its Bank Account balance was approximately $143,971 on September 7, 2016.

39.    ShopLink denies paragraph 39.

40.    Paragraph 40 contains no allegation to which a responsive pleading is necessary.

41.    ShopLink denies paragraph 41.

42.    ShopLink denies paragraph 42.

43.    ShopLink admits paragraph 43.

44.    ShopLink denies paragraph 44.

45.    ShopLink denies paragraph 45.

46.    ShopLink denies paragraph 46.

47.    ShopLink denies paragraph 47.

48.    Paragraph 48 contains no allegation to which a responsive pleading is necessary.

49.    ShopLink denies paragraph 49.

50.      ShopLink denies paragraph 50.

51.      ShopLink denies paragraph 51.

52.      ShopLink denies paragraph 52.

53.      Paragraph 53 contains no allegation to which a responsive pleading is necessary.

54.      ShopLink admits the first sentence of paragraph 54.   The second sentence of paragraph 54 purports to state a legal conclusion, as to which no response is required.

55.      ShopLink denies paragraph 55.

56.      ShopLink denies paragraph 56.

57.      Paragraph 57 contains no allegation to which a responsive pleading is necessary.

58.      ShopLink denies paragraph 58.

59.      ShopLink denies paragraph 59.

60.      Paragraph 60 contains no allegation to which a responsive pleading is necessary.

61.      ShopLink admits the first sentence of paragraph 61.   The second sentence of paragraph 61 purports to state a legal conclusion, as to which no response is required.

62.      ShopLink denies paragraph 62.

63.      ShopLink admits paragraph 63.

64.      ShopLink lacks knowledge sufficient to admit or deny paragraph 64.

65.      ShopLink denies paragraph 65.

66.      ShopLink denies paragraph 66, except admits that Elena Vorotyntsev was an authorized user of a debit card associated with the ShopLink Bank Account, which she used for certain expenditures.

67.      ShopLink denies paragraph 67.

68.      Paragraph 68 contains no allegation to which a responsive pleading is necessary.

69.     ShopLink denies paragraph 69.

70.     ShopLink denies paragraph 70.

71.     ShopLink denies paragraph 71.

72.     ShopLink denies paragraph 72.

73.     ShopLink denies paragraph 73.

## GENERAL DENIAL

ShopLink denies each and every allegation not specifically admitted here.

## FIRST AFFIRMATIVE DEFENSE

Plaintiff has failed, in whole or in part, to state a claim upon which relief may be granted.

## SECOND AFFIRMATIVE DEFENSE

Plaintiff's claims fail because Plaintiff has not suffered any injury.

## THIRD AFFIRMATIVE DEFENSE

Any injury caused to Plaintiff was due in whole or in part to Plaintiff's own actions.

## FOURTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred by the doctrine of equitable estoppel based on his concealment of facts he now alleges are true and silence in the face of ShopLink's explicit contrary assumptions. ShopLink acted in justifiable reliance on Plaintiff's words and/or conduct, or the words and/or conduct of those working in agency with him.

## FIFTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred by the doctrine of waiver, laches and/or unclean hands.

## SIXTH AFFIRMATIVE DEFENSE

Plaintiff has failed to mitigate alleged damages.

## SEVENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, by the doctrine of *in pari delicto*.

## EIGHTH AFFIRMATIVE DEFENSE

Plaintiff's claims premised on the existence of a fiduciary duty fail because Plaintiff was owed no fiduciary duty.

## NINTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part because Plaintiff assumed the risk that allegedly injured him.

## TENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred by the terms of the parties' agreement.

## RESERVATION OF RIGHTS

By setting forth the foregoing affirmative defenses, Defendant does not assume the burden of proving any fact, issue, or element of a cause of action where such burden properly belongs to Plaintiff. Nothing stated herein is intended to be or shall be construed as an admission that any particular issue or subject matter is relevant to Plaintiff's allegations. Defendant does not waive and expressly preserves its right to rely upon any other defenses that may become available in the course of the litigation and reserves the right to amend this Answer to assert further defenses or to modify its defenses.

## COUNTERCLAIMS AND CROSS-CLAIMS

ShopLink, by and through its attorneys, for its Amended Counterclaims against Plaintiff Gary Tatintsian ("Plaintiff" or "Tatintsian") and Cross-claims against Cross-claim Defendant Younis Zubchevich ("Zubchevich"), respectfully alleges as follows[1]:

**Preliminary Statement**

1.    Plaintiff Gary Tatintsian filed this lawsuit because, he claims, ShopLink is a "fraudulent scheme" and a "sham company."

2.    Yet, in the days just before filing it, he called ShopLink the "next tech giant," presenting "terrific opportunities to prosper."  Based on his "belief in the company," he was going "to raise [money] through his network" – "$15-$25 million if it can be justified."

3.    Indeed, Gary Tatintsian does not think ShopLink is a fraud.

4.    He just wants its technology for himself.   That is why he commenced this suit, which is just a part of Tatintsian's brazen, wrongful scheme.

5.    ShopLink now asserts counterclaims based on Tatintsian's illegal conduct, as well as cross-claims against ShopLink's former business advisor, who Tatintsian enlisted to carry out his plan.  Together, they caused ShopLink's chief programmer (mostly by paying him) to turn against ShopLink and claim (in a suit funded by Tatintsian) that he owns ShopLink's technology.

6.    Indeed, Tatintsian's real objective in this action is to debilitate ShopLink and take its technology for his own "new endeavor," as he calls it.

---

[1]    Cross-claim Defendant has failed to appear in this action after being served with ShopLink's initial Answer, Counterclaims and Cross-Claims (ECF Doc. No. 55). Accordingly, ShopLink has not, in this pleading, amended its cross-claims against Cross-claim Defendant.   ShopLink will, when appropriate, move for default judgment.

7.    Thus, the real "fraud" here is Tatintsian's claim, before this Court, to be acting "for the benefit of ShopLink" and its shareholders.  This is a fraud not only on the Court, but on each and every other shareholder in whose interests Tatintsian claims to be acting.

8.    This is not the first time Tatintsian has abused the legal process to achieve his improper ends.  In a recent suit against him, the Judge observed, "[i]n every possible way I believe Mr. Tatintsian is trying this case . . . not according to the rules of courtesy, fair play," but by "one unfairness after another."  Noting his conflicting sworn statements and claims "going opposite ways," the court concluded, "his credibility is not the strongest."

**Mr. Tatintsian and Mr. Vorotyntsev Were Friends**

9.    Mikhail Vorotyntsev and Gary Tatintsian have known each other for 18 years.

10.    They met when Tatintsian first came to New York in 1998 and spoke no English.

11.    At that time, Tatintsian was a struggling art dealer – armed with a decent inventory of artworks but saddled with onerous debt, including to lenders back in Russia.

12.    Tatintsian sought to "make it" in America, and Mr. Vorotyntsev – driven by similar ideals – admired Tatintsian's courage.  Vorotyntsev immediately liked Tatintsian and the two became friends.

13.    In fact, Vorotyntsev was of significant help to Tatintsian.

14.    For example, in or around 1999 when Tatintsian needed money to pay auction house fees, Vorotyntsev convinced his employer to lend Tatintsian $100,000.

15.    Then, a year or so later when Tatintsian needed money to pay back a lender in Russia, Vorotyntsev single-handedly arranged a meeting with the chief executive and chairman of one of the major auction houses to discuss its potential acquisition, from Tatintsian, of a collection of photographs by the celebrated Aleksander Rodchenko.

16.     That meeting resulted in a sale of several millions of dollars for Tatintsian, who was very pleased.  Vorotyntsev did not ask for anything in return for his role.  (However, Tatintsian did promise that someday he would give Vorotyntsev a few works of art.  He eventually gave Vorotyntsev a small pencil drawing by the artist Boris Sveshnikov worth an estimated $3,000.)

17.     Vorotyntsev helped Tatintsian and his art business in other ways, including with his new art gallery in Chelsea.

18.     In sum and substance, from around 1998 to around 2004, Vorotyntsev and Tatintsian were friends.

19.     And Vorotyntsev wanted to see his friend succeed in America.

20.     During this same period, Vorotyntsev was pursuing his own entrepreneurial projects, which he often discussed with Tatintsian, as friends would.

21.     Tatintsian often encouraged Vorotyntsev by saying (in Russian): "someday, you're going to make it."

22.     But, as Tatintsian was aware, Vorotyntsev and his wife were struggling to keep up financially.  Notwithstanding promising projects, they were, so to speak, running to stand still.

**Mr. Tatintsian Achieves Great Success and his Friendship with Vorotyntsev Fades**

23.     By 2003, the American economy was reeling from the burst of the "dot com" bubble.  As a result, buyers for high-end art were hard to come by.

24.     At this same time, however, the Russian economy was strong.

25.     In light of this, in or around 2003, Vorotyntsev began urging Tatintsian to open an art gallery in Moscow.  Not only did Moscow provide access to potential buyers flush with cash, it lacked a prominent contemporary art gallery on par with those in New York City.

26.     Tatintsian was ambivalent on this idea but, at Vorotyntsev's urging, he went to Moscow to assess the situation.   Upon doing so, he agreed that Moscow offered real opportunities for his art business.

27.     In or around 2004, Vorotyntsev suggested a general location for a gallery in Moscow – right next to Red Square – and that is where Tatintsian Gallery opened its doors.

28.     By 2005, Tatintsian's art business was thriving, including in Moscow.  Indeed, he had made upwards of $50 million, as he proudly told Vorotyntsev at around this time.  Tatintsian had "made it big."

29.     Perhaps not coincidentally, he appeared to forget his old friend Mikhail Vorotyntsev who had helped him in the early days.

30.     By late 2005, Tatintsian and Vorotyntsev were essentially no longer in touch.

**Vorotyntsev Begins Developing the Concept that Would Become ShopLink**

31.     In or around 2005, Vorotyntsev was working on a new start-up aimed at exporting a nutritional product from Russia to the United States for distribution.  In connection with that project, Vorotyntsev had the idea for an online forum where healthcare professionals, consumers and their family members could interact, support each other and, in the process, promote and sell the product for a commission.   Vorotyntsev envisioned several layers of referrals, earning commissions for the referrers and revenue for the company.

32.     While that particular project stalled, Vorotyntsev's idea for an online multi-tiered referral/reward program would evolve into something much bigger.

33.     Over the next several years and until early 2010, Vorotyntsev pursued a variety of entrepreneurial projects, each centered on a different, new and exciting product.  And on many of

those projects, he assembled a team of programmers in hopes of developing a centralized forum that would serve as a multi-tiered referral/reward market for the product.

34.    By early 2010, however, Vorotyntsev had arrived at a critical realization.  That is, his concept for an online multi-tiered referral/reward program need not be tethered *exclusively* to any one product.  Nor did the concept require the creation of a new marketplace at all.

35.    Indeed, he envisioned a *nonexclusive* environment – one that facilitated sales of potentially *any and all products* – that would exploit an *already existing* and by-then ubiquitous interactive platform: Social Media.

36.    Indeed, the rise of Twitter, Facebook, Tumblr, etc. had connected vast networks of people.  Those users, including influencers with substantial numbers of followers, could be readily converted into a salesforce if armed with one simple thing: a "buy" button, or a "link."

37.    Indeed, Vorotyntsev envisioned a way to allow consumers to introduce products to their friends and followers on social media and invite them to purchase with a single click. Upon facilitating a sale, a consumer would earn a commission.  The consumer's friends and followers could then have the ability to introduce the products to their own friends and followers and earn commissions themselves.   Through this multi-tiered referral/reward program, consumers and, in turn, their friends and followers, could be incentivized to generate word-of-mouth sales through social networks.

38.    By harnessing the reach of social networks to promote e-commerce, this concept would enable companies to convert consumers into massive salesforces and to exponentially increase points of sale.    All these consumers had to do – to make a sale and earn a commission – was share a link.

39.    In late 2011, Vorotyntsev arrived at a name for this new platform: "ShopLink."

**Vorotyntsev Founds ShopLink in May 2012**

40.    Vorotyntsev founded ShopLink on or about May 31, 2012.  He immediately began looking for the right team of technology professionals to carry out his vision.  He also began seeking investors to fund this revolutionary new e-commerce platform that, he believed, had the potential to earn billions in revenue.

41.    Vorotyntsev was singularly committed to ShopLink.  Its development and launch was, simply put, his dream (or his "American Dream," as Tatintsian called it).

42.    Vorotyntsev worked tirelessly toward getting ShopLink on its feet.  He set up countless meetings with investors, potential strategic partners, technology experts, as well as industry "thought leaders," including pioneers of the concept of "Peer Influence," a body of work and formulas designed to quantify how influence works on social media.

43.    In or around late 2012 / early 2013, Vorotyntsev's search for a technology team was ongoing.  Through a series of introductions, he was given a name: "Dimitriy Khmaladze."

**Vorotyntsev Meets Dimitriy Khmaladze in January 2013**

44.     On or around January 22, 2013, approximately eight months after forming ShopLink to pursue his new e-commerce platform, Vorotyntsev first met Dimitriy Khmaladze. The meeting occurred via skype.

45.    Khmaladze is an experienced software architect and computer programmer with special expertise in system frameworks that allow multiple servers to work together and run complex programs.

46.    Vorotyntsev disclosed his ideas for ShopLink to Khmaladze, and Khmaladze convinced Vorotyntsev that his special skills and expertise were critical to developing key

aspects of ShopLink's technology to render it efficient and scalable. In fact, at one point, Khmaladze told Vorotyntsev: "I'm the only one that can get this done."

47.    Khmaladaze came to believe, as he told Vorotyntsev, that his past experience had led him to that precise moment and that he was a "natural fit" for ShopLink. He told Vorotyntsev: "I feel like you're my brother."

48.    In or about February 2013, Khmaladze began working for ShopLink as its Chief Technology Officer.

49.    Vorotyntsev subsequently established AUM Code LLC ("AUM Code") to develop and own source code and create the cluster system that would serve as ShopLink's back-end architecture.

50.    AUM Code is a limited liability company initially comprised of two members, Vorotyntsev, who owned 60 percent, and Khmaladze, who owns 40 percent.

51.    IT Adapter LLC is a wholly owned subsidiary of AUM Code. (IT Adapter LLC is distinct from the similarly named Third-Party Defendant, ITAdapter Corporation, Inc., which is wholly owned by Khmaladze.) IT Adapter oversees certain operations for AUM Code and ShopLink.

52.    Khmaladze became a managing member and the Chief Technology Officer of AUM Code.

53.    Additionally, ShopLink and Khmaladze agreed that, as part of Khmaladze's compensation package, he would be entitled, among other things, to cash payments from ShopLink as necessary to meet his and his family's financial needs.

54.    Pursuant to that agreement, from in or about May 2013 through in or about August 2016, ShopLink paid <u>over $300,000</u> to Khmaladze and to his company, ITAdapter Corporation, Inc., in order to compensate Khmaladze for the work he promised to perform.

55.    In connection with his employment by ShopLink and its affiliates, Khmaladze entered into a number of written agreements with ShopLink's affiliates and supervised and managed a team of software developers charged with developing the technology to support ShopLink and its affiliates.

56.    Over the course of their working relationship, Vorotyntsev and ShopLink relied on Khmaladze's superior knowledge and expertise and entrusted him with confidential and proprietary information concerning his business plan for ShopLink and its affiliates.

57.    Vorotyntsev and Khmaladze conducted much of their work for ShopLink and AUM Code through email accounts under the IT Adapter domain name.  Khmaladze controlled access to those email accounts.

**<u>ShopLink Entrusts Zubchevich to Provide Business Advice</u>**

58.    Younis Zubchevich ("Zubchevich") is an investment banker and businessman with decades of experience.

59.    Vorotyntsev met Zubchevich nearly twenty years ago.

60.    In or about 2014, Vorotyntsev and ShopLink engaged Zubchevich as a business advisor.  In this capacity, Zubchevich agreed, among other things, to work with other outside professionals and help ShopLink establish a board of directors for ShopLink, organize the corporate structure for ShopLink and its affiliates, review and manage their contracts and create corporate governance policies and procedures to safeguard shareholders and employees.

61.    ShopLink worked closely with Zubchevich over the course of several years, with Vorotyntsev frequently communicating with him by phone and Skype from New York and meeting with him in person in New York.   During this period, ShopLink and Vorotyntsev entrusted Zubchevich with proprietary and confidential information concerning ShopLink's business plan and relied on Zubchevich to apply his superior expertise and knowledge to recommend and implement best practices.

62.    ShopLink paid at least $67,000 to Zubchevich and his company, Diabetica Research Solutions, Inc., in order to compensate Zubchevich for the work he promised to perform for ShopLink and its affiliates.

**Tatintsian Becomes a 2.8% Shareholder in ShopLink**

63.    In or about June 2015, Vorotyntsev reached out to his old friend Gary Tatintsian about the novel e-commerce platform Vorotyntsev had conceived and intended to launch through ShopLink.   Tatintsian expressed enthusiasm for ShopLink's innovative business plan and, in or about September 2015, expressed interest in investing in ShopLink.

64.    In October 2015, Tatintsian wired $250,000 to ShopLink to purchase shares in the company.   However, shortly thereafter Tatintsian decided he did not want to invest in ShopLink at that time.   Accordingly, Vorotyntsev caused ShopLink to immediately refund the $250,000 back to Tatintsian.

65.    In March 2016, Vorotyntsev re-introduced Tatintsian to Zubchevich (he had first introduced them in or about 2000).   At that time, Vorotyntsev explained to Tatintsian that Zubchevich was his and ShopLink's trusted advisor and was assisting ShopLink with corporate governance issues relating to ShopLink and its affiliates.

66.     Upon information and belief, Tatintsian spoke regularly with Zubchevich concerning Vorotyntsev and ShopLink.

67.     Tatintsian then invested in ShopLink in or about April 2016, eventually purchasing a 2.8% stake in the company.  Tatintsian also expressed interest in bringing in certain of his associates as additional investors.

**Vorotyntsev and ShopLink Refuse to Accept Funding from Tatintsian's "Network" and Tatintsian Becomes Enraged**

68.     From May through August 2016, Tatintsian and Zubchevich repeatedly urged Vorotyntsev to allow Tatintsian's associates to invest in ShopLink.

69.     Upon information and belief, Tatintsian told his associates about the enormous profit potential of ShopLink.

70.     Tatintsian proposed organizing a meeting in Miami, Florida to be held on August 26, 2016, where he planned to introduce his associates to Vorotyntsev.

71.     Vorotyntsev informed Tatintsian that he did not believe ShopLink needed Tatintsian's investors because ShopLink could attract capital from a reputable private equity firm.  Tatintsian scoffed at Vorotyntsev's suggestion.

72.     Vorotyntsev was also concerned that Tatintsian's associates were affiliated with organized crime and would be investing illicit funds.  Indeed, Tatintsian informed Vorotyntsev that a Swiss bank had frozen approximately $170 million belonging to one of the potential investors after the investor failed to provide information concerning the origin of the funds.

73.     Because of his belief that ShopLink could find other sources of capital and his concerns about Tatintsian's associates, Vorotyntsev declined to attend the meeting in Miami.

74.    Upon information and belief, Tatintsian was humiliated by Vorotyntsev's refusal to meet with his associates.  He became enraged at Vorotyntsev for his dismissal of Tatintsian's network as a source of funding for ShopLink.

**Tatintsian Devises a Scheme to Take ShopLink's Business Plan and Technology for Himself, Enlisting Zubchevich and Khmaladze in the Effort**

75.    In response to Vorotyntsev's refusal to accept funding from Tatintsian's network, Tatintsian devised a scheme to use his resources to punish Vorotyntsev, take ShopLink's business plan and usurp its technology.

76.    To be sure, that Tatintsian covets ShopLink's business plan and technology for himself is beyond dispute.  Indeed, two weeks before he commenced this suit, Tatintsian made known his belief that ShopLink – which he now claims is a "sham company" – would be the "next tech giant" and provide "terrific opportunities to prosper."

77.    In fact, based on his "belief in the company," he made known that he would "attempt to raise [money] through his network" – "$15-$25 million if it can be justified."

78.    Having decided to take ShopLink's business plan and technology for himself (to the exclusion of Vorotyntsev and all other investors), Tatintsian, upon information and belief, induced Zubchevich to sever ties with ShopLink and participate in his scheme.  Tatintsian (along with Zubchevich) also induced Khmaladze to sever ties with ShopLink and participate in the scheme.

79.    Upon information and belief, Tatintsian paid Zubchevich a substantial salary and gave him the nominal title, "Director of Investments."

80.    Upon information and belief, Zubchevich shared with Tatintsian the confidential information he had obtained in the course of serving as ShopLink's and Vorotyntsev's trusted

business adviser, including information about how Tatintsian could exploit the relationship between Vorotyntsev and Khmaladze for his own benefit.

81.    On or about August 30, 2016 – four days after Vorotyntsev refused to meet with Tatintsian's associates in Miami – Tatintsian, acting through counsel, demanded that ShopLink appoint a board of directors made up of directors selected exclusively by Tatintsian.  As a 2.8% shareholder, Tatintsian had no right to appoint any directors.

82.    On or about September 1, 2016, Tatintsian, through his agent, Zubchevich, contacted Khmaladze by email to malign Vorotyntsev, ShopLink, and their affiliates and to propose reorganizing ShopLink under Tatintsian's direction.

83.    Zubchevich represented that he could turn Khmaladze's work into a professional "demo" presentation that would bring in "big money" and that "Gary [Tatintsian] would very much like to work on that."

84.     Tatintsian, through his agent Zubchevich, offered Khmaladze cash payments and additional benefits to sever ties with ShopLink and Vorotyntsev and work instead with Tatintsian and Zubchevich.

85.    Zubchevich affirmed, "I am all in on this plan of Gary's" and invited Khmaladze to call him or Tatintsian "anytime . . . including in the middle of the night."

86.    On or about September 6, 2016, Tatintsian received copies of ShopLink's bank statements pursuant to an agreement by which Tatintsian agreed to keep them strictly confidential.  Upon information and belief, shortly after receiving the statements, Tatintsian sent the statements to Khmaladze, Zubchevich, and others in violation of his agreement.

87.     Upon information and belief, beginning on or about September 1, 2016 through the present, Zubchevich has contacted ShopLink investors, alleging that ShopLink is a sham and that Vorotyntsev lied about ShopLink's ownership of the technology.

88.     In the days and weeks preceding the filing of his lawsuit, Tatintsian barraged Vorotyntsev with a string of insulting, threatening, and extortionate text messages and phone calls.

89.     For example, he threatened Vorotyntsev and his wife, saying (in Russian): "I'm going to dissolve both of you in acid.  No body, no problem."

90.     Similarly, in a text message on August 31, 2016, he called Vorotyntsev and his wife "insects . . . Parasites which someone has to take care of," promising ominously that: "I will handle it."

91.     Telegraphing his plans to usurp ShopLink and its technology, Tatintsian wrote to Vorotyntsev, "U will see how easy you will loose [sic] Dmitriy and all you Dreams."

92.     Upon information and belief, Tatintsian and Zubchevich communicated with Khmaladze on multiple occasions in an effort to induce him to (i) stop communicating with Vorotyntsev; (ii) prevent Vorotyntsev from accessing ShopLink and AUM Code's proprietary source code and his IT Adapter email account; and (iii) resign as an employee and Chief Technology Officer of ShopLink and its affiliates and work instead for Tatintsian and Zubchevich in competition with ShopLink.

93.     On or about September 11, 2016, Khmaladze submitted a resignation letter to ShopLink and terminated its CEO's access to the Assembla code repository where ShopLink and AUM Code's proprietary source code was stored.

94.     Khmaladze also refused to release funds to pay software developers and other expenses necessary to complete the development of ShopLink and AUM Code's technology.

95.     On or about September 12, 2016, Khmaladze disavowed his association with AUM Code and IT Adapter and removed ShopLink's CEO's access to his IT Adapter email account.

96.     Khmaladze subsequently agreed to provide ShopLink with copies of certain source code and his archived email account.  However, to date, Khmaladze has refused to provide ShopLink with access to the Assembla code repository.  ShopLink has since determined that the code provided by Khmaladze is not complete or sufficient for ShopLink to launch its product.

97.     On or about September 15, 2016, Tatintsian filed this lawsuit.

98.     On or about October 13, 2016, Khmaladze filed a lawsuit against Vorotyntsev, ShopLink, AUM Code, and IT Adapter, seeking rescission of all agreements entered into by Khmaladze and a declaration that, among other things, ShopLink's technology belongs to Khmaladze rather than to ShopLink, AUM Code, or any of their affiliates.

99.     Upon information and belief, Khmaladze's lawsuit and his efforts to convert ShopLink and AUM Code's intellectual property and sever ties with ShopLink and Vorotyntsev have been instigated, orchestrated, and funded by Tatintsian.

100.    On November 11, 2016, Defendant Mikhail Vorotyntsev filed a Third-Party Complaint in this action against Dmitriy Khmaladze, IT Adapter Corporation, Inc., Younis Zubchevich and Diabetica Research Solutions, Inc.  *See* ECF Doc. No. 40.

<u>FIRST COUNTERCLAIM AGAINST GARY TATINTSIAN</u>
**(Tortious Interference with Existing Contractual Relations with Zubchevich)**

101.     ShopLink realleges each of the foregoing allegations as if set forth fully herein.

102.     ShopLink engaged Zubchevich as a business advisor, including to create corporate governance policies and procedures.

103.     In exchange for that service, ShopLink promised to make payments to Zubchevich over time.

104.     ShopLink and Zubchevich intended to conclude a binding agreement.

105.     Pursuant to this agreement, ShopLink paid at least $67,000 to Zubchevich and his company, Diabetica Research Solutions, Inc., in order to compensate him for the work he promised to perform for ShopLink and its affiliates.

106.     Zubchevich breached this agreement by failing to create corporate governance policies and procedures.  He also breached his implied duty of good faith and fair dealing to ShopLink in a variety of ways, including by agreeing to work with Tatintsian against ShopLink and its interests, as described herein.

107.     At all relevant times, Tatintsian had actual knowledge of Zubchevich's contractual relationship with ShopLink.

108.     Tatintsian intentionally procured Zubchevich's breach of the agreement by, among other things, arranging significant cash payments to Zubchevich in exchange for his agreement to cease all work on behalf of ShopLink and to join Tatintsian's effort to steal ShopLink's business plan and technology and pursue it under the auspices of a new business formed by Tatintsian and Zubchevich.

109.     Tatintsian also intentionally interfered with Zubchevich's and ShopLink's business relations by inducing Zubchevich to end them.

110.    In pursuing his wrongful objectives, Tatintsian acted solely for the purpose of injuring ShopLink and its CEO, engaged in culpable acts and used dishonest, unfair and improper means, including but not limited to acts of misrepresentation in connection with his campaign to wrongfully malign Vorotyntsev and falsely brand ShopLink a "fraudulent scheme." He also directed physical threats toward Vorotyntsev and his wife and distributed bank statements in violation of express confidentiality obligations, among other wrongful acts described herein.

111.    But for Tatintsian's wrongful conduct, Zubchevich's breaches would not have occurred and the business relationship between ShopLink and Zubchevich would not have been damaged or destroyed.

112.    As a result of Tatintsian's wrongful conduct, development of ShopLink's product has stopped and the company is unable to raise money from investors.

113.    As a result of Tatintsian's wrongful conduct, ShopLink has suffered damages in an amount to be determined at trial.  In light of the gross, wanton, willful and/or morally culpable conduct alleged herein, these damages include, but are not limited to, punitive damages.

## SECOND COUNTERCLAIM AGAINST GARY TATINTSIAN
### (Tortious Interference with Prospective Business Relations with Zubchevich)

114.    ShopLink realleges each of the foregoing allegations as if set forth fully herein.

115.    ShopLink engaged Zubchevich as a business advisor, including to create corporate governance policies and procedures.

116.    ShopLink and Zubchevich had consistent and sustained business dealings, and intended that relationship to continue indefinitely pursuant to achieving ShopLink's business plan and objectives.

117.    At all relevant times, Tatintsian had actual knowledge of ShopLink's and Zubchevich's intended prospective contractual relations.

118.    Tatintsian intentionally interfered with Zubchevich's and ShopLink's business relations by inducing Zubchevich to end them, including by engaging in the conduct described herein.

119.    In pursuing his wrongful objectives, Tatintsian acted solely for the purpose of injuring ShopLink and its CEO, engaged in culpable acts and used dishonest, unfair and improper means, including but not limited to acts of misrepresentation in connection with his campaign to wrongfully malign Vorotyntsev and falsely brand ShopLink a "fraudulent scheme." He also directed physical threats toward Vorotyntsev and his wife and distributed bank statements in violation of express confidentiality obligations, among other wrongful acts described herein.

120.    But for Tatintsian's wrongful conduct, the business relationship between ShopLink and Zubchevich would not have been damaged or destroyed.

121.    As a result of Tatintsian's wrongful conduct, development of ShopLink's product has stopped and the company is unable to raise money from investors.

122.    As a result of Tatintsian's wrongful conduct, ShopLink has suffered damages in an amount to be determined at trial.  In light of the gross, wanton, willful and/or morally culpable conduct alleged herein, these damages include, but are not limited to, punitive damages.

### THIRD COUNTERCLAIM AGAINST GARY TATINTSIAN
**(Tortious Interference with Existing Contractual Relations with Khmaladze)**

123.    ShopLink realleges each of the foregoing allegations as if set forth fully herein.

124.    ShopLink and Khmaladze agreed that he would develop the ShopLink software and, as part of the compensation package, ShopLink would make cash payments to Khmaladze as necessary to meet his and his family's financial needs.

125.    ShopLink and Khmaladze intended to conclude a binding agreement.

126.    Pursuant to that agreement, from in or about May 2013 through in or about August 2016, ShopLink paid over $300,000 to Khmaladze and to his company, ITAdapter Corporation, Inc., in order to compensate Khmaladze for the software development work he promised to perform.

127.    Khmaladze breached this contract by, among other things, failing to deliver a fully developed ShopLink product and, instead, converting the code further to his wrongful alliance with Tatintsian and refusing to acknowledge ShopLink's right to or interest in its software.

128.    At all relevant times, Tatintsian had actual knowledge of Khmaladze's contractual relationship with ShopLink.

129.    Tatintsian (working with Zubchevich) intentionally procured Khmaladze's breach of the agreement by, among other things, sending him ShopLink's bank statements (in violation of Tatintsian's express confidentiality obligations) and repeatedly contacting him to make false statements about ShopLink's CEO, Vorotyntsev.

130.    Upon information and belief, Tatintsian (working with Zubchevich) arranged significant cash payments to Khmaladze in exchange for his agreement to cease all work on the ShopLink software and to continue the development thereof under the auspices of a business formed by Tatintsian and Zubchevich.

131.    Tatintsian also intentionally interfered with Khmaladze's and ShopLink's business relations by inducing Khmaladze to end them.

132.    In pursuing his wrongful objectives, Tatintsian acted solely for the purpose of injuring ShopLink and its CEO, engaged in culpable acts and used dishonest, unfair and improper means, including but not limited to acts of misrepresentation in connection with his campaign to wrongfully malign Vorotyntsev and falsely brand ShopLink a "fraudulent scheme." He also directed physical threats toward Vorotyntsev and his wife and distributed bank statements in violation of express confidentiality obligations, among other wrongful acts described herein.

133.    But for Tatintsian's wrongful conduct, Khmaladze's breaches would not have occurred and the business relationship between ShopLink and Khmaladze would not have been damaged or destroyed.

134.    As a result of Tatintsian's wrongful conduct, development of ShopLink's product has stopped and the company is unable to raise money from investors.

135.    As a result of Tatintsian's wrongful conduct, ShopLink has suffered damages in an amount to be determined at trial.  In light of the gross, wanton, willful and/or morally culpable conduct alleged herein, these damages include, but are not limited to, punitive damages.

## FOURTH COUNTERCLAIM AGAINST GARY TATINTSIAN
### (Tortious Interference with Prospective Business Relations with Khmaladze)

136.    ShopLink realleges each of the foregoing allegations as if set forth fully herein.

137.    ShopLink and Khmaladze agreed that he would develop the ShopLink software and, as part of the compensation package, ShopLink would make cash payments to Khmaladze as necessary to meet his and his family's financial needs.

138.    ShopLink and Khmaladze had consistent and sustained business dealings, including as described above, and intended that relationship to continue indefinitely pursuant to achieving ShopLink's business plan and objectives.

139.    At all relevant times, Tatintsian had actual knowledge of ShopLink's and Khmaladze's intended prospective contractual relations.

140.    Tatintsian (and Zubchevich) intentionally interfered with Khmaladze's and ShopLink's business relations by inducing Khmaladze to end them, including by engaging in the conduct described herein.

141.    In pursuing his wrongful objectives, Tatintsian acted solely for the purpose of injuring ShopLink and its CEO, engaged in culpable acts and used dishonest, unfair and improper means, including but not limited to acts of misrepresentation in connection with his campaign to wrongfully malign Vorotyntsev and falsely brand ShopLink a "fraudulent scheme." He also directed physical threats toward Vorotyntsev and his wife and distributed bank statements in violation of express confidentiality obligations, among other wrongful acts described herein.

142.    But for Tatintsian's wrongful conduct, Khmaladze's breaches would not have occurred and the business relationship between ShopLink and Khmaladze would not have been damaged or destroyed.

143.    As a result of Tatintsian's wrongful conduct, development of ShopLink's product has stopped and the company is unable to raise money from investors.

144.    As a result of Tatintsian's wrongful conduct, ShopLink has suffered damages in an amount to be determined at trial.  In light of the gross, wanton, willful and/or morally culpable conduct alleged herein, these damages include, but are not limited to, punitive damages.

**FIFTH COUNTERCLAIM AGAINST GARY TATINTSIAN**
**(Tortious Interference with ShopLink's Prospective Business Relations with Investors)**

145.    ShopLink realleges each of the foregoing allegations as if set forth fully herein.

146.    ShopLink has business relations with several investors from whom the company has raised money to develop the ShopLink software and related projects.

147.    At all relevant times, Tatintsian had actual knowledge of those relationships.

148.    Tatintsian (in concert with Zubchevich) has intentionally interfered with those business relations by harassing certain of those investors and making false statements to them about ShopLink and its CEO.

149.    Upon information and belief, Tatintsian (in concert with Zubchevich) has falsely and tortiously told one or more investors that ShopLink is a "fraud."

150.    Upon information and belief, Tatintsian falsely and tortiously told at least one investor that ShopLink and its affiliates have no software code at all.

151.    Indeed, ShopLink is aware of at least one specific investor who, as a result of Tatintsian's wrongful conduct, severed his business relations with ShopLink.  Upon information and belief, were it not for Tatintsian's wrongful conduct, further investment arrangements would have been made with this investor.[2]

---

[2]    ShopLink will, upon request, provide this investor's name to Plaintiff and/or the Court.

152.    Tatintsian (in concert with Zubchevich) acted with the wrongful purpose of destroying ShopLink's relationship with these investors.

153.    These particular prospective business relations were lost due to Tatintsian's (and Zubchevich's) improper interference.

154.    But for Tatintsian's wrongful conduct, these relations would not have been lost and, upon information and belief, further investment would have been obtained.

155.    Tatintsian (in concert with Zubchevich) acted solely for the purpose of injuring ShopLink and its CEO, engaged in culpable acts and used dishonest, unfair and improper means.

156.    In pursuing his wrongful objectives, Tatintsian acted solely for the purpose of injuring ShopLink and its CEO, and used dishonest, unfair and improper means.

157.    As a result of Tatintsian's wrongful conduct, ShopLink has been unable to continue raising money from these investors.

158.    As a result of Tatintsian's wrongful conduct, ShopLink has suffered damages in an amount to be determined at trial.  In light of the gross, wanton, willful and/or morally culpable conduct alleged herein, these damages include, but are not limited to, punitive damages.

## SIXTH COUNTERCLAIM AGAINST GARY TATINTSIAN
### (Breach of Contract / Duty of Good Faith and Fair Dealing)

159.    ShopLink realleges each of the foregoing allegations as if set forth fully herein.

160.    This is a cause of action for breach of contract premised on a breach of the implied duty of good faith and fair dealing found in every contract.

161.    The Subscription Agreement, dated on or about April 8, 2016, by which Tatintsian acquired shares in ShopLink, does not contain an express provision requiring him to refrain from engaging in conduct detrimental to ShopLink.

162.    However, under the Subscription Agreement, Tatintsian had an implied duty to refrain from engaging in conduct detrimental to ShopLink.

163.    Tatintsian breached that duty by engaging in the numerous acts described herein, including by using his status as a shareholder to conspire with ShopLink's advisor and Chief Technology Officer to steal ShopLink's software and business plan in order to pursue it under the auspices of a new entity under his control.

164.    Moreover, for example, Tatintsian has breached that duty by commencing this meritless suit in bad faith and in furtherance of his wrongful scheme to take ShopLink's valuable software and business plan for himself and his co-conspirators.

165.    In fact, while he complains in this case that he was defrauded because "ShopLink had no revenue" and "had no marketing or public relations" (Complaint, ¶ 14), he represented and warranted in the Subscription Agreement that he "understands that . . . the Company was only recently formed and has no existing business operations."

166.    Also, while he complains of alleged oral misrepresentations by ShopLink's CEO, he represented and warranted in the Subscription Agreement that he had "not been furnished with any oral representation or oral information in connection with the offering of the Shares."

31

167.    And while he claims to be bringing this suit for the behalf of ShopLink and its shareholders, his real goal is to debilitate ShopLink and steal its valuable software and business plan for himself, to the exclusion of Vorotyntsev and the other investors.

168.    Indeed, Tatintsian commenced this suit with that singular goal in mind.

169.    Tatintsian has acted unreasonably, in bad faith and for his own gain, while purporting to act in accordance with ordinary, business dealings.

170.    Tatintsian's wrongful conduct, premised on his bad faith and aggressive tactics aimed at destroying ShopLink, was willful, intentional and in deliberate disregard of the interests of ShopLink.  It was egregiously dishonest, not only with respect to ShopLink, but also to other investors to whom Tatintsian has falsely and knowingly maligned ShopLink and its CEO.

171.    As a result of Tatintsian's wrongful conduct, ShopLink has suffered damages in an amount to be determined at trial.  In light of the gross, wanton, willful and/or morally culpable conduct alleged herein, these damages include, but are not limited to, punitive damages.

## SEVENTH COUNTERCLAIM AGAINST GARY TATINTSIAN
### (Aiding and Abetting Khmaladze's Breach of Fiduciary Duty)

172.    ShopLink realleges each of the foregoing allegations as if set forth fully herein.

173.    ShopLink hired Dmitry Khmaladze because he had superior knowledge and expertise in system frameworks for Internet servers.  As such, Khmaladze owed fiduciary duties, including the duty of loyalty and care to ShopLink.

174.    Khmaladze owed fiduciary duties for the additional reason that ShopLink and he had a special relationship of trust and confidence, pursuant to which ShopLink reposed confidence in him.  In particular, ShopLink reasonably relied on Khmaladze's superior knowledge and expertise and disclosed confidential and proprietary information to him with the expectation that he would use that information solely to benefit ShopLink and its affiliates.

175.    Khmaladze breached his fiduciary duties to ShopLink by, among other things, blocking ShopLink's access to the Assembla code repository for ShopLink proprietary source code, converting ShopLink's intellectual property for his own benefit, disabling ShopLink's CEO's access to his IT Adapter email account, refusing to pay IT Adapter employees or pay third-party expenses for development and operation of the ShopLink product, abruptly severing ties with ShopLink without assisting in a professional transition of work, and upon information and belief, agreeing to assist Tatintsian and Zubchevich in their efforts to steal ShopLink's valuable business plan for themselves and in competition with ShopLink.

176.    Tatintsian had actual knowledge that Khmaladze (i) owed a fiduciary duty to ShopLink by virtue of his position and his relationship with ShopLink and (ii) was engaging in conduct, including as described herein, in breach of his fiduciary duty.

177.    Tatintsian knowingly participated, induced and substantially assisted in Khmaladze's breaches of fiduciary duty to ShopLink by, upon information and belief, knowingly inducing him (in concert with Zubchevich) to engage in the acts described herein and work against ShopLink pursuant to a wrongful conspiracy.

178.    As a result of Tatintsian's wrongful conduct, ShopLink has suffered damages in an amount to be determined at trial.  In light of the gross, wanton, willful and/or morally culpable conduct alleged herein, these damages include, but are not limited to, punitive damages.

### EIGHTH COUNTERCLAIM AGAINST GARY TATINTSIAN
**(Aiding and Abetting Zubchevich's Breach of Fiduciary Duty)**

179.    ShopLink realleges each of the foregoing allegations as if set forth fully herein.

180.    ShopLink hired Younis Zubchevich because he had superior knowledge and expertise in investment consulting and management.  As such, Zubchevich owed fiduciary duties, including the duty of loyalty and care to ShopLink.

181.    Zubchevich owed fiduciary duties, including the duty of loyalty and care to ShopLink, for the additional reason that he and ShopLink had a special relationship of trust and confidence, pursuant to which ShopLink reposed confidence in him.  In particular, ShopLink, reasonably relying on Zubchevich's superior knowledge and expertise in investment consulting and management, disclosed confidential and proprietary information to Zubchevich with the expectation that Zubchevich would use that information to benefit ShopLink and its affiliates.

182.    Zubchevich breached his fiduciary duties to ShopLink by, among other things, willfully neglecting to support ShopLink's operation by coordinating corporate governance and other practices and procedures at ShopLink and its affiliates and, instead, exploiting his special knowledge of ShopLink's operations to induce the departure of ShopLink's Chief Technology Officer and conspire with Tatintsian to steal ShopLink's technology for his and Tatintsian's competing venture.

183.    Tatintsian had actual knowledge that Zubchevich (i) owed a fiduciary duty to ShopLink by virtue of his position and his relationship with ShopLink and (ii) was engaging in conduct, including as described herein, in breach of his fiduciary duty.

184.    Tatintsian knowingly participated, induced and substantially assisted in Zubchevich's breaches of fiduciary duty by knowingly inducing him to engage in the acts described herein and work against ShopLink pursuant to a wrongful conspiracy.

185.    As a result of Tatintsian's wrongful conduct, ShopLink has suffered damages in an amount to be determined at trial.  In light of the gross, wanton, willful and/or morally culpable conduct alleged herein, these damages include, but are not limited to, punitive damages.

### NINTH COUNTERCLAIM AGAINST GARY TATINTSIAN
**(Unfair Competition Perpetrated via Civil Conspiracy)**

186.    ShopLink realleges each of the foregoing allegations as if set forth fully herein.

187.    The ShopLink concept, its business plan and its software are the result of the labor and expenditure of ShopLink and Vorotyntsev.

188.    In bad faith, Tatintsian (and Zubchevich) set into motion a scheme whereby Khmaladze would misappropriate ShopLink's software while Tatintsian took overt steps to destroy ShopLink's ability to continue doing business or launch the ShopLink product (including by maligning ShopLink and Vorotytnsev to investors, as described elsewhere herein).

189.    Tatintsian, Zubchevich and Khmaladze acted in agreement in furtherance of this wrongful scheme, the purpose of which was to misappropriate the ShopLink concept, business plan and software and pursue it under the auspices of a new entity owned and/or operated by Tatintsian, Zubchevich and Khmaladze.

190.    Indeed, Tatintsian, Zubchevich and Khmaladze misappropriated the fruit of ShopLink's labors and expenditures by obtaining access to its business idea either through misrepresentation and deception, and through an abuse of fiduciary and confidential relationships.

191.    In furtherance of this agreement, Tatintsian (and Zubchevich) engaged in the overt acts (in addition to those noted above) of offering to pay Khmaladze and otherwise causing him to breach his duties to ShopLink and continue developing its product for Tatintsian.

192.    Tatintsian, Khmaladze, and Zubchevich individually, and in conspiracy with each other, intentionally participated in the furtherance of this plan, as detailed above.

193.    As a result of Tatintsian's wrongful conduct, development of ShopLink's product has stopped and the company is unable to raise money from investors.

194.    As a result of Tatintsian's wrongful conduct, ShopLink has suffered damages in an amount to be determined at trial.  In light of the gross, wanton, willful and/or morally culpable conduct alleged herein, these damages include, but are not limited to, punitive damages.

## TENTH COUNTERCLAIM AGAINST GARY TATINTSIAN
### (Conversion Perpetrated via Civil Conspiracy)

195.    ShopLink realleges each of the foregoing allegations as if set forth fully herein.

196.    The APA between Aum Code and ITAdapter Corp. effected the transfer of ITAdapter Corp.'s assets, including its code and software, to Aum Code.  This claim is asserted with respect to code that ShopLink has certain rights to, including but not limited to code developed in part by Khmaladze after execution of the APA in his capacity as ShopLink's CTO.

197.    Khmaladze continued after execution of the APA, including further to his employment relationship with ShopLink, to develop the ShopLink software and, in exchange, received cash payments from ShopLink.

198.    Accordingly, under the Copyright Act, ShopLink has certain rights to the ShopLink software, including the code created by Khmaladze after execution of the APA.

199.    In any event, ShopLink had possession and control over the property.

200.    Khmaladze wrongfully converted the ShopLink software (physical computer code) by denying ShopLink access to it and otherwise using it in furtherance of his wrongful conspiracy with Tatintsian and Zubchevich to misappropriate the ShopLink concept, business

plan and software and pursue it under the auspices of a new entity owned and/or operated by Tatintsian, Zubchevich and Khmaladze.

201.    In furtherance of this agreement, Tatintsian (and Zubchevich) engaged in the overt acts (in addition to those noted above) of offering to pay Khmaladze and otherwise causing him to breach his duties to ShopLink and continue developing its product for Tatintsian.

202.    Tatintsian, Khmaladze, and Zubchevich individually, and in conspiracy with each other, intentionally participated in the furtherance of this plan, as detailed above.

203.    Tatintsian, Khmaladze, and Zubchevich thus exercised an unauthorized dominion over the ShopLink software, to the alteration of its condition or to the exclusion of the plaintiff's rights.

204.    As a result of Tatintsian's wrongful conduct, development of ShopLink's product has stopped and the company is unable to raise money from investors.

205.    As a result of Tatintsian's wrongful conduct, ShopLink has suffered damages in an amount to be determined at trial.  In light of the gross, wanton, willful and/or morally culpable conduct alleged herein, these damages include, but are not limited to, punitive damages.

## ELEVENTH COUNTERCLAIM AGAINST GARY TATINTSIAN
### (Breach of Fiduciary Duty Perpetrated via Civil Conspiracy)

206.    ShopLink realleges each of the foregoing allegations as if set forth fully herein.

207.    As described elsewhere herein, Khmaladze and Zubchevich breached their fiduciary duties to ShopLink and Tatintsian aided and abetted those breaches of fiduciary duty.

208.    Tatintsian, Khmaladze, and Zubchevich agreed to carry out a scheme to convert ShopLink's technology for their own benefit.  They agreed to effect this scheme by depriving ShopLink of its access to and interest in ShopLink's technology in order to place it and ShopLink's business model in the control of Tatintsian, Khmaladze, and Zubchevich.

209.    Tatintsian committed an overt act in furtherance of this agreement by, among other things, upon information and belief: disclosing ShopLink's confidential bank statements to Khmaladze and others in violation of the express terms of an agreement between Tatintsian and ShopLink, directing Khmaladze to disable ShopLink's CEO's access to ShopLink's proprietary source code and his IT Adapter email account, and offering Khmaladze employment at an increased salary if he agreed to sever ties with ShopLink and convert ShopLink's technology.

210.    Khmaladze committed an overt act in furtherance of this agreement by, among other things, disabling ShopLink's CEO's access to ShopLink's proprietary source code and his IT Adapter email account and refusing to pay IT Adapter employees or pay third-party expenses necessary for ShopLink to continue to develop their product.

211.    Zubchevich committed an overt act in furtherance of this agreement by, among other things, emailing Khmaladze to malign Vorotyntsev, ShopLink and their affiliates and propose organizing a new business under Tatintsian's direction and offering Khmaladze a job under Tatintsian at an increased salary if he agreed to sever ties with ShopLink and convert its technology.

212.    Tatintsian, Khmaladze, and Zubchevich individually, and in conspiracy with each other, intentionally participated in the furtherance of this plan, as detailed above.

213.    As a result of Tatintsian's wrongful conduct, ShopLink has suffered damages in an amount to be determined at trial.  In light of the gross, wanton, willful and/or morally culpable conduct alleged herein, these damages include, but are not limited to, punitive damages.

## FIRST CROSS-CLAIM AGAINST YOUNIS ZUBCHEVICH[3]
### (Tortious Interference with ShopLink's Existing Contractual Relations with Khmaladze)

214.    ShopLink realleges each of the foregoing allegations as if set forth fully herein.

215.    ShopLink and Khmaladze agreed that he would develop the ShopLink software and, as part of his compensation package for that work, ShopLink would make cash payments to Khmaladze as necessary to meet his and his family's financial needs.

216.    Pursuant to that agreement, from in or about May 2013 through in or about August 2016, ShopLink paid over $300,000 to Khmaladze and to his company, ITAdapter Corporation, Inc., in order to compensate Khmaladze for the work he promised to perform.

217.    Khmaladze breached this contract by, among other things, failing to deliver a fully developed ShopLink product and, instead, converting the code for purposes of his wrongful alliance with Tatintsian and refusing to acknowledge ShopLink's right to or interest in the ShopLink software.

218.    Zubchevich (in concert with Tatintsian) intentionally procured Khmaladze's breach by, among other things, repeatedly contacting him to make false statements about ShopLink's CEO, Vorotyntsev.

219.    Zubchevich also (in concert with Tatintsian), upon information and belief, arranged significant cash payments to Khmaladze in exchange for his agreement to cease all work on the ShopLink software and to continue the development thereof under the auspices of a business formed by Tatintsian and Zubchevich.

---

[3]    As noted above, ShopLink has not, in this pleading, amended its cross-claims against Cross-claim Defendant.    Accordingly, these cross-claims are the same as those asserted in ShopLink's initial pleading (ECF Doc. No. 55).  ShopLink reserves the right, should it become necessary, to amend these cross-claims in the future.

220.    As a result of Zubchevich's wrongful conduct, development of ShopLink's product has stopped and the company is unable to raise money from investors.

221.    As a result of Zubchevich's wrongful conduct, ShopLink has suffered damages in an amount to be determined at trial.  In light of the gross, wanton, willful and/or morally culpable conduct alleged herein, these damages include, but are not limited to, punitive damages.

### SECOND CROSS-CLAIM AGAINST YOUNIS ZUBCHEVICH
**(Tortious Interference with ShopLink's Prospective Business Relations with Khmaladze)**

222.    ShopLink realleges each of the foregoing allegations as if set forth fully herein.

223.    ShopLink hereby alleges a claim for tortious interference with prospective business relations, including in the alternative in the event a finder of fact determines that ShopLink and Khmaladze had no enforceable contract.

224.    ShopLink and Khmaladze had consistent and sustained business dealings since 2013 pursuant to which ShopLink paid Khmaladze over $300,000 in exchange for his work developing software for ShopLink.

225.    Zubchevich (in concert with Tatintsian) intentionally interfered with those business relations by inducing Khmaladze to end them.

226.    Zubchevich (in concert with Tatintsian) did this by, among other things, repeatedly contacting Khmaladze to make false statements about ShopLink's CEO, Vorotyntsev.

227.    Zubchevich also (in concert with Tatintsian), upon information and belief, arranged significant cash payments to Khmaladze in exchange for his agreement to cease all work on the ShopLink software and to continue the development thereof under the auspices of a business formed by Tatintsian and Zubchevich.

228.    Zubchevich (in concert with Tatintsian) acted solely for the purpose of injuring ShopLink and its CEO and used dishonest, unfair and improper means to do so.

229.    As a result of Zubchevich's wrongful conduct, development of ShopLink's product has stopped and the company is unable to raise money from investors.

230.    As a result of Zubchevich's wrongful conduct, ShopLink has suffered damages in an amount to be determined at trial.  In light of the gross, wanton, willful and/or morally culpable conduct alleged herein, these damages include, but are not limited to, punitive damages.

### THIRD CROSS-CLAIM AGAINST YOUNIS ZUBCHEVICH
**(Tortious Interference with ShopLink's Prospective Business Relations with Investors)**

231.    ShopLink realleges each of the foregoing allegations as if set forth fully herein.

232.    ShopLink has business relations with several investors from whom the company has raised money to develop the ShopLink software and related projects.

233.    Zubchevich (in concert with Tatintsian) has intentionally interfered with those business relations by, upon information and belief, harassing certain of those investors and making false statements to them about ShopLink and its CEO.

234.    Upon information and belief, Zubchevich (in concert with Tatintsian) has falsely told one or more investors that ShopLink is a "fraud."

235.    Zubchevich (in concert with Tatintsian) acted with the wrongful purpose of destroying ShopLink's relationship with these investors.

236.    Zubchevich (in concert with Tatintsian) acted solely for the purpose of injuring ShopLink and its CEO and used dishonest, unfair and improper means to do so.

237.    As a result of Zubchevich's wrongful conduct, development of ShopLink's product has stopped and the company is unable to raise money from investors.

238.    As a result of Zubchevich's wrongful conduct, ShopLink has suffered damages in an amount to be determined at trial.  In light of the gross, wanton, willful and/or morally culpable conduct alleged herein, these damages include, but are not limited to, punitive damages.

**FOURTH CROSS-CLAIM AGAINST YOUNIS ZUBCHEVICH**
**(Breach of Contract / Duty of Good Faith and Fair Dealing)**

239.    ShopLink realleges each of the foregoing allegations as if set forth fully herein.

240.    ShopLink engaged Zubchevich as a business advisor and to create corporate governance policies and procedures.

241.    Pursuant to this agreement, ShopLink paid at least $67,000 to Zubchevich and his company, Diabetica Research Solutions, Inc., in order to compensate Zubchevich for the work he promised to perform for ShopLink and its affiliates.

242.    Zubchevich breached this agreement by failing to create corporate governance policies and procedures.  He also breached his implied duty of good faith and fair dealing to ShopLink by, as per various acts described herein, working in a manner adverse to ShopLink and its interests.

243.    Zubchevich has acted unreasonably, in bad faith and for his own gain, while purporting to act in accordance with ordinary, business dealings.

244.    Zubchevich's wrongful conduct, premised on his bad faith and aggressive tactics aimed at destroying ShopLink, was willful, intentional and in deliberate disregard of the interests of ShopLink.  It was egregiously dishonest, not only with respect to ShopLink, but also to other investors to whom Zubchevich has falsely and knowingly maligned ShopLink and its CEO.

245.    As a result of Zubchevich's wrongful conduct, ShopLink has suffered damages in an amount to be determined at trial.  In light of the gross, wanton, willful and/or morally culpable conduct alleged herein, these damages include, but are not limited to, punitive damages.

## FIFTH CROSS-CLAIM AGAINST YOUNIS ZUBCHEVICH
### (Aiding and Abetting Khmaladze's Breach of Fiduciary Duty)

246.    ShopLink realleges each of the foregoing allegations as if set forth fully herein.

247.    ShopLink hired Khmaladze because he had superior knowledge and expertise in system frameworks for Internet servers.  As such, Khmaladze owed fiduciary duties, including the duty of loyalty and care to ShopLink.

248.    Khmaladze owed fiduciary duties for the additional reason that ShopLink and Khmaladze had a special relationship of trust and confidence, pursuant to which ShopLink reposed confidence in Khmaladze.  In particular, ShopLink reasonably relied on Khmaladze's superior knowledge and expertise and disclosed confidential and proprietary information to Khmaladze with the expectation that Khmaladze would use that information solely to benefit ShopLink and its affiliates.

249.    Khmaladze breached his fiduciary duties to ShopLink by, among other things, blocking ShopLink's access to the Assembla code repository for ShopLink proprietary source code, converting ShopLink's intellectual property for his own benefit, disabling ShopLink's CEO's access to his IT Adapter email account, refusing to pay IT Adapter employees or pay third-party expenses for development and operation of the ShopLink product, abruptly severing ties with ShopLink without assisting in a professional transition of work, and upon information and belief, agreeing to assist Tatintsian and Zubchevich in their efforts to steal ShopLink's valuable business plan for themselves.

250.    Zubchevich knew that Khmaladze, by virtue of his position and his relationship with ShopLink, owed a fiduciary duty to ShopLink.

251.    Zubchevich knowingly participated and substantially assisted in Khmaladze's breaches of fiduciary duty to ShopLink by, upon information and belief, knowingly inducing him (in concert with Tatintsian) to engage in the acts described herein.

252.    As a result of Zubchevich's wrongful conduct, ShopLink has suffered damages in an amount to be determined at trial.  In light of the gross, wanton, willful and/or morally culpable conduct alleged herein, these damages include, but are not limited to, punitive damages.

### SIXTH CROSS-CLAIM AGAINST YOUNIS ZUBCHEVICH
**(Breach of Fiduciary Duty)**

253.    ShopLink realleges each of the foregoing allegations as if set forth fully herein.

254.    ShopLink hired Younis Zubchevich because he had superior knowledge and expertise in investment consulting and management.  As such, Zubchevich owed fiduciary duties, including the duty of loyalty and care to ShopLink.

255.    Zubchevich owed fiduciary duties, including the duty of loyalty and care to ShopLink, for the additional reason that he and ShopLink had a special relationship of trust and confidence, pursuant to which ShopLink reposed confidence in Zubchevich.  In particular, ShopLink, reasonably relying on Zubchevich's superior knowledge and expertise in investment consulting and management, disclosed confidential and proprietary information to Zubchevich with the expectation that Zubchevich would use that information to benefit ShopLink and its affiliates.

256.    Zubchevich breached his fiduciary duties to ShopLink by working in a manner adverse to ShopLink and its interests, including by, among other things, willfully neglecting to support ShopLink's operation by coordinating corporate governance and other practices and procedures at ShopLink and its affiliates and, instead, exploiting his special knowledge of ShopLink's operations to malign Vorotyntsev and ShopLink to investors, induce the departure of

ShopLink and AUM Code's Chief Technology Officer and conspire with Tatintsian to oust Vorotyntsev and usurp ShopLink's business plan and technology for a competing venture.

257.    As a direct and proximate result of Zubchevich's breaches of fiduciary duty, ShopLink has suffered damages in an amount to be proven at trial.  In light of the gross, wanton, willful and/or morally culpable conduct alleged herein, these damages include, but are not limited to, punitive damages.

### SEVENTH CROSS-CLAIM AGAINST YOUNIS ZUBCHEVICH
**(Unfair Competition Perpetrated via Civil Conspiracy)**

258.    ShopLink realleges each of the foregoing allegations as if set forth fully herein.

259.    The ShopLink concept, its business plan and its software are the result of the labor and expenditure of ShopLink and Vorotyntsev.

260.    In bad faith, Zubchevich (and Tatintsian) set into motion a scheme whereby Khmaladze would misappropriate ShopLink's software while Tatintsian took overt steps (including by commencing this litigation and funding Khmaladze's lawsuit against ShopLink) to destroy ShopLink's ability to continue doing business or launch the ShopLink product.

261.    Tatintsian, Zubchevich and Khmaladze acted in agreement in furtherance of this wrongful scheme, the purpose of which was to misappropriate the ShopLink concept, business plan and software and pursue it under the auspices of a new entity owned and/or operated by Tatintsian, Zubchevich and Khmaladze.

262.    In furtherance of this agreement, Zubchevich (and Tatintsian) engaged in the overt acts (in addition to those noted above) of arranging payment to Khmaladze and otherwise causing him to breach his duties to ShopLink and continue developing its product for Tatintsian and Zubchevich.

263.     Zubchevich, Tatintsian and Khmaladze individually, and in conspiracy with each other, intentionally participated in the furtherance of this plan, as detailed above.

264.     As a result of Zubchevich's wrongful conduct, development of ShopLink's product has stopped and the company is unable to raise money from investors.

265.     As a result of Zubchevich's wrongful conduct, ShopLink has suffered damages in an amount to be determined at trial.  In light of the gross, wanton, willful and/or morally culpable conduct alleged herein, these damages include, but are not limited to, punitive damages.

### EIGHTH CROSS-CLAIM AGAINST YOUNIS ZUBCHEVICH
**(Conversion Perpetrated via Civil Conspiracy)**

266.     ShopLink realleges each of the foregoing allegations as if set forth fully herein.

267.     Khmaladze wrongfully converted the ShopLink software by denying ShopLink access to it and otherwise using it in furtherance of his wrongful conspiracy with Tatintsian and Zubchevich to misappropriate the ShopLink concept, business plan and software and pursue it under the auspices of a new entity owned and/or operated by Tatintsian, Zubchevich and Khmaladze.

268.     In furtherance of this agreement, Zubchevich (and Tatintsian) engaged in the overt acts (in addition to those noted above) of arranging payment to Khmaladze and otherwise causing him to breach his duties to ShopLink and continue developing its product for Tatintsian and Zubchevich.

269.     Zubchevich, Tatintsian and Khmaladze individually, and in conspiracy with each other, intentionally participated in the furtherance of this plan, as detailed above.

270.     As a result of Zubchevich's wrongful conduct, development of ShopLink's product has stopped and the company is unable to raise money from investors.

271.    As a result of Zubchevich's wrongful conduct, ShopLink has suffered damages in an amount to be determined at trial.  In light of the gross, wanton, willful and/or morally culpable conduct alleged herein, these damages include, but are not limited to, punitive damages.

### NINTH CROSS-CLAIM AGAINST YOUNIS ZUBCHEVICH
### (Breach of Fiduciary Duty Perpetrated via Civil Conspiracy)

272.    ShopLink realleges each of the foregoing allegations as if set forth fully herein.

273.    As described elsewhere herein, Khmaladze and Zubchevich breached their fiduciary duties to ShopLink and Tatintsian aided and abetted those breaches of fiduciary duty.

274.    Khmaladze, Zubchevich, and Tatintsian agreed to carry out a scheme to convert ShopLink and AUM Code's technology for their own benefit.  They agreed to effect this scheme by depriving ShopLink's CEO of his access to and interest in ShopLink and AUM Code's technology in order to place ShopLink's technology and business model in the control of Khmaladze, Zubchevich, and Tatintsian.

275.    Khmaladze committed an overt act in furtherance of this agreement by, among other things, disabling ShopLink's CEO's access to ShopLink and AUM Code's proprietary source code and his IT Adapter email account and refusing to pay IT Adapter employees or pay third-party expenses necessary for ShopLink and AUM Code to continue to develop their product.

276.    Zubchevich committed an overt act in furtherance of this agreement by, among other things, emailing Khmaladze to malign Vorotyntsev, ShopLink, and their affiliates and to propose organizing ShopLink under Tatintsian's direction and offering Khmaladze employment under Tatintsian at an increased salary if he agreed to sever ties with ShopLink and convert its technology.

277.    Tatintsian committed an overt act in furtherance of this agreement by, among other things, upon information and belief: disclosing ShopLink's confidential bank statements to Khmaladze and others in violation of the express terms of an agreement between him and ShopLink and Vorotyntsev, directing Khmaladze to disable Vorotyntsev's access to ShopLink and AUM Code's proprietary source code and his IT Adapter email account, and offering Khmaladze employment at an increased salary if he agreed to sever ties with ShopLink and Vorotyntsev and convert ShopLink's technology.

278.    Zubchevich, Tatintsian and Khmaladze individually, and in conspiracy with each other, intentionally participated in the furtherance of this plan, as detailed above.

279.    As a result of Zubchevich's wrongful conduct, ShopLink has suffered damages in an amount to be determined at trial.  In light of the gross, wanton, willful and/or morally culpable conduct alleged herein, these damages include, but are not limited to, punitive damages.

## REQUEST FOR RELIEF

ShopLink, as Counterclaim-Plaintiff and Cross-claim-Plaintiff, respectfully requests that this Court enter judgment in its favor and against Counterclaim-Defendant Gary Tatintsian and Cross-claim-Defendant Younis Zubchevich, awarding ShopLink the following relief:

A.     Dismissing Plaintiff's Complaint in its entirety;

B.     On the Amended Counterclaims, actual, compensatory, consequential, and/or incidental monetary damages, including interest, in an amount to be determined at trial;

C.     On the Amended Counterclaims, exemplary, punitive, and/or multiple damages in an amount to be determined at trial;

D.     On the Cross-claims, actual, compensatory, consequential, and/or incidental monetary damages, including interest, in an amount to be determined at trial;

E.     On the Cross-claims, exemplary, punitive, and/or multiple damages in an amount to be determined at trial;

F.     Reasonable expenses, including attorneys' fees and costs; and

G.     Such other relief as the Court deems just and proper.

Dated: New York, New York
        January 31, 2017

POHL LLP

By:____/s/ David M. Pohl____
        David M. Pohl

345 Seventh Avenue, 21st Floor
New York, New York 10001
(212) 202-1614
(646) 924-3100 (fax)

*Attorneys for Nominal Defendant,
Counterclaim-Plaintiff and Cross-claim
Plaintiff, ShopLink, Inc.*