USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 8/6/2024

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------- X
                                  :

GARY TATINTSIAN,                     :
                                  :

                  Plaintiff,     :           1:16-cv-7203-GHW
                                  :

              -v –              :       MEMORANDUM OPINION &
                                  :               ORDER
MICHAIL VOROTYNTSEV, *et al.*,    :
                                  :

                Defendants.   :
                                  :
------------------------------------------------------------------- X

GREGORY H. WOODS, United States District Judge:

## I.      INTRODUCTION

      In 2015, Gary Tatintsian invested more than one million dollars in his old friend Michail

Vorotyntsev's e-commerce start-up, Shoplink.  Mr. Tatintsian believed that the funds would go

towards start-up expenses such as paying software developers, purchasing equipment, and

fundraising.  He was wrong.  Over the next few months, Mr. Vorotynsev and his wife blew through

hundreds of thousands of dollars of Mr. Tatintsian's investment at Barney's, Dean & Deluca, and

other luxury stores, paid off personal debts, and made large transfers to Ms. Vorotyntsev's personal

bank account.  Within a year, Mr. Tatintsian's investment was depleted, and Shoplink still did not

have a marketable product.

      When he discovered the fate of his money, Mr. Tatintsian brought this action for securities

fraud.  He also tipped off Dmitry Khmaladze, a programmer who was developing software for

Shoplink.  After Mr. Khmaladze severed ties with Mr. Vorotyntsev, he and Mr. Tatintsian formed a

new company, Agnicore, also focused on ecommerce.  Mr. Vorotyntsev countersued, claiming that

Mr. Tatintsian and Mr. Khmaladze had conspired to steal Shoplink's billion-dollar idea and

technology for Agnicore.  Mr. Tatintsian now moves for summary judgment on all of Mr.

Vorotyntsev's counterclaims, as well as his own securities fraud claim.

Mr. Tatintsian is not entitled to summary judgment on his securities claim, because he has failed to present evidence that he relied on Mr. Vorotyntsev's misrepresentations about Shoplink or that he suffered an economic loss. However, he is entitled to summary judgment on Defendants' counterclaims because he has established a lack of genuine dispute of material fact with respect to any of those claims. Therefore, summary judgment is DENIED in part and GRANTED in part.

## II.    BACKGROUND

### A. Shoplink Background

Shoplink, Inc. ("Shoplink") is a start-up e-commerce company founded to develop a product that would help companies and consumers market and sell goods through referral links on social media. Dkt. No. 402-17 ("Shoplink Answer and Counterclaims") ¶ 13. Mikhail Vorotyntsev is the Chief Executive Officer ("CEO") of Shoplink. *Id.* ¶ 1. He incorporated Shoplink in Delaware in 2012. Dkt. No. 402-4 (Shoplink's certificate of incorporation).

In early 2013, Mr. Khmaladze, a software developer and the sole owner of IT Adapter Inc., began working with Mr. Vorotyntsev to develop code for the Shoplink e-commerce platform (the "Shoplink Software"). Shoplink Answer and Counterclaims ¶¶ 48–50. Mr. Vorotyntsev and Mr. Khmaladze "set up a separate company . . . . IT Adapter LLC, which was supposed to be an operating entity for software development." Dkt. No. 402-1 ("Vorotyntsev Dep. I") 184:19–23. They did so in order to "decentralize the development process." *Id.* 184:24-185:4. Mr. Khmaladze was the CTO of IT Adapter LLC, but did not have an employment relationship with Shoplink. *Id.*

AUM Code LLC ("AUM Code") is the parent company of IT Adapter LLC. *Id.* 185:9–10. Mr. Vorotyntsev is AUM Code's CEO. Dkt. No. 402-6 ("APA"); Dkt. No. 402 ("Santillo Decl.") ¶ 7. He personally owns 60% of AUM Code, and Defendants have asserted in their unsworn pleadings that Mr. Khmaladze owns the other 40%. Shoplink Answer and Counterclaims ¶ 50. In a related action, the parties dispute whether Mr. Khmaladze owns 40% of AUM Code or whether Mr.

Vorotyntsev remains the sole owner. *See* 1:16-cv-8209, at Dkt. Nos. 264, 270. But there are no other owners of AUM Code.

In late 2013, Mr. Vorotyntsev and Mr. Khmaladze filed patent application No. 14/071,137 listing themselves as applicants and inventors. Dkt. No. 402-8 (the "Patent Application") at DK03202; Santillo Decl. ¶ 9. The application related to a "system and method for marketing and sales of products using customized ELinks to support viral marketing and sales." *Id.* at DK03212. In June 2016, the United States Patent Office (the "U.S.P.T.O") rejected the application because it "[did] not amount to significantly more than [an] abstract idea." Dkt. No. 402-9 at 4 (correspondence with U.S.P.T.O); Santillo Decl. ¶ 10. Later that year, Mr. Vorotyntsev and Mr. Khmaladze signed an agreement transferring ownership of the patent, which had already been rejected, to Shoplink. Dkt. No. 402-10 (assignment agreement); Santillo Decl. ¶ 11. Shoplink does not own any other patents. Dkt. No. 402-2 ("Vorotyntsev Dep. II") 37:7–38:18.

In April 2015, Mr. Khmaladze executed an agreement (the "Asset Purchase Agreement") on behalf of ITAdapter Corp. with Mr. Vorotyntsev and AUM Code agreeing to transfer ownership of IT Adapter Corp.'s technology to AUM Code. APA. Thereafter, Mr. Khmaladze signed an agreement effectuating the transfer. Dkt. No. 402-7 (IP assignment); Santillo Decl. ¶ 8.[1] Mr. Khmaladze and a team of software developers continued to develop the technology through 2016. 1:16-cv-8029, at Dkt. No. 267 ("Vorotyntsev Affidavit").

**B. Mr. Tatintsian's Investment in Shoplink**

In May 2015, Mr. Vorotyntsev reached out to his "old friend" Gary Tatintsian about an opportunity to invest in Shoplink. Vorotyntsev Affidavit at 9. In the following months, the two

---

[1] In the related action, the parties disputed whether the transfer of assets to AUM Code was effective, or whether the assets still belonged to ITAdapter Inc. *See* 1:16-cv-8209, at Dkt. Nos. 264, 270. The Court found that AUM Code had failed to transfer to Mr. Khmaladze the promised 40% membership interest in AUM Code that was consideration for the assets under the Asset Purchase Agreement. As a result of this failure of consideration, the Court granted rescission of the Asset Purchase Agreement, and held that those disputed assets belong to ITAdapter Inc.

negotiated the terms of the investment and prepared a written agreement (the "Subscription Agreement"). During the negotiations, Mr. Tatintsian asked for assurance that Shoplink owned the technology for the product. Dkt. No. 402-11 (recording); Dkt. No. 402-12 at 2, 3 (transcript and translation of recording); Dkt. No. 401 ("Tatintsian Decl.") ¶ 6.[2] Mr. Vorotyntsev responded that Shoplink "fully own[ed] the entire technology. . . . And including the patent, which had been assigned a year ago . . . to the company." Dkt. No. 402-11 (recording); Dkt. No. 402-12 at 3 (transcript and translation of recording); Tatintsian Decl. ¶ 6. Mr. Tatintsian also specifically requested that the Subscription Agreement reflect Shoplink's ownership of the technology. *Id.*

In April 2016, Mr. Tatintsian executed the Subscription Agreement, pursuant to which he agreed to purchase $1,098,200 worth of shares in Shoplink. Dkt. No. 402-5 ("Subscription Agreement"); Santillo Decl. ¶ 6. He later purchased an additional $250,000 worth of shares. Dkt. No. 402-14 ("Shoplink 2016 Bank Statement"); Santillo Decl. ¶ 15. The Subscription Agreement included a provision representing that Shoplink owned the pending patent application No. 14/071,137. Subscription Agreement § 4.8, SL000710. It also stated that "the net proceeds to [Shoplink] from the Shares will be used primarily for working capital to fund the Company's start-up operations, including the fees and expenses associated with the development of the Company's initial product offerings." *Id.* § 3(c)(ii), SL000706. Finally, the Subscription Agreement provided that "[Shoplink]'s limited resources have and will continue to be spent on startup activities, which will include but not be limited to software development, contacting potential customers, establishing several initial customers, partners and business alliances, exploring marketing contacts, performing

---

[2] Defendants assert that Plaintiff failed to produce this recording during discovery and have moved to quash it under Federal Rule of Civil Procedure 37. Dkt. No. 385. That motion is denied. Counsel for Plaintiff has produced uncontroverted evidence showing that Plaintiff produced the recording to Defendants' prior counsel and to Defendant individually on October 27, 2020, prior to the close of fact discovery. *See* Dkt. No. 389-1 (October 27, 2020 email from Plaintiff's counsel containing production); Dkt. No. 389-2 (October 28, 2020 email from Dropbox confirming that defense counsel downloaded the production, including the recording); Dkt. No. 389 ¶¶ 6–7 (declaration of Kristen Santillo).

certain research and development activities, executing, updating and monitoring its business plan and model, selecting professional advisors and consultants and seeking capital for the Company." *Id.* Ex. C at SL000732.

In May 2016, Mr. Tatintsian transferred nearly $900,000 from his bank account to Shoplink's. Shoplink 2016 Bank Statement at SL000213. The following month, he made an additional transfer of almost $200,000. *Id.* at SL000240. In August 2016, Mr. Tatintsian made a final transfer of $250,000 to Shoplink's account. *Id.* at SL000093.

### C. The Vorotyntsevs' Use of the Shoplink Bank Account

Unbeknownst to Mr. Tatintsian, Mr. Vorotyntsev and his wife, Elena Vorotyntsev, regularly used Shoplink's bank account for personal expenses. In fact, Mr. Vorotynsev did not have a personal bank account, and the Shoplink account was "the only account at [his] disposal." Vorotyntsev Dep. I 111:4–9.

This use of the Shoplink account began before the parties executed the Subscription Agreement. For instance, between January 2016 and the execution of the subscription agreement, the Vorotyntsevs spent and withdrew a total of $100,000 from the Shoplink account. Shoplink 2016 Bank Statement at SL000151, 164, 180. Many of the purchases were from luxury retailers such as Bloomingdales, Saks, or Bergdorf Goodman. *See, e.g.*, *id.* at SL000148–49, SL000160.

After Mr. Tatintsian transferred more than $1 million to Shoplink's account in May 2016, the Vorotyntsevs continued to use the account for personal expenses. Mr. Vorotyntsev used the Shoplink account to pay for "everything" in his personal life, including his rent, car, dry cleaning, groceries, and clothing. Vorotyntsev Dep. I 76:12-14; 95:11-96:2; 95:11-14; 95:11-96:2. In his opinion, "there was never a purchase that wasn't appropriate to buy from Shoplink's bank account." *Id.* 110:24-111:3.

Between May 2016 and August 2016, the Vorotyntsevs spent and withdrew hundreds of

thousands of dollars from Shoplink's account. *See* Shoplink 2016 Bank Statement at SL000217, SL000244, SL0000251-252, SL000097. Once again, many of the purchases were from luxury stores. For instance, in June 2016, the month after Mr. Tatintsian made his first transfer to the Shoplink bank account, the Vorotyntsevs spent and withdrew over $100,000, including purchases totaling tens of thousands of dollars from Barney's alone, as well as tens of thousands of dollars from other luxury clothing retailers, home goods stores, cigar stores, and grocery stores. *Id.* at SL000217, SL000244, SL0000251-252, SL000097. During this same period, IT Adapter LLC paid Mr. Khmaladze and the other developers working on his team a total of $53,700. Dkt. No. 402-15 (IT Adapter LLC bank statement) at SL000078, 82, 86, 90; Santillo Decl. ¶ 16.

Mr. Vorotyntsev also used the proceeds of Mr. Tatintsian's investment to pay his personal debts. Vorotyntsev Dep. I 179:6–182:13. He used Shoplink funds to repay a Pryor Cashman lawyer, Eric Hellige, for a $30,000 personal loan. Vorotyntsev Dep. I at 179:6-182:13. He also paid his landlord more than $4,000 in Shoplink funds to settle a dispute and an additional $12,000 in rent. Vorotyntsev Dep. I 181:25-182:3; 210:11-212:19. In addition, he transferred nearly $100,000 from the Shoplink account to Ms. Vorotyntsev's personal bank account, also for personal expenses. Vorotyntsev Dep. I 208-21:210:6. By August 2016, the Vorotyntsevs' spending had depleted Mr. Tatintsian's investment. *See* Shoplink 2016 Bank Statement at SL000091 (showing an August 2016 ending balance of $337,000, which included Mr. Tatintsian's August 2016 deposit of $250,000).

Nevertheless, Mr. Vorotyntsev did not report any of this spending as income on his tax returns. Vorotyntsev Dep. I 95:4-10. He considered those personal expenses to be "loans" from Shoplink. *Id.* 97:8-98:1. However, no such loans were recorded in Shoplink's business records. *Id.* Mr. Vorotyntsev also did not save any receipts from the purchases to document the expenses. *Id.* 76:5-14. Additionally, from the inception of the Shoplink bank account in 2012 until at least September 2016, Shoplink did not have an accountant. *Id.* 92:5-93:8; 94:19-95:3.

### D. Agnicore

In September 2016, Mr. Tatintsian, having discovered the Vorotyntsevs' depletion of his investment, emailed Mr. Khmaladze a Shoplink bank statement revealing the spending.  Dkt. No. 402-18 (emails between Mr. Tatintsian and Mr. Khmaladze); Santillo Decl. ¶ 19.  "[C]oncerned about potential criminality" and "concerned for [his] integrity," Mr. Khmaladze ended his business relationship with Mr. Vorotyntsev and blocked Mr. Vorotyntsev's access to "Assembla," the online repository that stored the software transferred pursuant to the Asset Purchase Agreement and the code subsequently developed by Mr. Khmaladze and the other developers (together, the "Shoplink Software").  Dkt. No. 402-3 ("Khmaladze Dep.") 330:21-331:7; 311:4-9.

In October 2016, Mr. Tatintsian and Mr. Khmaladze formed a company called Agnicore.  *Id.* 77:10-12.  Agnicore hired Younis Zubchevich as the Director of Investment.  Vorotyntsev Affidavit at 19.  According to Mr. Vorotyntsev, Agnicore would later "launch an identical Shoplink product" called "Monetize your Influence."  Khmaladze Dep 130:7–131:4; Vorotyntsev Affidavit at 19.  However, Plaintiff has provided uncontroverted testimony that Agnicore used a "different code base, different build, different framework, different . . . structure" than any of Shoplink's technology, and did not utilize any of the code transferred pursuant to the Asset Purchase Agreement or developed by Mr. Khmaladze and his team for Defendants.  Khmaladze Dep. 307:16–308:25.  In 2018, Agnicore folded.  *Id.* 72:5–25.  It had never publicly launched a product or generated revenue. *Id.* 261:7–14; 253:3–254:9.

### E. Procedural History

Mr. Tatintsian filed this lawsuit against Shoplink and the Vorotyntsevs in 2016.  He asserted a claim of securities fraud against Mr. Vorotyntsev as well as various derivative claims on behalf of Shoplink against all of the defendants, all arising out of the Vorotyntsevs alleged misuse of investor funds.  Dkt. No. 1 ("Complaint").  Defendants answered with a long list of counterclaims mostly

7

based on the theory that Mr. Tatintsian had improperly interfered with Shoplink and used Agnicore to compete with Shoplink. Dkt. No. 32, amended at Dkt. No. 187. Shortly thereafter, the Court enjoined the Vorotyntsevs from using the Shoplink bank account during the pendency of this action. Dkt. No. 13. The parties filed cross-motions to dismiss, and the Court dismissed all of Mr. Tatintsian's derivative claims against Shoplink and most of Defendants' counterclaims against Mr. Tatintsian. Dkt. Nos. 181, 183.

Mr. Tatintsian now moves for summary judgment on his remaining claim against Mr. Vorotyntsev and all of Defendants' counterclaims. Dkt. No. 375, refiled at Dkt. No. 399 ("Pl. Mem."). Shoplink and the Vorotyntsevs filed oppositions to Plaintiff's motion. Dkt. Nos. 382 ("Def's Opp.") and 395 ("Vorotyntsev Opp."). The matter was fully briefed when Plaintiff filed a reply. Dkt. No. 390.

First, Plaintiff argues he is entitled to summary judgment on his securities fraud claim because Mr. Vorotyntsev induced him to invest in Shoplink by knowingly making material representations about Shoplink's ownership of the Shoplink technology and about the use of Plaintiff's investment, and Plaintiff's shares in Shoplink have since become worthless. Then Plaintiff argues he entitled to summary judgment on Shoplink's conversion counterclaim because there is no evidence that Shoplink owned the software that is the subject of the counterclaim. Next, Plaintiff argues that he is entitled to summary judgment on Shoplink's tortious interference counterclaim because there is no competent evidence that Plaintiff contacted Defendants' investors or directed others to do so. Plaintiff then argues that he is entitled to summary judgment on Shoplink's fiduciary duty counterclaim because Mr. Khmaladze did not owe a fiduciary duty to Shoplink. Finally, Plaintiff argues that he is entitled to summary judgment on Shoplink's unfair competition counterclaim because there is no evidence that Plaintiff misappropriated any commercial advantage belonging to Shoplink. The Court will address Plaintiff's claim and each counterclaim in turn.

### III.    LEGAL STANDARD

#### A.  Summary Judgment

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) ("[S]ummary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" (quoting former Fed. R. Civ. P. 56(c))).  "[W]here a party relies on affidavits or deposition testimony to establish facts, the statements 'must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.'" *DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012) (quoting Fed. R. Civ. P. 56(c)(4)).  A genuine dispute exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," while a fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

The movant bears the initial burden of demonstrating "the absence of a genuine issue of material fact," and, if satisfied, the burden then shifts to the non-movant to present "evidence sufficient to satisfy every element of the claim." *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008) (citing *Celotex*, 477 U.S. at 323).  To defeat a motion for summary judgment, the non-movant "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting former Fed. R. Civ. P. 56(e)). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252.  Moreover, the non-movant "must do more than simply show that there is

some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586 (citations omitted), and she "may not rely on conclusory allegations or unsubstantiated speculation." *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (internal quotation marks and citation omitted).

In determining whether there exists a genuine dispute as to a material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)). The Court's job is not to "weigh the evidence or resolve issues of fact." *Lucente v. Int'l Bus. Machs. Corp.*, 310 F.3d 243, 254 (2d Cir. 2002) (citation omitted); *see also Hayes v. N.Y.C. Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996) ("In applying th[e] [summary judgment] standard, the court should not weigh evidence or assess the credibility of witnesses."). "Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." *Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citation omitted).

Further, because Mr. Vorotyntsev is proceeding in this action *pro se*, the Court "liberally" construes his opposition brief to "raise the strongest arguments that it suggests" regarding the securities fraud claim against him. *Nielsen v. Rabin*, 746 F.3d 58, 63 (2d Cir. 2014). However, in that brief, the Vorotyntsevs also make a number of arguments regarding Shoplink's counterclaims. The Court disregards those arguments, because while Mr. Vorotyntsev is representing himself with respect to Plaintiff's claim against him, he is not representing Shoplink, and the law does not permit him to do so. *See Rowland v. California Men's Colony*, 506 U.S. 194, 201–02 (1993) ("It has been the law for the better part of two centuries . . . that a corporation may appear in the federal courts only through licensed counsel."); *Pridgen v. Anresen*, 113 F.3d 391, 393 (2d Cir. 1997) ("[I]t is well established that a layperson may not represent a corporation.").

### B. Local Rule 56.1

Local Rule 56.1 requires that a party moving for summary judgment submit "a separate, short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried." Local R. 56.1(a). The party opposing summary judgment must submit "a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party." Local R. 56.1(b). The statements in the numbered paragraphs "will be deemed to be admitted for purposes of the motion unless specifically controverted." Local R. 56.1(c). "Each statement by the movant or opponent pursuant to Rule 56.1(a) and (b), including each statement controverting any statement of material fact, must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c)." Local R. 56.1(d). A Local Rule 56.1 statement "is not itself a vehicle for making factual assertions that are otherwise unsupported in the record." *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 74 (2d Cir. 2001). Moreover, in evaluating a motion for summary judgment, the Court "is not required to consider what the parties fail to point out in their Local Rule 56.1 statements . . . ." *Id.* at 73.

Defendants' Rule 56.1 statement fails to comply with Local Rule 56.1 in several respects.[3] First, it is replete with factual assertions "that are otherwise unsupported in the record." *Holtz*, 258 F.3d at 74. The Court need not, and has not, scoured the record for evidence that might support those assertions. *Id.* at 73; *see also Nicholas Acoustics & Specialty Co. v. H & M Const. Co.*, 695 F.2d 839, 846-47 (5th Cir. 1983) ("judges are not ferrets. …[P]ractical constraints on the time of a judge make it impossible for the judge to examine a record of even moderate size with such finitude as to

---

[3] As a *pro se* party, Mr. Vorotyntsev is entitled to "special solicitude," and the Court has afforded him such in analyzing this motion. *Tracy v. Freshwater*, 623 F.3d 90, 101 (2d Cir. 2010). But the Court notes that Mr. Vorotyntsev did not submit a Rule 56.1 Statement as required by Local Rule 56.1. "Pro se litigants are 'not excused from meeting the requirements of Local Rule 56.1.'" *Diggs v. Volpe*, 2013 WL 4015758, at *1 n.1 (S.D.N.Y. Aug. 7, 2013) (quoting *Wali v. One Source Co.*, 678 F. Supp. 2d 170, 178 (S.D.N.Y. 2009)). Therefore, where Mr. Vorotyntsev did not support the arguments in his brief with cites to record evidence, the Court did not search the record for evidence that supports those arguments. *See Holtz*, 258 F.3d at 74.

be both exhaustive and exhausting.").[4]

Second, rather than limiting their Rule 56.1 Statement to a "short and concise statement of the material facts," Local R. 56.1(b), Defendants have crammed their Rule 56.1 Statement with legal argument that does not appear in their brief. "Courts can and do ignore all portions of [a] Rule 56.1 Statement that contain [such] improper legal argument . . . ." *Bellis v. New York City Dep't of Educ.*, No. 21-CV-3282 (JMF), 2024 WL 1177232, at *2 (S.D.N.Y. Mar. 19, 2024) (alteration in the original) (quoting *Emanuel v. Griffin*, No. 13-CV-1806 JMF, 2015 WL 1379007, at *2 (S.D.N.Y. Mar. 25, 2015); *India Globalization Cap., Inc. v. Apogee Fin. Invs., Inc.*, No. 21-CV-1131 (VEC), 2023 WL 5003347, at *2 (S.D.N.Y. Aug. 4, 2023) (disregarding legal argument in a Rule 56.1 Statement); *Kesner v. Buhl*, 590 F. Supp. 3d 680, 691 (S.D.N.Y. 2022), *aff'd sub nom. Kesner v. Dow Jones & Co., Inc.*, No. 22-875, 2023 WL 4072929 (2d Cir. June 20, 2023) (setting aside the portions of a Rule 56.1 Statement that contained legal argument). However, the Court has considered the arguments that appear in Defendants' Rule 56.1 Statement, even though that is not an appropriate place for them.

Third, Defendants respond to many of the statements of fact in Plaintiff's Rule 56.1 Statement with denials that lack citations to evidentiary support or assertions that a document Plaintiff cites "speaks for itself." Dkt. No. 382 ("Def's Counterstatement") ¶ 10. The Court deems those facts undisputed, because Rule 56.1 requires that "each statement controverting any statement of material fact [] must be followed by citation to evidence . . . ." LR 56.1(d); *see, e.g., Tapia v. TWC Admin. LLC*, No. 17-CV-431 (KMK), 2018 WL 5016608, at *1 (S.D.N.Y. Oct. 16, 2018) ("[S]ome of Plaintiff's purported denials in the 56.1 statement are merely semantic disagreements with Defendant's language or recitations of other, often irrelevant facts. . . . These paragraphs do not

---

[4] Because the Court has considered only the evidence that the parties cite in their Rule 56.1 Statements, references in this opinion to evidence that a party "pointed to" or "presented" refer only to evidence cited in Rule 56.1 Statements, and not more generally to all of the evidence that a party has entered into the record but "fail[ed] to point out in [its] Local Rule 56.1 statement . . . ." *Holtz*, 258 F.3d at 73.

actually challenge the factual substance described in the relevant paragraphs in Defendant's 56.1 statement, and thus the Court will not consider them as creating disputes of fact.").

Finally, the Court observes that Defendants frequently attempt to support the factual assertions in their statement with citations to 15-page affidavit by Mr. Vorotyntsev, with no pin cites. The Court has considered the entirety of the affidavit in its analysis. However, where Defendants cite lengthier documents without including pin cites, the Court disregards those citations. *See Schwartz v. Allstate Ins. Co.*, No. 20-CV-79 (JMA) (JMW), 2023 WL 2742059, at *1 (E.D.N.Y. Mar. 31, 2023) (holding that a party "does not 'properly controvert' an asserted fact in a 56.1 statement by citing to an 'entire deposition transcript without a point cite.'") (quoting *Russell v. Aid to Developmentally Disabled, Inc.*, 753 F. App'x 9, 12–13 (2d Cir. 2018) (summary order)).

## IV.    DISCUSSION

### A. Securities Fraud Claim

Plaintiff is not entitled to summary judgment on his securities fraud claim, because he has failed to show that he relied on Mr. Vorotyntsev's alleged misrepresentations about Shoplink or that he suffered an economic loss due to that purchase. Plaintiff claims that Mr. Vorotyntsev violated Section 10(b) of the Exchange Act. The Securities and Exchange Commission ("SEC") rule implementing that section makes it unlawful to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b); *see also* 15 U.S.C. § 78j(b). To succeed on a Section 10(b) claim, a plaintiff must therefore show (1) a material misrepresentation or omission, (2) scienter, (3) a connection with the purchase or sale of a security, (4) reliance, (5) economic loss, and (6) loss causation. *Kleinman v. Elan Corp., plc*, 706 F.3d 145, 152 (2d Cir. 2013) (citing *Dura Pharms. v. Broudo*, 544 U.S. 336, 341-42, 125 S. Ct. 1627, 161 L. Ed. 2d 577, (2005)).

Plaintiff brings this claim based on two categories of misrepresentations: misrepresentations regarding the use of Mr. Tatintsian's investment (the "Investment Misrepresentations") and misrepresentations regarding Shoplink's ownership of technology and a patent (the "IP Misrepresentations"). The Court will address the elements with respect to both categories.

### i.     Investment Misrepresentations

### a)     Material Misrepresentation

With respect to the Investment Misrepresentations, Plaintiff has established the first element of the claim, a material misrepresentation. The Court analyzes the misrepresentation component of the element first, then considers materiality element.

It is undisputed that Mr. Vorotyntsev made multiple misrepresentations regarding the use of Mr. Tatintsian's investment. In the context of Rule 10(b), "[v]eracity of a statement or omission is measured not by its literal truth, but by its ability to accurately inform rather than mislead prospective buyers." *Kleinman v. Elan Corp.*, 706 F.3d 145, 153 (2d Cir. 2013) (quoting *Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 92 (2d Cir. 2010)). "Statements of literal truth 'can become, through their context and manner of presentation, devices which mislead investors.'" *Id.* (quoting *McMahan & Co. v. Wherehouse Entm't, Inc.*, 900 F.2d 576, 579 (2d Cir. 1990)). "Even a statement which is literally true, if susceptible to quite another interpretation by the reasonable investor[,] may properly be considered a material misrepresentation." *Id.* (quoting *McMahan & Co*, 900 F.2d at 579).

Mr. Vorotyntsev made misrepresentations in the Subscription Agreement. In that agreement, he represented that "the net proceeds to [Shoplink] from the Shares will be used primarily for working capital to fund the Company's start-up operations" and that "[Shoplink]'s limited resources have and will continue to be spent on startup activities, which will include but not be limited to software development, contacting potential customers, establishing several initial

customers, partners and business alliances, exploring marketing contacts, performing certain research and development activities, executing, updating and monitoring its business plan and model, selecting professional advisors and consultants and seeking capital for the Company." Subscription Agreement Ex. C at SL000706; SL000732. But in fact, the Vorotyntsevs would use nearly all of Mr. Tatintsian's investment on their personal expenses. Therefore, there is no genuine dispute of fact that a "reasonable investor" would be misled by the statements in the Subscription Agreement. *Kleinman*, 706 F.3d at 153.

Defendants make several unsupported attempts to create a dispute of fact as to whether the statements were misleading. First, they assert that Mr. Tatintsian "reviewed all of the bank statement [sic] prior to April 8th, 2016" and was thus aware of Mr. Vorotyntsev's use of the account for personal expenses. Def's Counterstatement ¶ 69. Defendants cite only to Mr. Vorotyntsev's affidavit, and no portion of the affidavit provides support for the assertion that Mr. Tatintsian reviewed Shoplink's bank statements before investing. A Rule 56.1 statement "is not itself a vehicle for making factual assertions that are otherwise unsupported in the record." *Holtz*, 258 F.3d at 74.

Second, Defendants point to Mr. Vorotyntsev's deposition testimony that his expenditures and withdrawals from the Shoplink account were merely "loans." Vorotyntsev Dep. I 97:8-98:1. But this argument too is unavailing. As an initial matter, no reasonable factfinder could conclude that the Vorotyntsevs' personal spending consisted of loans. No such loans were recorded in Shoplink's business records. *Id.* And Mr. Vorotyntsev did not save any receipts from the purchases to document the expenses. *Id.* 76:5-14. In any event, the use of the investment to fund "loans" to fund the purchase of luxury goods by Mr. Vorotyntsev and his wife would also render the Investment Representations misleading. A "reasonable investor" would not interpret the

Investment Representations to include this possibility. *Kleinman*, 706 F.3d at 153.[5]  Therefore, there is no genuine dispute of material fact that Mr. Vorotyntsev made misrepresentations regarding how Shoplink would use Plaintiff's investment.[6]

There is also no genuine dispute that those misrepresentations were material.  "An alleged misrepresentation is material if there is a substantial likelihood that a reasonable person would consider it important in deciding whether to buy or sell shares of stock." *Singh v. Cigna Corp.*, 918 F.3d 57, 63 (2d Cir. 2019) (internal quotation marks and citation omitted); *accord TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976).  A statement is material if it "significantly alter[s] the 'total mix' of information made available." *Id.* (internal quotation marks and citation omitted).  "Only if the established omissions [or misrepresentations] are so obviously important to an investor, that reasonable minds cannot differ on the question of materiality is the ultimate issue of materiality appropriately resolved as a matter of law by summary judgment." *TSC Indus.*, 426 U.S. at 450 (internal quotation marks omitted).

Here, "reasonable minds" could not differ:  Mr. Vorotyntsev's misrepresentations regarding the use of the investment were "so obviously important to an investor" that the Court can resolve this issue at summary judgment. *TSC Indus.*, 426 U.S. at 450.  Courts in this district have held at

---

[5] Defendants make several other arguments in their Rule 56.1 statement that warrant only a brief response.  They assert that "[n]one of Tatintsian's funds were used to settle personal debts," that "[a]ll the expenses for leases and rental space were legitimate business expenses and Tatintsian knew that, in every detail," that the luxury purchases using Shoplink funds "were not only approved by Tatintsian, but in fact, demanded" and "were a part of the business process and, as such, they show that nothing out of the ordinary took place; it was just a matter of regular business practices," and finally that Mr. Tatintsian approved of the "loans" to Mr. Vorotyntsev.  Def's Counterstatement ¶¶ 62, 64, 68, 75.  In support, they cite only to Mr. Vorotyntsev's affidavit, which does not support those assertions.  "[U]nsupported assertions [in a Local Rule 56.1 statement] must . . . be disregarded." *Suares v. Cityscape Tours, Inc.*, 603 F. App'x 16, 17 (2d Cir. 2015) (quoting *Giannullo v. City of New York*, 322 F.3d 139, 140 (2d Cir. 2003)).

[6] In their opposition, the Vorotyntsevs also assert that "there were business expenses, including hiring Khmaladze for technology (over $300,000) and hiring Zubchevich.  Vorotyntsev deserved a salary, too, as chief executive and creator of the business.  All of these salaries alone would eat up the $1,200,000 investment of plaintiff, over the three or so years that Shoplink was being developed intensely.  There were also other expenses for rent, computers, etc, in an expensive setting, NYC." Vorotyntsev Opp. at 2.  The Vorotyntsevs do not cite to any portion of the record to support these assertions in their brief, and they did not file a Rule 56.1 Statement.  To the extent that the Vorotyntsevs rely on Shoplink's 56.1 statement, it does not cite evidence that supports these assertions.

summary judgment that obfuscation of the true use of an investment, as Mr. Vorotyntsev did here, is material. *See SEC v. Research Automation Corp.*, 585 F.2d 31, 35-36 (2d Cir. 1978) (holding that the materiality of the fact that an investor's funds were diverted to the company's officers rather than used for company expenses was "beyond cavil") ("What reasonable investor would not wish to know that the money raised by stock sales would not be used for working capital but be diverted to RAC's officers?"); *Sec. & Exch. Comm'n v. Riel*, 282 F. Supp. 3d 499, 520 (N.D.N.Y. 2017) (No reasonable investor would have invested with REinvest had he or she known that REinvest did not invest in real estate or any other business, that Defendant Riel and REinvest did not intend to invest most of the funds for a return, or that Defendant Riel would use most of the investment funds for personal expenses."). Accordingly, Plaintiff has established the first element of the claim, a material misrepresentation.[7]

### b) Scienter

Plaintiff has also established the second element of the claim, scienter. "Plaintiffs may satisfy the scienter requirement by producing 'evidence of conscious misbehavior or recklessness.'" *Gould v. Winstar Communs., Inc.*, 692 F.3d 148, 158 (2d Cir. 2012) (quoting *ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009). "Scienter based on conscious misbehavior, in turn, requires a showing of deliberate illegal behavior, a standard met when it is clear that a scheme, viewed broadly, is necessarily going to injure." *Id.* (citations and quotations omitted). "Scienter based on recklessness may be demonstrated where a defendant has engaged in conduct that was 'highly unreasonable, representing an extreme departure from the

---

[7] Defendants also assert that Plaintiff's art gallery, and not Plaintiff himself, purchased the shares in Shoplink, and therefore "Tatintsian has no proprietary rights, is not a shareholder, is not an investor, and has no standing to file suit." Def's Opp. at 21. In support of this assertion, they point to Mr. Tatintsian's testimony, which establishes that Mr. Tatintsian wired the money for the Shoplink shares from his "art gallery bank account." Dkt. No. 384-1 78:13–24. Nevertheless, it is undisputed that Plaintiff signed the Subscription Agreement individually, and not on behalf of his art gallery, and that the title to the shares was in Plaintiff's name. *See* Subscription Agreement.

standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'" *Id.* at 158-59 (quoting *Rothman v. Gregor*, 220 F.3d 81, 90 (2d Cir. 2000) (quotation marks omitted)). "Recklessness may be established where a defendant 'failed to review or check information that [it] had a duty to monitor, or ignored obvious signs of fraud.'" *Id.* at 158 (quoting *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000)).

Here, Plaintiff has met his burden to establish scienter by evidence of "conscious misbehavior." *Gould.*, 692 F.3d at 158. It is undisputed that Mr. Vorotyntsev intended to use Mr. Tatintsian's investment for personal expenses at the time he entered into the Subscription Agreement. When he signed the Subscription Agreement, Mr. Vorotyntsev already had a practice of using the Shoplink account in this manner. *See, e.g.*, Shoplink 2016 Bank Statement at SL000151, 164, 180. He also did not have a personal bank account or any other account "at his disposal" from which he could otherwise cover his personal expenses in order to change this practice. Vorotyntsev Dep. I 111:4-9. Defendants do not contest that Mr. Vorotyntsev intended to use Plaintiff's investment in this manner at the time he signed the Subscription Agreement. Therefore, Plaintiff has adequately established this element of the claim.

### c)    Economic Loss and Reliance

However, Plaintiff is not entitled to summary judgment on this theory of his claim because he has not met his burden with respect to the remaining elements, economic loss[8] and reliance. First, as to economic loss, Plaintiff asserts that "Tatintsian's shares are now worthless, establishing economic loss." Pl. Mem at 19. However, he cites to no evidence to support this assertion, and therefore has not met his burden on this element. *See* Fed. R. Civ. P. 56(c) ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion.").

---

[8] Because Plaintiff has failed to meet his burden to establish economic loss, the Court will not analyze whether the final element, loss causation, is met.

The Court acknowledges that certain evidence in the record, to which Plaintiff has not cited to support his argument on this element of the claim, might give rise an inference that Plaintiff's shares declined in value. For instance, as described, Shoplink's bank statements show that the Vorotyntsevs depleted the balance of the Shoplink bank account after Mr. Tatintsian's investment, and Shoplink's only patent application was rejected by the U.S.P.T.O. *See* Dkt. No. 402-9 at 4; Santillo Decl. ¶ 10. However, Plaintiff is the moving party, and the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson*, 680 F.3d at 236. The moving party, not the Court, should identify the facts that support its position.

Second, as to reliance, "[r]eliance by the plaintiff upon the defendant's deceptive acts is an essential element of the § 10(b) private cause of action." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 810 (2011). "This is because proof of reliance ensures that there is a proper 'connection between a defendant's misrepresentation and a plaintiff's injury.'" *Id.* (*quoting Basic Inc. v. Levinson*, 485 U.S. 224, 243 (1988). "[A] plaintiff can demonstrate reliance . . . by showing that he was aware of a company's statement and engaged in a relevant transaction—e.g., purchasing common stock—based on that specific misrepresentation." *Id.* "In securities fraud cases, reliance is equated with 'transaction causation,' which requires the defendant's conduct be the 'but for' cause of the plaintiff's detrimental action." *Charney v. Wilkov*, 734 F. App'x 6, 9 (2d Cir. 2018) (summary order) (citing *Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171, 186 (2d Cir. 2001) (holding that in a securities fraud case, a plaintiff must establish that "but for the fraudulent statement or omission, the plaintiff would not have entered into the transaction"), *abrogated on other grounds by Assured Guar. (UK) Ltd. v. J.P. Morgan Inv. Mgmt. Inc.*, 939 N.Y.S.2d 274 (2011)).

Here, while Plaintiff has established that he was aware of the Investment Representations because he executed the Subscription Agreement in which they appeared, he has presented no

evidence that he purchased the shares in reliance on those representations.  Plaintiff argues that he need not establish reliance to prevail on his claim because "in cases involving primarily a failure to disclose, positive proof of reliance is not a prerequisite to recovery—instead, [a]ll that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of this decision."  Pl. Mem. at 14 (quoting *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153–54 (1972)).  But Plaintiff has not shown that the so-called "Affiliated Ute Presumption" applies.

In analyzing whether the Affiliated Ute Presumption applies, "the labels 'misrepresentation' and 'omission' 'are of little help' because in 'many instances, an omission to state a material fact relates back to an earlier statement, and if it is reasonable to think that that prior statement still stands, then the omission may also be termed a misrepresentation.'"  *Waggoner v. Barclays PLC*, 875 F.3d 79, 95 (2d Cir. 2017) (quoting *Wilson v. Comtech Telecommunications Corp.*, 648 F.2d 88, 95 (2d Cir. 1981)).  "The Affiliated Ute presumption does not apply to earlier misrepresentations made more misleading by subsequent omissions, or to what has been described as 'half-truths,' nor does it apply to misstatements whose only omission is the truth that the statement misrepresents."  *Waggoner*, 875 F.3d at 96.  It "is important is to understand the rationale for a presumption of causation in fact in cases like *Affiliated Ute*, in which no positive statements exist:  reliance as a practical matter is impossible to prove."  *Id.* at 95 (quoting *Wilson*, 648 F.2d at 93).

Here, the Investment Representations are affirmative misrepresentations on which it is possible for Plaintiff to prove he relied.  Mr. Vorotyntsev's "omission" that he would spend the investment on personal expenses, rather than legitimate start-up expenses, "is simply the inverse" of the argument that the Investment Misrepresentations were false.  *Id.* at 96 (holding that the Affiliated Ute Presumption did not apply where the defendant touted a program as keeping investors who used an alternate trading system safe, but omitted that the program did not apply to a

significant portion of investments made through that alternate trading system). Indeed, Plaintiff's complaint alleges that "[b]ased on [the Investment Representations], Tatintsian believed his investment in Shoplink was to be used for legitimate business purposes—to fund the operations of Shoplink's technology startup business and help launch its technology." Complaint ¶ 28. Accordingly, Plaintiff is required to establish reliance in order to prevail on his claim. Because he has not pointed to any evidence of his reliance on the Investment Misrepresentations, he has failed to meet his burden on summary judgment. Accordingly, Plaintiff is not entitled to summary judgment on his Rule 10(b) claim based on the Investment Misrepresentations.

### ii.   IP Misrepresentations

#### a)   Material Misrepresentation

Plaintiff also raises a theory of his Rule 10(b) claim based on representations regarding Shoplink's ownership of intellectual property. As to the first element of the claim, Plaintiff has established that Mr. Vorotyntsev made misrepresentations regarding the ownership of the No. 14/071,137 patent and the technology for the Shoplink concept. There is no genuine dispute of fact that Mr. Vorotyntsev told Plaintiff that Shoplink owned "the entire the technology . . . . [I]ncluding the patent" when in fact, AUM Code owned the code, and Mr. Vorotyntsev and Mr. Khmaladze owned the patent. Dkt. No. 402-11 (recording); Dkt. No. 402-12 at 2, 3 (transcript and translation of recording); Tatintsian Declaration ¶ 6. Mr. Vorotyntsev also represented in the Subscription Agreement that Shoplink owned the patent. Subscription Agreement § 4.8, SL000710. And there is no genuine dispute of fact that this was false, because Mr. Vorotyntsev and Mr. Khmaladze, and not Shoplink, owned the patent. Patent Application at DK03202. Shoplink did not gain ownership of the patent until 2016. Dkt. No. 402-10 (assignment agreement).

Mr. Vorotyntsev's misrepresentations about the ownership of the patent and technology were also so "obviously important to an investor . . . ." that the Court holds that there is no genuine

dispute of fact that they were material.  *TSC Indus.*, 426 U.S. at 450.  Shoplink did not own any other

patents, Vorotyntsev Dep. II 37:7-38:18, and as discussed, AUM code, and not Shoplink, owned the

Shoplink Software.  *See S.E.C. v. Coates*, 137 F. Supp. 2d 413, 427 (S.D.N.Y. 2001) (holding at

summary judgment that a misrepresentation that a company owned certain patents was material

"because the ownership of the . . . patents was one of CIL's principal assets").  Accordingly, Plaintiff

has satisfied the first element of the claim on this theory.

**b) Scienter**

As to the second element of the claim, there is also no genuine dispute that Mr. Vorotyntsev

made the IP Misrepresentations with scienter.  When he represented to Mr. Tatintsian that Shoplink

owned "all of the technology," Mr. Vorotyntsev had already personally signed the Asset Purchase

Agreement transferring ownership of the technology to AUM Code.  Asset Purchase Agreement.

Mr. Vorotyntsev himself owned 60% of AUM Code, and the Asset Purchase Agreement purported

to give Mr. Khmaladze 40% ownership of the company.  *Id.*  No reasonable factfinder could

conclude that Mr. Vorotyntsev, who was also the CEO of AUM Code, was unaware of those facts.

Indeed, in the related action, Defendants maintain that Mr. Khmaladze owns 40% of AUM Code

and Mr. Vorotyntsev owns 60%.  1:16-cv-8029, at Dkt. No. 270.  In addition, when he promised

Plaintiff that Shoplink owned patent No. 14/071,137, Mr. Vorotyntsev had filed the patent

application listing himself and Mr. Khmaladze—and not Shoplink—as the applicants and the

owners of the patent.  Patent Application at DK03202.

Defendants do not dispute that AUM Code owned the technology, that Mr. Vorotyntsev

and Mr. Khmaladze originally owned the patent, or that Mr. Vorotyntsev was aware of both of those

facts when he made the IP Representations.  Instead, they make two arguments in rebuttal for which

they have failed to present supportive evidence.  First, they assert that "Tatintsian knew about the

patent application, which had been assigned to ShopLink by both Vorotyntsev and Khmaladze in

April 2015." Def's Counterstatement ¶ 29.  In support of this assertion, they cite to Mr. Vorotyntsev's Affidavit, without a pin cite.  But no portion of the affidavit supports that patent No. 14/071,137 was assigned to Shoplink before Mr. Vorotyntsev made the IP Representations, or that Mr. Tatintsian knew that it had not been assigned.  The Court reiterates that a Local Rule 56.1 statement "is not itself a vehicle for making factual assertions that are otherwise unsupported in the record." *Holtz*, 258 F.3d at 74.

Second, Defendants repeatedly assert that AUM Code was a wholly owned subsidiary of Shoplink "vicariously and by proxy through Vorotyntsev." *See e.g.*, Def's Counterstatement ¶ 31. But they cite only Mr. Vorotyntsev's affidavit in support, which does not establish that Shoplink owned AUM Code.  In his affidavit, Mr. Vorotyntsev states that in 2013, he planned to "form Aum Code LLC, as a wholly owned subsidiary of Shoplink, to acquire all of Dmitriy's technology, and Dmitriy and Serge would each get 20% of Aum Code.  Dmitriy was also going to own options to buy ShopLink shares.  There would be a cross-licensing deal between Aum Code and ShopLink. Upon commercial launch of ShopLink, AumCode could be spun out in an equity swap cross licensing deal and Shoplink would issue 30% of its equity to Aum Code and would retain 10% of AumCode equity for ShopLink."  Vorotyntsev Affidavit at 6.

As an initial matter, the ownership structure Mr. Vorotyntsev described would not make AUM Code a "wholly owned subsidiary" of Shoplink, given that Shoplink would retain only 10% ownership.  In any event, there is no evidence to support an inference that his alleged plan ever came to fruition.  Mr. Vorotyntsev does not state in his affidavit, and Defendants point to no other evidence, that Mr. Vorotyntsev ultimately structured AUM Code in this way.  And there is significant evidence, in the form of Defendants' representations in their counterclaims in this case, that Mr. Vorotyntsev and Mr. Khmaladze, or Mr. Vorotyntsev only, owned AUM Code.  Shoplink Answer and Counterclaims ¶ 50.  Accordingly, there is no genuine dispute of fact that Shoplink did

not own AUM Code, and Defendants have not raised a genuine dispute of fact as to whether Mr. Vorotyntsev made misrepresentations about the ownership of the Shoplink technology.

### c) Economic Loss and Reliance

However, as with his other theory of the claim, Plaintiff is not entitled to summary judgment based on the Patent Misrepresentations because he has not met his burden with respect to the remaining elements, economic loss[9] and reliance. As discussed, Plaintiff points to no evidence about the value of Shoplink or the value of his shares that would establish that he suffered losses. Instead, he conclusorily argues that his shares are "worthless," without citing to supporting evidence. Pl. Mem at 19. In addition, Plaintiff does not present evidence that establishes a lack of any genuine dispute of material fact regarding reliance. While Plaintiff shows that he specifically requested that a representation regarding Shoplink's ownership of the patent be included in the Subscription Agreement, he does not present evidence that he would have declined to purchased shares in Shoplink "but for" that representation. *Charney*, 734 F. App'x at 9. That is insufficient to meet Plaintiff's burden. Accordingly, Plaintiff is not entitled to summary judgment based on either theory of securities fraud.

### B. Shoplink's Conversion Counterclaim

Plaintiff is entitled to summary judgment on Shoplink's counterclaim for conspiracy to commit conversion because Shoplink did not own the Shoplink Software. Under New York law, "[a]llegations of conspiracy are permitted only to connect the actions of separate defendants with an otherwise actionable tort." *Abacus Fed. Sav. Bank v. Lim*, 905 N.Y.S.2d 585, 588 (1st Dep't 2010) (quoting *Alexander & Alexander of N.Y. v Fritzen*, 68 N.Y.2d 968, 969 (1986)). Therefore, under New York Law, to establish a claim of civil conspiracy, the claimant "must demonstrate the primary tort,

---

[9] Because Plaintiff has failed to meet his burden to establish economic loss, the Court will not analyze whether the final element, loss causation, is met.

plus the following four elements:  (1) an agreement between two or more parties; (2) an overt act in furtherance of the agreement; (3) the parties' intentional participation in the furtherance of a plan or purpose; and (4) resulting damage or injury."  *Id.*

Here, the primary tort is conversion.  "A conversion takes place when someone, intentionally and without authority, assumes or exercises control over personal property belonging to someone else, interfering with that person's right of possession."  *Colavito v. N.Y. Organ Donor Network, Inc.*, 827 N.Y.S.2d 96, 100 (2006).  "The two elements of conversion are '(1) plaintiff's possessory right or interest in the property and (2) defendant's dominion over the property or interference with it, in derogation of plaintiff's rights.'"  *St. John's Univ., N.Y. v. Bolton*, 757 F. Supp. 2d 144, 178 (E.D.N.Y. 2010) (quoting *Colavito*, 827 N.Y.S.2d at 100).

As described above in Section IV(A)(ii)(b), Defendants have not presented evidence that the Shoplink Software belonged to Shoplink, which is fatal to the conversion component of Shoplink's conversion counterclaim and entitles Plaintiff to summary judgment on it.  There exists no genuine dispute of fact that the Shoplink Software was owned by AUM Code, and that Shoplink did not have any ownership interest in AUM Code.  Accordingly, there exists no genuine dispute of fact that Shoplink lacked a "possessory right or interest" in the code.  *St. John's Univ., N.Y.*, 757 F. Supp. 2d at 178.[10]

Defendants argue that in the alternative, Shoplink was a "beneficial owner" of the code, which Defendants define by citing to case law discussing beneficial ownership of property under the

---

[10] Defendants also argue that Shoplink "had been assigned all of Khmaladze's rights to the patent for the code."  Def. Opp. at 18.  In support of this assertion, they cite to evidence showing that ITAdapter Inc. transferred intellectual property to AUM Code through the Asset Purchase Agreement.  As described, Shoplink did not have any ownership of AUM Code.  And there is no evidence that Shoplink owned any patents to software.  The application for patent No. 14/071,137, which was assigned to Shoplink after being rejected by the U.S.P.T.O., was not for software, but for the idea for an ecommerce platform.  *See* Patent Application; Dkt. No. 402-9 at 4 (correspondence with U.S.P.T.O); Santillo Decl. ¶ 10.  It is undisputed that Shoplink did not own any patents other than the rejected patent No. 14/071,137.  Vorotyntsev Dep. II 37:7–38:18.

New York Tax code.  Def. Opp. at 19 (citing *Matter of CBS Corp. v. Tax Appeals Tribunal of State of N.Y.*, 867 N.Y.S.2d 270, 272 (3d Dep't 2008).  But this unsupported argument is insufficient to defeat summary judgment.  As an initial matter, Defendants do not cite to any part of the record to support the assertion that Shoplink was a "beneficial owner" of the Shoplink Software, as defined under the New York tax code or otherwise.  Furthermore, to sustain a claim for conversion, a claimant must show "must show legal ownership or an immediate superior right of possession to a specific identifiable thing."  *Halvatzis v. Perrone*, 156 N.Y.S.3d 428, 430 (2d Dep't 2021) (quoting *Nat'l Ctr. for Crisis Mgmt., Inc. v. Lerner*, 938 N.Y.S.2d 138, 138 (2d Dep't 2012)).  Defendants do not cite, and the Court is not aware, of any legal authority to support the theory that "beneficial ownership" under the New York tax code is sufficient to satisfy that standard.  Accordingly, Plaintiff is entitled to summary judgment on this counterclaim.

### C.  Shoplink's Tortious Interference Counterclaim

Plaintiff is entitled to summary judgment on Shoplink's tortious interference counterclaim because Defendants have failed to present competent evidence of any wrongful conduct by Tatintsian directed at Shoplink's investors.[11]  To establish tortious interference with business relations under New York law, "four conditions must be met:  (i) the plaintiff had business relations with a third party; (ii) the defendants interfered with those business relations; (iii) the defendants acted for a wrongful purpose or used dishonest, unfair, or improper means; and (iv) the defendants' acts injured the relationship."  *Scutti Enters. v. Park Place Entm't Corp.*, 322 F.3d 211, 215 (2d Cir. 2003) (quoting *Lombard v. Booz-Allen & Hamilton, Inc.*, 280 F.3d 209, 214 (2d Cir. 2002)).

Plaintiff is entitled to summary judgment because Defendants have presented no competent evidence that supports the second element of the counterclaim, interference.  Instead, Defendants

---

[11] The Court observes that the parties also make arguments regarding tortious interference with an existing contract. Because the Court previously dismissed this counterclaim, it limits its analysis on summary judgment to tortious interference with prospective business relations.  *See* Dkt. No. 182 at 10.

rely on inadmissible hearsay. First, Defendants point to Mr. Vorotyntsev's deposition testimony, in which Mr. Vorotyntsev asserted that Plaintiff spread "slander and lies about [Mr. Vorotyntsev] and the company" and told Shoplink investors that Plaintiff had "put a contract on [the Vorotyntsevs'] lives . . . ." Vorotyntsev Dep. I 132:14–20; 136:2–6. Mr. Vorotyntsev does not claim to have personally observed any of those alleged interactions, or even to have heard about them from a specific person who observed them. *See id.* 140:15–16 ("Ginsberg's wife had called my wife and told her that she should watch out for Gary."); 141:3–6 ("we began hearing from people close to these transactions that it was my Russian investor, Gary Tatintsian, and somebody working on his behalf . . . ."). Therefore, his testimony is inadmissible hearsay pursuant to Fed. R. Evid. 801 and 802; *see also DiStiso*, 691 F.3d at 230 (holding that "[w]here a non-movant relies on testimony to establish facts, the statements must be made on personal knowledge") (quotation omitted).[12]

Second, Defendants cite Mr. Vorotyntsev's affidavit. The affidavit states that in November 2017, "Tatintsian ha[d] someone call [a potential customer] and inform them that Shoplink's technology is in federal court and is being contested and that MV is investigated criminally by NYAG office," causing the customer to back out of a deal with Shoplink. Vorotyntsev Affidavit at 20.[13] But this statement is similarly not based on personal knowledge: Mr. Vorotyntsev does not

---

[12] Defendants also assert in their Rule 56.1 statement, in response to Plaintiff's assertion that there is no evidence that Mr. Tatintsian interfered with investors, that "Tatintsian confirms in his deposition that he tortuously [sic] interfered with Shoplink, including badgering Shoplink investors for years and a London hijacking of Vorotyntsev's assets, and confirming on the record that he had masterminded and directed the perpetrators actions against Vorotyntev [sic]." Def's Counterstatement ¶ 85. But Defendants do not identify any specific portion of Mr. Tatintsian's deposition. The Court declines to ferret through the entire 288-page document for evidence that supports their assertion. *See Schwartz v. Allstate Ins. Co.*, No. 20-CV-79 (JMA) (JMW), 2023 U.S. Dist. LEXIS 56755, at *3 (E.D.N.Y. Mar. 31, 2023) (holding that a party "does not 'properly controvert' an asserted fact in a 56.1 statement by citing to an 'entire deposition transcript without a point cite.'") (quoting *Russell v. Aid to Developmentally Disabled, Inc.*, 753 F. App'x 9, 12–13 (2d Cir. 2018) (summary judgment)).

[13] The affidavit also states that Plaintiff called another investor, Chris Woodrow, to "threaten[] him with litigation and slander[] Mikhail and then inform[ed] Woodrow that he, Tatintsian, took out a contract on Mikhail and his wife, and that both would be killed if they traveled back to Moscow." Vorotyntsev Affidavit at 20–21. Because the affidavit states that Chris Woodrow was a potential investor in a company called Moviecoin.com, and not in Shoplink, this allegation cannot serve as a basis for Shoplink's tortious interference counterclaim. Moreover, because it does not appear that Mr. Vorotyntsev had personal knowledge of the alleged phone call between Mr. Tatintsian and Mr. Woodrow, the Court must disregard this evidence. *See Santos*, 243 F.3d at 683

assert that he observed this alleged interaction between "someone" and the customer. Nor does he establish that he has personal knowledge that "someone" called the customer at Mr. Tatintsian's direction. Because "[h]earsay testimony that would not be admissible if testified to at the trial may not properly be set forth in [a Rule 56] affidavit," the Court disregards this evidence. *Santos v. Murdock*, 243 F.3d 681, 683 (2d Cir. 2001) (quoting *H. Sand & Co. v. Airtemp Corp.*, 934 F.2d 450, 454-55 (2d Cir. 1991)); *see also U.S. Small Bus. Admin. v. Feinsod*, No. 17-CV-3586(JS)(JMW), 2023 WL 6385814, at *3 (E.D.N.Y. Sept. 29, 2023) (striking a portion of an affidavit from the summary judgment record "because such matters do not appear to be based on [the affiant's] personal knowledge").

Finally, Defendants cite to several emails between Mr. Vorotyntsev and others. Dkt. Nos. 384-11–384-16. But those emails contain are inadmissible hearsay, and even if they were admissible, would not support the assertion that Mr. Tatintsian tortiously interfered with investors, vendors, or customers. The first email is from Justin Sher, who claims that "Younis and Gary have been calling [an investor's] wife" to tell her that "there is no code and no technology." Dkt. No. 384-11. This email itself is inadmissible hearsay, and it also contains multiple levels of inadmissible hearsay—the alleged statement by the investor to Mr. Sher, and the alleged statement by the investor's wife to the investor. Moreover, as Plaintiff argues, "any discussions that Tatintsian may have had with third parties regarding the fact that ShopLink did not own the technology that it was developing were also not a false criticism," because, as the Court has determined, there is no genuine dispute of fact that Shoplink did not own the Shoplink Software. Dkt. No. 391 ("Pl's Counterstatement") ¶ 127. The remaining cited emails are from Mr. Vorotyntsev to his lawyers relating secondhand reports of conversations between Mr. Zubchevich—not Mr. Tatintsian—and investors. Moreover, those emails are inadmissible hearsay. They also contain reports of conversations of which Mr. Vorotyntsev does not have personal knowledge, rendering them double hearsay. Accordingly, none

of the emails Defendants cite raise a genuine dispute of fact, and Plaintiff is entitled to Shoplink's tortious interference counterclaim.

### D. Shoplink's Aiding and Abetting Breach of Fiduciary Duty Counterclaim

Plaintiff is entitled to summary judgment on Shoplink's counterclaim for aiding and abetting Mr. Khmaladze's breach of fiduciary duty, because Mr. Khmaladze did not owe a fiduciary duty to Shoplink. "New York law dictates that the law of the state of incorporation governs an allegation of breach of fiduciary duty owed to a corporation." *Walton v. Morgan Stanley & Co., Inc.*, 623 F.2d 796, 798 n.3 (2d Cir. 1980). Defendant Shoplink is a Delaware corporation. "Under Delaware law, a claim of aiding and abetting a breach of fiduciary duty (sometimes referred to as a claim of civil conspiracy) requires: (1) the existence of a fiduciary relationship, (2) a breach of the fiduciary's duty, and (3) a knowing participation in that breach by the non-fiduciary." *BBS Norwalk One, Inc. v. Raccolta, Inc.*, 60 F. Supp. 2d 123, 129-30 (S.D.N.Y. 1999) (citing *In re Santa Fe Pacific Corp. Shareholder Litig.*, 669 A.2d 59, 72 (Del. 1995)), *aff'd*, 205 F.3d 1321 (2d Cir. 2000). Under Delaware law, "[a] fiduciary relationship is a situation where one person reposes special trust in another or where a special duty exists on the part of one person to protect the interests of another." *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 901 A.2d 106, 113 (Del. 2006) (citation omitted).

Defendants articulate two theories of a fiduciary relationship between Mr. Khmaladze and Shoplink. They have failed to present competent evidence that supports either one. First, Defendants assert that Mr. Khmaladze had a fiduciary duty to Shoplink arising from his employment relationship, specifically because he was "one of only two key people in the executive level of the corporate defendants (along with Mikhail Vortoynsev) [sic]." Def's Counterstatement ¶ 130. But Defendants have not presented evidence supporting the conclusion that Mr. Khmaladze was an executive of Shoplink or otherwise had an employment relationship with Shoplink. Mr. Vorotyntsev testified that Mr. Khmaladze's employment relationship was instead with IT Adapter LLC or AUM

Code. When asked if Shoplink had any employees at all, Mr. Vorotyntsev responded, "[n]o. Technically we had a CTO, but he wasn't working directly for ShopLink, so no." Vorotyntsev Dep. I 184:9–12. When he was then asked to confirm that Mr. Khmaladze was not working for Shoplink, Mr. Vorotyntsev stated that "he was [but] he used various code names in the development process for ShopLink, and we set up a separate company that—which was called IT Adapter, LLC, which was supposed to be an operating entity for software development." *Id.* 184:18-21. He then clarified that Mr. Khmaladze was the CTO of IT Adapter LLC. *Id.* 185:5-8.

Defendants do not argue that this testimony raises a dispute of fact as whether Mr. Khmaladze worked for Shoplink directly. Instead, they assert that Mr. Khmaladze was the CTO of Shoplink's "wholly owned subsidiary" AUM Code. Def's Counterstatement ¶ 130. But as discussed, Defendants have not presented any evidence that Shoplink owned any of AUM Code, let alone that it owned it in whole. Accordingly, Defendants have failed to raise a genuine dispute of fact as to whether Mr. Khmaladze owed a fiduciary duty to Shoplink by virtue of his employment relationship.

Second, Defendants assert that Mr. Khmaladze had a fiduciary duty to Shoplink arising from his control over development of the Shoplink Software and the "trust, reliance, and confidence" placed in him by Mr. Vorotyntsev to develop the code. Def. Opp. at 12. They argue that "Mikhail Vorotyntsev's reliance upon [Mr. Khmaladze] for developing the architecture and code for ShopLink and AUM Code LLC" and Mr. Khmaladze's "sole control over the source code" gave rise to a fiduciary duty to Shoplink. Def's Counterstatement ¶¶ 136–36. But Mr. Khmaladze could not have had a duty to "protect the interests," *Wal-Mart Stores*, 901 A.2d at 113, of Shoplink in the software, because as described above, Shoplink had no interest in the software at all. Defendants have not presented evidence that Shoplink owned any of the Shoplink Software or any of the entity that owned the software, or that Shoplink had any other rights to the software. Accordingly,

Defendants have not presented evidence that supports either of their theories that Mr. Khmaladze owed a fiduciary duty to Shoplink, and as a result, Plaintiff is entitled to summary judgment on this counterclaim.

### E.  Shoplink's Unfair Competition Counterclaim

Plaintiff is entitled to summary judgment on Shoplink's counterclaim for conspiracy to engage in unfair competition, because Defendants have not presented evidence that he misappropriated a confidential trade secret or idea or any other commercial advantage belonging to Shoplink.  In addition to the elements of civil conspiracy stated above, a claim for civil conspiracy to engage in unfair competition requires proof of the elements of unfair competition.  New York courts "have long recognized two theories of common-law unfair competition:  palming off and misappropriation." *ITC Ltd. v. Punchgini, Inc.*, 850 N.Y.S.2d 366 (2007).  As described below, Shoplink advances a number of theories of unfair competition, all based on misappropriation.  An unfair competition claim involving misappropriation requires the claimant to "establish that the [the other party]:  (1) misappropriated the [claimant's] labors, skills, expenditures, or good will; and (2) displayed some element of bad faith in doing so." *Apple Mortg. Corp. v. Barenblatt*, 162 F. Supp. 3d 270, 284 (S.D.N.Y. 2016) (citing *Barbagallo v. Marcum LLP*, 820 F. Supp. 2d 429, 446 (E.D.N.Y. 2011)); *see also Schroeder v. Pinterest Inc.*, 217 N.Y.S.3d 678, 693 (1st Dep't, 2015) (holding that a claim for unfair competition requires proof that "the defendant misappropriated the plaintiff's labor, skills, expenditures or good will, and displayed some element of bad faith in doing so").  "In this context, bad faith can be established by a showing of fraud, deception, or an abuse of a fiduciary or confidential relationship." *Id.*

Defendants articulate multiple theories of unfair competition.  They assert that Plaintiff unfairly competed with Shoplink by 1) misappropriating the Shoplink software, 2) misappropriating Shoplink's business model or product idea, and 3) poaching Mr. Khmaladze, Mr. Zubchevich, and

other developers that worked for Shoplink. The Court addresses each theory in turn.[14]

First, Plaintiff is entitled to summary judgment on Shoplink's theory of unfair competition based on the alleged misappropriation of the Shoplink Software, because Shoplink did not own the software. Under the Asset Purchase Agreement, AUM Code owned the Shoplink Software, and as described in Section III(A)(ii)(b), there is no genuine dispute of fact that Shoplink had no ownership of AUM Code. *See Big Vision Priv. Ltd. v. E.I. du Pont de Nemours & Co.*, 610 F. App'x 69, 70 (2d Cir. 2015) (summary order) (holding that a claim for unfair competition by misappropriation "will fail where a plaintiff cannot demonstrate the bad faith misappropriation of a commercial advantage which belonged . . . to him") (quotations omitted); *LoPresti v. Mass. Mut. Life Ins. Co.*, 820 N.Y.S.2d 275, 277 (2d Dep't 2006) (same).

Second, Plaintiff is entitled to summary judgment on Shoplink's theory based on misappropriation of its "e-commerce business model" and Agnicore's creation of "knock-off" platform, Def's Counterstatement ¶ 146, because Defendants have not presented evidence showing that the Shoplink business model or product was a confidential trade secret or idea. A claim for misappropriation of an idea requires: "(1) a legal relationship between the parties in the form of a fiduciary relationship, an express contract, implied contract, or quasi contract; and (2) a[] [misappropriated] idea that is novel and concrete." *Schroeder*, 17 N.Y.S.3d at 692. Similarly, "[t]o succeed on a claim for the misappropriation of trade secrets under New York law, a party must demonstrate: (1) that it possessed a trade secret, and (2) that the defendants used that trade secret in

---

[14] Defendants also conclusorily assert that Plaintiff misappropriated Shoplink's "brands, logos, trademarks and trade names, and trade secrets such as know-how." Def's Counterstatement ¶ 139. In support, they cite Mr. Vorotyntsev's affidavit, which does not identify any confidential "brands, logos, trademarks and trade names," or other trade secrets misappropriated by Plaintiff. Such "conclusory allegations" are insufficient to defeat a motion for summary judgment. *Fujitsu Ltd.*, 247 F.3d at 428; *see also Town & Country Linen Corp. v. Ingenious Designs LLC*, 556 F. Supp. 3d 222, 270 (S.D.N.Y. 2021) ("[S]pecificity is required before the court so that the defendant can defend himself adequately against claims of trade secret misappropriation and can divine the line between secret and non-secret information . . . .") (quoting *Sit-Up Ltd. v. IAC/InterActiveCorp.*, 2008 WL 463884, at *11 (S.D.N.Y. Feb. 20, 2008)) (citing *Next Communs., Inc. v. Viber Media, Inc.*, 2017 WL 4402540, at *4 (S.D.N.Y. Sept. 30, 2017) ("In order to survive summary judgment . . . the plaintiff must describe the secrets with greater precision; vague and indefinite illustrations will not suffice.")).

breach of an agreement, confidential relationship or duty, or as a result of discovery by improper means." *Faiveley Transport Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 117 (2d Cir. 2009) (quoting *N. Atl. Instruments, Inc. v. Haber*, 188 F.3d 38, 43–44 (2d Cir. 1999)).  Neither an idea misappropriation nor a trade secret misappropriation claim can "extend to material in the public domain." *Schroeder*, 17 N.Y.S.3d at 692.

Defendants have not presented evidence showing that Shoplink possessed a trade secret or confidential idea.  Defendants cite only Mr. Vorotyntsev's affidavit in support of this assertion.  No portion of the affidavit either describes Shoplink's business model or asserts that Shoplink's product idea was confidential.  *See Next Communs., Inc. v. Viber Media, Inc.*, 2017 WL 4402540, at *4 (S.D.N.Y. Sept. 30, 2017) ("In order to survive summary judgment . . . the plaintiff must describe the secrets with greater precision; vague and indefinite illustrations will not suffice.").  Accordingly, Plaintiff is entitled to summary judgment on this theory of the counterclaim.

Plaintiff is also entitled to summary judgment on Shoplink's theory based on the alleged poaching of Mr. Khmaladze, because Mr. Khmaladze was not Shoplink's employee.  As described, Defendants have not pointed to evidence that Mr. Khmaladze worked for Shoplink, nor that Shoplink had any ownership of AUM Code or IT Adapter LLC, the two entities with which Mr. Khmaladze had an employment relationship.  Because Shoplink therefore asserts its unfair competition counterclaim based on the alleged poaching of another company's employee, the claim must fail.  *Big Vision Priv. Ltd.*, 610 F. App'x at 70 (summary order) (holding that a claim for unfair competition "will fail where a [claimant] cannot demonstrate the bad faith misappropriation of a commercial advantage which belonged exclusively to him").

Finally, Plaintiff is entitled to Shoplink's theory based on Agnicore's hiring of the developers and Mr. Zubchevich, because Defendants have not presented evidence that supports the second element of the claim, that Plaintiff "displayed some element of bad faith" in hiring them.  *Apple*

*Mortg. Corp.*, 162 F. Supp. 3d at 284.  With respect to the developers, the affidavit cited by Defendants states that Agnicore "took the whole team" of developers to Agnicore, but provides no other details.  Vorotyntsev Affidavit at 19.  With respect to Mr. Zubchevich, the deposition testimony cited by Defendants does not show that Plaintiff poached Mr. Zubchevich from Shoplink, but rather that Agnicore hired him after he had already terminated his relationship with Defendants.  Khmaladze Dep. 221:15–25.  Defendants do not present any evidence, nor do they even argue, that Plaintiff acted in bad faith in the course of hiring any of those employees, as required to satisfy the second element of a claim for unfair competition.  *Apple Mortg. Corp.*, 162 F. Supp. 3d at 284.  Therefore, Plaintiff is entitled to summary judgment on all of Shoplink's theories of unfair competition.[15]

## V.    CONCLUSION

For these reasons, Plaintiff's motion for summary judgment is GRANTED in part and DENIED in part.  Summary judgment in is granted as to Defendants' counterclaims for conspiracy to commit conversion, tortious interference, aiding and abetting breach of fiduciary duty, and conspiracy to commit unfair competition.  Summary judgment is DENIED as to Plaintiff's claim for securities fraud.  The Clerk of Court is directed to terminate the motions pending at Dkt. Nos. 374, 385, and 398.

SO ORDERED.

Dated:  August 6, 2024

_____
GREGORY H. WOODS
United States District Judge

---

[15] Defendants also assert as a component of this theory that Mr. Zubchevich "d[u]g up dirt on Vorotyntsev[.]"  Def's Counterstatement ¶ 147.  But they cite no evidence that supports that assertion, let alone that supports that Mr. Tatintsian was in any way involved.  The Court reiterates that a Rule 56.1 statement "is not itself a vehicle for making factual assertions that are otherwise unsupported in the record."  *Holtz*, 258 F.3d at 74.