UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------X
GARY TATINTSIAN, et al.,
Plaintiff, Counterclaim-Defendant,

-against-                                          Case No. 1:16-cv-7203-GHW

MIKHAIL VOROTYNTSEV, et al.,
Defendants, Counterclaim-Plaintiff, :


---------------------------------------------X
DMITRIY KHMALADZE and IT ADAPTER
CORPORATION INC.,
Plaintiffs, Counterclaim-Defendants,

-against-                                          Case No. 1:16-cv-8029-GHW

MIKHAIL VOROTYNTSEV, et al.,
Defendants, Counterclaim-Plaintiffs. :
---------------------------------------------X

# Legal Brief Requesting Stay of Proceedings in Tatintsian v. Vorotyntsev and Khmaladze v. Vorotyntsev in Preparation for Rule 60(b) Filings

## I. Executive Summary

This brief is an addendum to the Motions, filed by Mikhail Vorotyntsev, pro se, and on behalf of Shopink et al., respectfully requests that the Honorable Gregory H. Woods stay all proceedings in the interconnected federal cases, Case No. 1:16-cv-7203-GHW (the "GT case") and Case No. 1:16-cv-8029-GHW (the "DK case"). This extraordinary relief is necessary to allow for the comprehensive preparation and adjudication of motions for relief from judgment pursuant to Federal Rule of Civil Procedure 60(b) in both matters.

Newly discovered and scientifically verifiable evidence demonstrates a systematic and pervasive "fraud on the court" orchestrated by Gary Tatintsian ("GT"), Younis Zubchevich ("YZ"), and Dmitriy Khmaladze ("DK"). This fraud includes, but is not limited to, perjured sworn statements, intellectual property theft, and deliberate obstruction of justice, which has corrupted the judicial process across both

cases and tainted prior rulings. The integrity of the federal judiciary and the fundamental principles of due process demand immediate intervention to prevent further abuse of the Court's processes and to ensure that justice is rendered based on truth, not deception.

## II. Introduction: The Imperative for Judicial Integrity and Scientific Truth

### Context of the Interconnected Litigation

The two federal cases, 1:16-cv-7203-GHW (*Tatintsian v. Vorotyntsev*) and 1:16-cv-8029-GHW (*Khmaladze v. Vorotyntsev*), though distinct in their initial filings, are deeply intertwined. They arise from a common set of facts involving ShopLink Inc., its intellectual property, and the complex relationships between Mikhail Vorotyntsev ("MV"), Gary Tatintsian ("GT"), Younis Zubchevich ("YZ"), and Dmitriy Khmaladze ("DK").[1]
The Court's August 6, 2024, orders in both cases underscore this interconnectedness, as they address overlapping claims and counterclaims related to software ownership, contractual breaches, and alleged business interference.[1] For instance, the DK case involves claims and counterclaims concerning the Asset Purchase Agreement, the ownership of ShopLink software, and alleged breaches of fiduciary duty by DK, while the GT case addresses GT's securities fraud claims against MV and ShopLink's counterclaims against GT and DK, including those related to conversion and unfair competition of ShopLink's software and business ideas.[1] The factual findings and legal conclusions in one case inevitably bear upon the other, creating a scenario where a comprehensive understanding of the alleged fraudulent scheme is essential for just adjudication in both.

### The Foundational Role of Truth, Verifiable Facts, and Scientific Integrity in Federal Judicial Proceedings

The bedrock of any fair and impartial judicial system rests upon the veracity of facts presented and the reliability of information, particularly when such information purports to be scientific or technical in nature. Courts depend on the accuracy of sworn statements and the scientific validity of technical information to make informed decisions and apply the law correctly. This reliance forms a foundational principle of due process and ensures equitable adjudication. When a litigant intentionally introduces false sworn statements into the judicial record, especially concerning complex technical matters, fundamental factual errors are embedded into the very fabric of the proceedings.[1] This deliberate act directly impedes the court's capacity to understand the true nature of the dispute and to apply legal principles accurately. Such conduct transforms what might otherwise be a dispute between parties into a direct assault on the court's impartial function. The doctrine of "fraud on the court" exists precisely for these situations, where a party's knowing falsehoods undermine the court's ability to render a just decision and corrupt the judicial process itself.[1] This extends beyond a private wrong against an opposing party; it constitutes a public wrong against the judicial system, demanding robust intervention to protect the system's integrity and public confidence.

## Statement of Purpose

This brief aims to demonstrate, through a meticulously detailed and scientifically verified analysis, how the systematic fraudulent conduct of GT, YZ, and DK constitutes a "fraud on the court" that has fundamentally corrupted the judicial process in both the GT and DK cases. The compelling nature of this evidence necessitates an immediate stay of proceedings to allow for the comprehensive filing and adjudication of Rule 60(b) motions, thereby upholding the sanctity of federal judicial proceedings and public confidence in the courts.

# III. Factual Background: A Coordinated Scheme of Deception and Abuse of Process

## A. The Genesis of the Fraudulent Enterprise

### Gary Tatintsian's Hostile Takeover Mentality and Financial Threats

Initial interactions between Gary Tatintsian and Mikhail Vorotyntsev reveal GT's aggressive posture and attempts to leverage financial influence. Following his initial investment, GT allegedly made demands for corporate cleanup and offered to buy our all then existing promissory notes, from Shoplink investors, suggesting an early attempt to exert control over ShopLink's operations.[1] This behavior escalated significantly, culminating in explicit threats against MV and his family. GT's statements included threats to do "RICO" and a declaration that he was "going to destroy MV's Dreams".[1] These are not merely expressions of frustration but coercive tactics designed to intimidate and force compliance.

GT's financial leverage was explicitly articulated in his boast, "I can efford much more to sped to fighting u then you all!!".[1] This statement, coupled with his refusal to accept a buyback of his stock—declaring, "it's not gone happen. Not with me!!!"[1]—demonstrates a hostile takeover mentality and an unwillingness to pursue a peaceful resolution. This aggressive stance and refusal to disengage from his investment appear to be the direct catalyst for the coordinated scheme that unfolded. His explicit threats of financial and personal destruction signaled a deliberate intent to gain control, which then directly led to the strategic manipulation of key personnel like YZ and DK. This establishes a clear cause-and-effect chain, transforming what might have been a simple business dispute into a pre-meditated hostile takeover attempt.

### Younis Zubchevich's Role in Manipulation and Witness Tampering

Younis Zubchevich, initially MV's trusted business advisor, betrayed MV, self-confessed in his text message, by aligning with GT in the scheme.[1] YZ reportedly "sold Gary on the idea that he was the one who architected all of Shoplink's corporate affairs and knew all the details," suggesting to GT that this knowledge could provide an advantage if GT intended an "unfriendly move" against MV.[1] This positioned YZ as a crucial insider for GT's agenda.

YZ actively coordinated with GT to outline a "takeover plan" for DK, explicitly admitting that DK's

"contractual entitlement to 40% of Aum Code has not been perfected" and offering a more favorable deal directly within ShopLink to induce DK's cooperation.[1] YZ's commitment to this plan was unequivocal, as he explicitly stated, "I am all in on this plan of Gary's".[1] Beyond internal manipulation, YZ engaged in what appears to be systematic witness tampering. He actively solicited Ken Lanyon and other investors to join litigation against MV, spreading damaging narratives about MV, and suggesting a potential criminal investigation by the NYAG office.[1]

These actions had a direct ripple effect, undermining ShopLink's reputation, sabotaging potential deals (such as the Sundial deal, proven to have been derailed due to YZ's and GT's interference)[1], and creating an environment of legal harassment that severely crippled the company's operations. This demonstrates a systemic attack on ShopLink's viability, extending beyond individual disputes to a broader campaign aimed at dismantling ShopLink's business through legal and reputational warfare.

### Dmitriy Khmaladze's Initial Betrayal and Resistance to Collaboration

Dmitriy Khmaladze, a software developer, initially exhibited resistance to collaboration, insisting on using his own proprietary code and allegedly pushing out other developers like Serge Aleynikov.[1] He consistently pressured MV to abandon pilot projects and return to developing his "clusterware software".[1] Despite receiving over $300,000 in compensation and extensive personal benefits from ShopLink, including a new car, house remodeling, computer equipment, and paid vacations[1], DK "caved immediately" after being contacted by GT and YZ, as is directly established by evidence, provided by DK's own counsel. This capitulation led to him stealing code, deleting it, and blocking MV's access to critical company assets.[1]

DK's "betrayal" was not an independent act but appears to be a direct result of GT and YZ's coordinated inducement. This inducement leveraged his existing contractual vulnerabilities, such as the unperfected "40% of Aum Code" entitlement[1], and his expressed fear of GT's "Russian Mobster" reputation.[1] His subsequent actions—including code theft and blocking access—are a direct consequence of this inducement, forming a crucial link in the overall conspiracy.

## B. The Formation of Agnicore and Intellectual Property Theft

### Detailed Timeline of Agnicore LLC's Formation and Coordinated Actions

The formation of Agnicore LLC and the subsequent actions constitute a meticulously detailed sequence of events, suggesting a highly premeditated "smash-and-grab" operation rather than a reactive business pivot. The timeline of these coordinated actions is critical:

- **August 23, 2016:** Gary Tatintsian sends an explicit threat email to DK, YZ, and MV, indicating an aggressive intent to pursue control or assets.[1]
- **September 1, 2016:** Younis Zubchevich sends a coordination email to DK outlining GT's comprehensive takeover plan, explicitly admitting that DK's "contractual entitlement to 40% of Aum Code has not been perfected".[1]
- **September 6-9, 2016:** GT meets with DK in person in Ohio, confirming direct, in-person

- coordination between the two.[1]
- **September 8, 2016:** Agnicore LLC is formally established by Frank Hariton on behalf of GT, DK, and YZ. This formation occurred just three days before DK's resignation from ShopLink, highlighting the premeditated nature of the enterprise.[1]
- **September 11, 2016:** GT forwards YZ/FH's "legal analysis" to DK, providing instructions on how to withdraw from the Asset Purchase Agreement, accompanied by the message: "It's exactly we are talk about," which serves as direct evidence of prior coordination.[1]
- **September 11, 2016 (same day):** Dmitriy Khmaladze resigns from ShopLink at 3:14 PM. Immediately thereafter, at 4:46 PM, he blocks MV's access to critical code repositories (Assembla) and simultaneously takes all developers to Agnicore.[1]
- **September 14, 2016:** DK further compounds this obstruction by blocking MV's access to corporate email accounts, allegedly having "deleted most incriminating emails before his resignation".[1]
- **October 13, 2016:** DK files his perjured complaint, falsely claiming ownership of the "R7" software.[1]
- **December 1, 2016:** A patent theft filing occurs, fraudulently removing MV as the original inventor from ShopLink's patent applications and transferring the intellectual property to Agnicore.[1]

This meticulously detailed timeline reveals a highly premeditated "smash-and-grab" operation, rather than a reactive business pivot. The formation of Agnicore *before* DK's resignation and the swift, coordinated actions of blocking access, deleting emails, and filing fraudulent patent applications strongly suggest a "coordinated criminal enterprise" and a "pattern of racketeering activity".[1] This elevates the alleged conduct beyond mere civil fraud, indicating a profound abuse of legal and technical systems.

### Dmitriy Khmaladze's Fraudulent Patent Inventorship Theft

On December 1, 2016, Dmitriy Khmaladze filed a patent extension application on behalf of Agnicore LLC. This application fraudulently removed Mikhail Vorotyntsev as the original inventor from ShopLink's patent applications, specifically a continuation of application No. 14/071,137.[1] Concurrently, this filing transferred ShopLink's intellectual property rights to Agnicore.[1] This action constitutes "classic intellectual property misappropriation—the unlawful taking of another's intellectual property rights".[1] This theft occurred despite DK's clear knowledge that MV was the true original inventor, as evidenced by pre-existing patent applications listing MV as a sole inventor, filed in 2012, and DK as a co-inventor, filed in 2013 and 2014.[1] The patent inventorship theft directly undermines any legitimate claim DK or Agnicore might have to the underlying technology. It also implies that any subsequent commercialization efforts by Agnicore were predicated on stolen intellectual property, further tainting the entire scheme and its outcomes.

### Launch of "Identical ShopLink Product" (MYI) and Poaching of Customers/Developers

Following the intellectual property theft, Agnicore launched a product called "Monetize Your Influence" (MYI), which MV asserts was "identical" to a ShopLink product.[1] This launch occurred with ShopLink's only customer under contract at the time, Readerlink, with whom ShopLink's team, led by then-CTO

Khmaladze, was actively integrating.[1] Furthermore, Agnicore hired all of the developers who had previously worked for ShopLink, with DK blocking MV's access to the code and taking the entire team with him to the new entity.[1] The immediate launch of an "identical product" and the poaching of ShopLink's sole customer and development team demonstrate a deliberate strategy of economic warfare. This was designed to cripple ShopLink by usurping its market, technology, and human capital, representing a direct competitive attack built on the alleged fraud.

## C. Systematic Obstruction of Evidence

### Dmitriy Khmaladze's Deliberate Blocking of Code Repositories and Corporate Email Access

On September 11, 2016, the very day of his resignation, Dmitriy Khmaladze took deliberate steps to obstruct access to critical technical evidence. He blocked MV's access to code repositories (Assembla) at 4:46 PM and immediately took all developers to Agnicore.[1] This action effectively severed ShopLink's access to its own proprietary software and development team. Three days later, on September 14, 2016, DK further compounded this obstruction by blocking MV's access to corporate email accounts, allegedly having "deleted most incriminating emails before his resignation".[1]
DK's immediate and systematic obstruction of evidence directly impaired MV's ability to defend himself and uncover the full extent of the fraud earlier in the litigation. This deliberate act of concealment fundamentally undermined the adversarial process, tainting all subsequent proceedings by ensuring that the Court operated on an incomplete and potentially manipulated factual record. This constitutes a direct assault on due process.

### Allegations of Deletion of Incriminating Emails and Provision of Incomplete Code

MV alleges that DK "deleted most incriminating emails before his resignation".[1] This claim suggests a deliberate effort to eliminate evidence that could expose the fraudulent scheme. Furthermore, MV states that DK eventually turned over "incomplete code," which a new team later confirmed was unusable.[1] The alleged deletion of incriminating emails and the provision of incomplete code are not mere oversights; they represent a deliberate and calculated effort to conceal the extent of the fraudulent scheme and manipulate the evidentiary record presented to the Court. This is a direct act of bad faith intended to frustrate justice.

## D. The "Santillo Connection" and Alleged Abuse of Legal Process

### Evidence Suggesting GT's Counsel Was "Pre-positioned" to Represent Conspiracy Members

Younis Zubchevich's text message to Ken Lanyon, stating, "She will rep me if I'm served," and explicitly referring to "Gary's attorney," is presented as proof that GT's counsel was "pre-positioned to represent conspiracy members".[1] This suggests a deliberate perversion of the legal system itself. This implies that legal representation was not merely for legitimate defense but was integrated into a broader "criminal

enterprise"[1] to facilitate and shield illicit activities, raising grave ethical concerns for officers of the court. The pre-positioning of counsel to represent multiple individuals involved in a coordinated scheme suggests a unified legal strategy that extends beyond independent representation.

**Arguments Regarding Coordinated Legal Strategy and Alleged Abuse of Attorney-Client Privilege**

The documented evidence explicitly proves "coordinated legal strategy across multiple defendants" and "abuse of attorney-client privilege to shield conspiracy communications".[1] The alleged abuse of attorney-client privilege is a profound form of "fraud on the court" because it weaponizes a fundamental legal protection to conceal criminal conduct. This transforms a safeguard of legal rights into a tool for systemic deception, directly undermining the integrity of judicial proceedings. If attorney-client privilege is allegedly used to shield "conspiracy communications," it means the legal process itself is being subverted. This is not a private wrong between parties but a public wrong against the judicial system, as it prevents the court from accessing the full truth and rendering a just decision.

# IV. The Pillars of Perjury: Dmitriy Khmaladze's Direct Fraud on the Court

## A. The R7 Software Ownership Fraud

### Analysis of DK's False Sworn Statements in His Initial Complaint

In his complaint filed October 13, 2016, Dmitriy Khmaladze swore under penalty of perjury in Paragraph 29 that "In 2014, Dmitriy began work on a software program called 'R7,' which was based on Dmitriy's software architecture ideas," claiming it as his original creation.[1] This statement formed the very foundation for all of DK's claims for rescission, declaratory relief, and intellectual property ownership.[1] The core of DK's lawsuit relies on his ownership of "R7." His sworn complaint asserts this ownership as a foundational fact.

### Presentation of Contradictory Evidence from DK's Own Deposition Testimony and Internal ShopLink Documentation

During his deposition, DK admitted that "R7" was merely a codename for ShopLink technology, specifically acknowledging it as "the name of the code asset" for ShopLink source code residing in the company's repository. He further conceded that he created demonstrations and links for ShopLink using this "code base connected to R7".[1] This admission directly contradicts his sworn complaint.
Internal ShopLink documentation authored by DK himself provides irrefutable evidence of the software's true nature. The "September 4, 2015 ShopLink Developer Start Guide" explicitly describes "R7/ShopLink" as "proprietary (closed source) ShopLink code" built on the "ShopLink ecosystem." Further Project Overview Documentation, also generated by DK, reiterates that "R7/ShopLink is a proprietary (closed source) ShopLink code. It is where the business logic of Shop Link system resides".[1] These documents directly refute his claim of independent creation and ownership of "R7," showing R7

was an integral, proprietary component of ShopLink's technology.

### Elaboration on "Technical Falsehood" from an Insider with Presumed Authority

As the Chief Technology Officer, DK was the subject matter expert responsible for developing ShopLink's proprietary e-commerce platform and related software systems.[1] His misrepresentation, therefore, constitutes a deliberate technical falsehood from an insider with presumed authority on the subject, designed to mislead the court on a complex technical matter.[1] As CTO, DK's statements carried significant weight, and the court would naturally rely on his technical expertise. By presenting a false technical narrative, he intentionally misled the court on a foundational fact, making it impossible for the court to accurately assess the merits of his claims. This manipulation of technical reality directly corrupted the court's understanding of the core intellectual property at issue, which was foundational to DK's claims for rescission and intellectual property ownership.

## B. The Rule 56.1 Perjury

### Examination of DK's False Sworn Denial of Intellectual Property Misappropriation Evidence

In his Local Rule 56.1 Statement of Material Facts, filed on April 22, 2022, Dmitriy Khmaladze swore under penalty of perjury in Paragraph 69 that "No evidence has been produced by any party showing that Defendants' intellectual property was misappropriated by Khmaladze".[1] This statement was demonstrably false when made. As detailed in Section III.B, DK's own December 1, 2016, patent filing [1], which unilaterally removed MV as the original inventor and transferred ShopLink's intellectual property to Agnicore, constituted direct and irrefutable evidence of intellectual property misappropriation.[1] Patent theft is explicitly identified as the "quintessential example of intellectual property misappropriation" under federal law.[1]

### Discussion of the Impact of This Perjury on the Court's Summary Judgment Analysis

Courts rely heavily on the accuracy and good faith of Rule 56.1 statements to streamline and understand the evidentiary record for summary judgment determinations.[1] DK's perjury in this critical submission "likely influenced the Court's summary judgment analysis" by falsely suggesting an absence of evidence when the opposite was true, thereby directly corrupting the judicial process at a crucial, dispositive stage.[1] Rule 56.1 statements are designed to identify undisputed facts for summary judgment. By swearing that "no evidence has been produced" regarding IP misappropriation, DK was making a statement that was directly contradicted by his own prior actions. This is a deliberate misrepresentation to the court in a formal filing, intended to influence the court's decision-making process by concealing crucial evidence that would have undermined his claims and supported the defendants' counterclaims.

## C. The Settlement Confession

**Detailed Account of DK's Counsel's Admission of Meritless Claims During Settlement Negotiations**

On May 13, 2019, David Pohl, then counsel for ShopLink, relayed a settlement proposal from DK's counsel. As summarized by Pohl, the proposal stated: "Dmitriy is offering to give up his claims and walk away entirely." The proposal further clarified that "the contracts that ShopLink has with his entity (concerning rights to the software, etc.) would all remain in place. In other words, ShopLink would have all the rights that you believed it had at the time of entering those contracts - Dmitriy is no longer challenging the validity of any contracts".[1]

**Admission Directly Contradicts Core Allegations and Reveals the Fabricated Nature of DK's Lawsuit**

This admission is profoundly significant because it "directly contradicts every material allegation in DK's complaint".[1] DK's original complaint had sought rescission of all contracts based on claims that they were procured by fraud and that DK, not ShopLink, owned the disputed intellectual property.[1] The settlement offer, therefore, "constitutes an admission that DK's entire lawsuit was fabricated".[1] It reveals that DK "pursued claims he knew were meritless, hoping to extract settlement value through the cost and burden of litigation".[1] DK's initial complaint explicitly seeks rescission of contracts and claims IP ownership. The settlement offer, relayed by his counsel, states he is "giving up his claims" and "no longer challenging the validity of any contracts." This direct contradiction means the core premise of his lawsuit was abandoned. The only logical inference is that the lawsuit's purpose was not to genuinely litigate claims but to create leverage, forcing the defendants to settle due to the financial strain of prolonged litigation. This is a clear indicator of bad faith and abuse of the judicial system from the outset.

# V. Scientific Verification of Technical Fraud: Corrupting the Judicial Process Across Cases

## A. Application of Forensic Science Principles to Technical Misrepresentations

### Relevance of the Daubert Standard (FRE 702) and Lessons from Forensic Science Reform (NAS/PCAST Reports) in Evaluating DK's Technical Claims

Federal Rule of Evidence 702 governs the admissibility of expert testimony, establishing a critical gatekeeping role for judges to ensure reliability.[1] The 2023 amendments to FRE 702 further strengthen this duty, emphasizing that the proponent must establish admissibility by a preponderance of the evidence and empowering courts to exclude testimony with "analytical gaps".[1] Lessons from forensic science reform, particularly the 2009 National Academy of Sciences (NAS) report and the 2016 President's Council of Advisors on Science and Technology (PCAST) report, highlight the need for standardization, rigorous research, empirical validation, and quantifiable measures of uncertainty in technical and scientific disciplines.[1] These principles are directly applicable to evaluating the technical claims made by parties in litigation, especially when those claims are central to the dispute.

**Demonstration of How DK's Claims, Functioning as "Expert Testimony," Demonstrably Lacked Empirical Support and Were Contradicted by Objective Evidence**

Dmitriy Khmaladze's sworn statements regarding R7 software ownership and patent inventorship, particularly given his position as Chief Technology Officer, functioned as authoritative factual assertions or, in essence, "expert testimony" on technical matters central to the case.[1] However, DK's claims demonstrably lacked empirical support and were directly contradicted by objective evidence, including his own internal documents and deposition testimony.[1]

This pattern of conduct constitutes a form of technical fraud, where an individual with specialized knowledge deliberately misrepresents technical facts to mislead the court.[1] This is analogous to presenting scientifically invalid expert testimony. Framing DK's deliberate misrepresentations of technical facts as "technical fraud" and applying the rigorous scrutiny of forensic science principles (Daubert, NAS/PCAST) provides a robust legal argument.

This elevates the deception beyond simple perjury to a form of scientific misconduct that fundamentally corrupts the court's ability to discern truth in complex technical disputes, particularly where the court relies on such technical expertise. By applying these standards, it becomes evident that the court was not just misled on a fact, but on a *technical truth* by someone in a position of presumed technical authority, undermining the very basis of informed judicial decision-making in complex intellectual property matters.

## B. Interpretation of the August 6, 2024 Order in Case No. 1:16-cv-7203-GHW (Tatintsian v. Vorotyntsev)

The August 6, 2024, order in the GT case[1] reflects findings that, when viewed in light of the newly revealed evidence of systematic fraud, appear to have been directly influenced by the pervasive deception, R7 perjury, patent inventorship theft, and obstruction of code access. The judgments rendered, therefore, are likely tainted by this "fraud on the court." The direct contradictions between the Court's factual findings in the GT case and the newly revealed evidence of systematic fraud demonstrate that the prior judgments are profoundly compromised.

The opposing parties misled the Court on fundamental issues of intellectual property ownership, reliance, and the existence of actionable misconduct, not due to a lack of merit in the claims, but due to a deliberate and coordinated campaign of deception and obstruction of justice. By comparing the specific rulings in the GT Order with the detailed evidence of fraud, it becomes clear that the factual premises upon which the court based its decisions were compromised, necessitating a re-evaluation of the judgments.

The following table provides a comparative analysis of key court findings in the August 6, 2024 GT Order versus the newly revealed fraud evidence:

| Key Finding/Ruling from August 6, 2024 GT Order [1] | Relevant Factual Basis Cited by Court in GT Order [1] | Newly Revealed Fraud Evidence (Snippet IDs) | How Fraud Evidence Influenced/Tainted the Original Finding |
| --- | --- | --- | --- |

| | | | |
|---|---|---|---|
| **GT's Securities Fraud Claim Denied (Lack of Reliance)** | GT "failed to present evidence that he relied on Mr. Vorotyntsev's misrepresentations."[1] | GT's threats, hostile takeover mentality, and manipulation *before* investment.[1] GT's knowledge of MV's financial situation.[1] | The court's finding of non-reliance may have been influenced by the incomplete picture of GT's true intent. If GT's investment was part of a coercive scheme to gain control, his "reliance" might be re-evaluated not as genuine investor reliance but as a calculated step in a broader fraudulent enterprise, which was concealed from the court. |
| **Summary Judgment Granted for GT on Shoplink's Conversion Counterclaim** | Shoplink "did not own the Shoplink Software."[1] | DK's R7 perjury (claiming R7 as his own, when it was Shoplink's).[1] Patent inventorship theft (removing MV, transferring to Agnicore).[1] Obstruction of code access.[1] | The court's finding of Shoplink's non-ownership was based on a fraudulent narrative presented by DK (R7 perjury, patent inventorship theft) and compounded by his obstruction of evidence, directly tainting the judgment on this key intellectual property issue. The court was misled as to the true ownership of the core asset. |

| **Summary Judgment Granted for GT on Tortious Interference Counterclaim** | Defendants "failed to present competent evidence of any wrongful conduct by Tatintsian... evidence was inadmissible hearsay or not based on personal knowledge."[1] | YZ's witness tampering (Ken Lanyon texts).[1] GT's direct threats and instigation of NYAG investigation.[1] DK's systematic obstruction of evidence that prevented full factual development.[1] | The court's finding of "lack of competent evidence" was a direct *result* of the conspirators' efforts to conceal and obstruct (DK's actions) and to manipulate witnesses (YZ's actions), rather than a genuine absence of facts. The Court was deprived of critical, admissible evidence due to the fraudulent scheme. |
|---|---|---|---|
| **Summary Judgment Granted for GT on Aiding & Abetting Breach of Fiduciary Duty Counterclaim** | Mr. Khmaladze "did not owe a fiduciary duty to Shoplink."[1] | DK's initial betrayal[1] and YZ's coordination email outlining GT's takeover plan, admitting DK's "contractual entitlement to 40% of Aum Code has not been perfected".[1] | The court's finding that DK owed no fiduciary duty to Shoplink may have been influenced by the concealed scheme to undermine his original contractual obligations and shift allegiance. The depth of the conspiracy and inducement, now revealed, suggests a more complex relationship and potential duty that was obscured. |

| | | | |
|---|---|---|---|
| **Summary Judgment Granted for GT on Unfair Competition Counterclaim (Misappropriation of Business Model/Product Idea)** | Defendants "failed to present evidence that Shoplink's business model or product idea was a confidential trade secret or novel and concrete idea." [1] | MV Affidavit details GT & DK launching "identical Shoplink product" MYI with Readerlink.[1] YZ email discusses "Shoplink, its subsidiary companies, i.e. Readrs Inc.".[1] | The court's finding of no confidential trade secret may have been influenced by the lack of clear, admissible evidence due to the overall scheme's concealment. The "identical product" launch [1] and YZ's early knowledge of Shoplink's structure [1] suggest a misappropriation of concept that was not adequately proven due to the fraud. |

# VI. Legal Arguments for Staying Both Cases (1:16-cv-7203-GHW and 1:16-cv-8029-GHW)

## A. Preservation of Judicial Integrity

### The Court's Inherent Power and Obligation to Protect Its Proceedings from "Fraud on the Court" (Rule 60(d)(3))

Federal courts possess inherent authority to remedy "fraud on the court," which is fraud specifically directed at the judicial process itself, not merely fraud between parties.[1] This doctrine, originating from *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238 (1944) [2], allows courts to vacate judgments obtained through such egregious deception, regardless of typical time limitations.[1] The systematic perjury by DK (R7, Rule 56.1) and the alleged abuse of legal process (Santillo Connection) constitute a direct "defile[ment] of the court itself" [1], subverting the judicial machinery and preventing the court from performing its impartial task. If the court's processes are being used as instruments of fraud, continuing proceedings would only perpetuate the abuse. A stay provides a necessary pause to allow for the comprehensive Rule 60(b) motions to be filed and adjudicated, ensuring that any final outcomes are based on a truthful record, not a fabricated one. This is essential for the court to maintain its role as an impartial arbiter.

**Argument That the Systematic Corruption Constitutes "Extraordinary Circumstances" Warranting Relief Under Rule 60(b)(6)**

Federal Rule of Civil Procedure 60(b)(6) serves as a "grand reservoir of equitable power" to prevent injustice in "extraordinary circumstances" not covered by other provisions.[1] The coordinated perjury spanning multiple years, the alleged criminal enterprise using courts as instruments of fraud and extortion, and the resulting constitutional implications (violation of due process) represent precisely the type of "extraordinary circumstances" that demand immediate judicial relief.[1] The alleged "systematic corruption of federal court proceedings" [1] through coordinated perjury and a "criminal enterprise" [1] represents a direct and profound threat to the very foundation of the judicial system. A stay is the logical and necessary first step to halt the ongoing "perversion of the legal system" [1] and allow the Court to fully investigate the alleged "fraud on the court" without further tainted proceedings, thereby preserving public confidence and judicial integrity.

## B. Interconnectedness of the Fraudulent Scheme

### Demonstration That the Alleged "Criminal Enterprise" and "Pattern of Racketeering Activity" Span Both Cases

The detailed, coordinated timeline explicitly links the actions of GT, YZ, and DK, demonstrating that the alleged fraud is not confined to one case but is a pervasive "pattern of racketeering activity" [1] spanning both the GT and DK cases. For example, Agnicore LLC was formed by GT, DK, and YZ [1], followed by DK's resignation, code blocking, and patent theft—actions central to the DK case—while GT simultaneously initiated his securities fraud claim (GT case).[1] The Court's August 6, 2024, orders [1] show how the same underlying intellectual property ownership issues (e.g., ShopLink's software ownership) were litigated in both cases, and how the court's findings were based on the clearly evidenced fraudulent narrative. The coordinated timeline shows that the formation of Agnicore, the intellectual property theft, and the subsequent lawsuits (GT and DK cases) are all part of a single, overarching scheme.

### Unified Adjudication - Preventing Piecemeal Justice

The pervasive and interconnected nature of the fraudulent scheme, explicitly linking actions and impacts across both the GT and DK cases [1], necessitates a unified approach to adjudication. A stay allows for a holistic review of the Rule 60(b) motions, preventing piecemeal justice where findings in one case might contradict or be undermined by revelations in the other. This ensures judicial efficiency and consistency. Adjudicating Rule 60(b) motions separately could lead to conflicting findings or an incomplete understanding of the full scope of the fraud. A single, comprehensive adjudication after a stay ensures that all related judgments are reviewed in light of the complete fraudulent picture, promoting judicial economy and coherence.

## C. Facilitating Comprehensive Rule 60(b) Filings

**The Need for a Stay to Allow for Full Factual Development and Presentation of Newly Discovered Evidence**

The full extent of DK's systematic deception was not reasonably discoverable until very recently. This was due to DK's systematic obstruction of evidence, including blocking access to code repositories and corporate emails, and allegedly deleting incriminating emails.[1] Additionally, crucial admissions, such as the settlement confession, were protected by litigation privilege until their disclosure in court submissions.[1] The comprehensive evidentiary analysis, synthesizing the pattern of deception across complaints, discovery, and summary judgment submissions, was only completed between 2024 and 2025.[1] A stay is not merely a procedural convenience but a practical and legal necessity to allow for the full factual development and presentation of this newly discovered evidence of systematic fraud.

**Arguments for Rule 60(b)(3) Relief (Fraud, Misrepresentation, or Misconduct) and Rule 60(b)(6) Relief (Extraordinary Circumstances) in Both Cases**

The systematic perjury (R7 ownership fraud, patent inventorship theft, Rule 56.1 perjury) and misconduct by DK [1] meet the clear and convincing evidence standard for Rule 60(b)(3) relief, as this misconduct prevented the moving party from fully presenting its case.[1] The pervasive and coordinated nature of the fraud, indicative of a criminal enterprise, constitutes "extraordinary circumstances" warranting Rule 60(b)(6) relief.[1] The motion for Rule 60(b) relief is timely based on "newly discovered evidence" that only became apparent after extensive, recent analysis. The previous obstruction of evidence directly impaired the ability to discover this fraud earlier. Therefore, to ensure that the Rule 60(b) motions are comprehensive and that the court has all necessary information to make a just decision, a temporary halt to proceedings (a stay) is essential. This directly addresses the due process concerns raised by the alleged fraud.

## VII. Conclusion and Recommendations

The evidence presented unequivocally demonstrates a pervasive and egregious systematic fraud on the Court, meticulously orchestrated by Gary Tatintsian, Younis Zubchevich, and Dmitriy Khmaladze. This scheme, involving technical falsehoods, intellectual property theft, deliberate obstruction, and the perversion of legal processes, has corrupted the very foundation of justice in both Case No. 1:16-cv-7203-GHW and Case No. 1:16-cv-8029-GHW.
The prior judgments in these cases are demonstrably tainted by this fraud, having been rendered on a factual record that was incomplete and misleading due to the defendants' deliberate deception and concealment.
To preserve the sanctity of federal judicial proceedings, uphold the integrity of the Court, and ensure that justice is ultimately served based on truth and merit, the following actions are respectfully and urgently recommended:

- **Immediate Stay of Proceedings:** All proceedings in Case No. 1:16-cv-7203-GHW and Case No. 1:16-cv-8029-GHW must be immediately stayed to allow for the comprehensive filing and adjudication of Rule 60(b) motions in both cases.

- **Vacation of All Tainted Judgments:** Upon adjudication of the Rule 60(b) motions, all judgments obtained through this systematic fraud must be vacated.
- **Consideration of Criminal Referral:** The compelling evidence of perjury, intellectual property theft, and a coordinated criminal enterprise warrants immediate consideration for a criminal referral to the United States Attorney for appropriate prosecution.

The systematic nature of this misconduct threatens not only the parties to these proceedings but the integrity of the federal judicial system itself. Only immediate and comprehensive action can remedy the corruption that has infected these proceedings and prevent further harm.

Most respectfully submitted,

**MIKHAIL VOROTYNTSEV**
*Pro Se*
Founder, ShopLink Inc.

---

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing letter was served upon all parties of record via the Court's ECF system and/or by email on this 23rd day of June, 2025.

/s/ Mikhail Vorotyntsev
**MIKHAIL VOROTYNTSEV**