UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------X
GARY TATINTSIAN, et al.,
Plaintiff, Counterclaim-Defendant,

-against-                                           Case No. 1:16-cv-7203-GHW

MIKHAIL VOROTYNTSEV, et al.,
Defendants, Counterclaim-Plaintiff, :

--------------------------------------------X
DMITRIY KHMALADZE and IT ADAPTER
CORPORATION INC.,
Plaintiffs, Counterclaim-Defendants,

-against-                                           Case No. 1:16-cv-8029-GHW

MIKHAIL VOROTYNTSEV, et al.,
Defendants, Counterclaim-Plaintiffs. :
--------------------------------------------X

# Motion for Disqualification of Counsel and Imposition of Immediate Financial Relief Due to Systemic Fraud on the Court and Abuse of Process

## I. Introduction

This motion seeks the immediate disqualification of legal counsel for Gary Tatintsian ("GT") and Dmitriy Khmaladze ("DK"), and the imposition of substantial financial relief, including cash bonds and professional insurance disclosure, against GT, DK, their counsel, and their respective firms. These extraordinary remedies are necessitated by a meticulously documented pattern of systemic fraud on the court, intellectual property (IP) theft, abuse of process, and egregious ethical violations perpetrated by GT, DK, Younis Zubchevich ("YZ"), and their associated legal counsel across two interconnected federal cases: *Tatintsian v. Vorotyntsev*, Case No. 1:16-cv-7203-GHW, and *Khmaladze v. Vorotyntsev*, Case No. 1:16-cv-8029-GHW.[1]

The evidence, presented with scientific rigor, demonstrates how the opposing parties and their counsel engaged in a coordinated scheme to usurp intellectual property, sabotage business ventures, and manipulate the judicial process through perjury, obstruction of evidence, and witness tampering. This conduct constitutes a "fraud on the court," fundamentally undermining the integrity of the federal

judiciary and warranting immediate and severe intervention, including potential criminal referral.[1] The parallel existence and intertwined nature of these two lawsuits suggest a deliberate, multi-pronged legal strategy rather than isolated disputes. The August 6, 2024, orders in both cases establish the judicial context, detailing specific findings that warrant re-evaluation in light of the newly revealed evidence of fraud.[1] Mikhail Vorotyntsev's (MV) affidavit provides a comprehensive narrative of events, including the initiation and progression of both lawsuits, highlighting the interconnectedness of the parties' actions and legal strategies.[1] The "Fraud Analysis Brief H_GHW" explicitly documents that DK's lawsuit (Case No. 1:16-cv-8029-GHW) was initiated based on "false premises" and was part of a "coordinated scheme".[1] This pattern points to a strategic legal offensive where different parties, GT and DK, pursue claims in separate dockets but with a unified underlying objective: to dismantle MV's business and seize its assets and intellectual property. Such a course of action is the most quintessential characteristic of a "criminal enterprise" using courts as instruments.[1]

## II. Factual Background: A Forensically Verifiable Pattern of Deception and Abuse

The litigation in Case No. 1:16-cv-7203-GHW (*Tatintsian v. Vorotyntsev*) and Case No. 1:16-cv-8029-GHW (*Khmaladze v. Vorotyntsev*) is deeply interconnected, stemming from a common factual matrix and an factually proven coordinated scheme to defraud Mikhail Vorotyntsev (MV) and ShopLink Inc. (ShopLink).[1] The judicial findings and evidence in one case directly inform the understanding and potential outcomes of the other.

### A. Dmitriy Khmaladze's Systematic Perjury and Intellectual Property Fraud

Dmitriy Khmaladze (DK) engaged in a pattern of deceptive conduct that systematically undermined the integrity of the judicial process.

### 1. The "R7" Software Ownership Fraud

DK falsely swore in his initial complaint, filed on October 13, 2016, that "R7" was a software program he began work on in 2014, based on his own architectural ideas, and intended to monetize social-network links. This statement formed the very foundation for all his claims of rescission, declaratory relief, and intellectual property ownership in Case No. 1:16-cv-8029-GHW.[1]

However, this sworn statement is directly and unequivocally contradicted by DK's own subsequent admissions during his deposition, where he stated that "R7" was merely a codename for ShopLink technology and the "name of the code asset" for ShopLink source code residing in the company's repository.[1] Furthermore, internal ShopLink documentation authored by DK himself, such as the "September 4, 2015 ShopLink Developer Start Guide" and "Project Overview Documentation," explicitly describes "R7/ShopLink" as "proprietary (closed source) ShopLink code" built on the "ShopLink ecosystem," further refuting his claim of independent creation.[1]

DK's false claim of R7 ownership is not a mere factual dispute but a deliberate "technical falsehood" from an insider. As the Chief Technology Officer, DK was the subject matter expert.[1] His statements were authoritative factual assertions, akin to expert testimony.[1] The principles of the Daubert Standard (Federal Rule of Evidence 702) and forensic science reform (National Academy of Sciences and President's Council of Advisors on Science and Technology reports) emphasize that technical claims must be empirically validated.[1] DK's claims demonstrably lacked empirical support and were directly contradicted by objective evidence.[1] This calculated manipulation of technical facts by someone in a position of trust and expertise fundamentally corrupted the court's understanding of the core intellectual property at issue.[1] This "technical fraud" represents a direct assault on judicial integrity.

## 2. Patent Inventorship Theft

On December 1, 2016, DK filed a patent extension application on behalf of Agnicore LLC that fraudulently removed MV as the original inventor from ShopLink's patent applications and simultaneously transferred ShopLink's intellectual property rights to Agnicore.[1] This action is characterized as "classic intellectual property misappropriation".[1] The theft occurred despite DK's clear knowledge that MV was the true original inventor, as evidenced by pre-existing patent applications listing MV as a sole inventor, filed in 2012, and DK as a co-inventor filed in 2013 and 2014.[1]
An early email from DK on October 3, 2013, shows his awareness of patent inventorship and concern about listing multiple people, suggesting his well informed involvement in the ongoing patent discussions.[1] The Agnicore patent application itself lists DK as the inventor.[1]

This patent theft was a calculated and premeditated act, part of a larger scheme to legitimize stolen intellectual property through perjured court filings. The rapid succession of events—Agnicore LLC was formed on September 8, 2016, just three days before DK's resignation on September 11, 2016.[1] On September 11, 2016, GT forwarded "legal analysis" on how to back out of the Asset Purchase Agreement (APA) to DK.[1] DK filed his perjured complaint on October 13, 2016, and then the patent theft filing occurred on December 1, 2016.[1] This sequence demonstrates a "pre-planned, systematic scheme"[1] rather than reactive actions, aligning with the definition of a "criminal enterprise" and "pattern of racketeering activity".[1]

## 3. Systematic Obstruction of Evidence

On the very day of his resignation, September 11, 2016, DK deliberately blocked MV's access to code repositories and immediately took all developers to Agnicore.[1] Three days later, on September 14, 2016, DK further compounded this obstruction by blocking MV's access to corporate email accounts, allegedly having "deleted most incriminating emails before his resignation".[1] MV's affidavit also indicates that DK withheld signed documents and patent assignments, and later turned over incomplete code, which MV's new team confirmed was unusable.[1]
This systematic obstruction of evidence directly impacted the discovery process and the court's ability to ascertain the truth, potentially influencing prior judicial findings. The court in Case 1:16-cv-7203-GHW dismissed several of MV's counterclaims, such as tortious interference and unfair competition based on misappropriation, due to "inadmissible hearsay" and "lack of competent evidence".[1] All such evidence

was deliberately obstructed and destroyed, it directly prevented MV from presenting a full and accurate defense and prosecuting his counterclaims. The court's findings, while based on the available record, may have been inadvertently shaped by this systematic deception, constituting a "fraud on the court" because it undermines the integrity of the adjudicative process.[2]

## B. Gary Tatintsian's Hostile Takeover Attempts and Sabotage

Gary Tatintsian (GT) engaged in a series of actions and threats that demonstrate a clear hostile takeover intent and a pattern of sabotage against ShopLink and MV.

### 1. Explicit Threats and Financial Warfare

GT's August 23, 2016, email explicitly stated his refusal to be bought out of his ShopLink shares, declaring, "it's not gone happen. Not with me!!!" He further asserted his financial capacity for a prolonged legal battle, stating, "I can efford much more to sped to fighting u then you all!!".[1]
These statements are characterized as "racketeering extortion," "financial warfare," and indicative of a "hostile takeover" intent.[1] MV's affidavit, confirmed by contemporaneous evidence, details GT's escalating threats, including violent and abusive language.[1]
Furthermore, GT's email on July 21, 2016, demanding confirmation that the subscription agreement had no rescission right, reinforces his intent to prevent MV from exiting the deal.[1]
GT's explicit threats and refusal of a buyout demonstrate a clear intent to gain control through aggressive, potentially illicit means, rather than a legitimate investor seeking to protect an investment. An investor primarily seeking to recover funds typically accepts a buyout offer, especially given so many purported corporate governance red flags. GT's refusal, coupled with overt threats and demands for control, such as "Corporated means there are we all fucking EVEN!"[1], suggests an objective beyond mere investment recovery. His insistence on the absence of rescission rights further locked him into the company.[1] This pattern points to a deliberate strategy of "hostile takeover"[1] and "racketeering extortion"[1], where litigation and threats are tools to gain control or inflict maximum damage, rather than to resolve a good-faith dispute.

### 2. Sabotage of Business Prospects

GT directly interfered with ShopLink's critical business deals and instigated unlawful asset freezes to cripple MV financially. MV's affidavit details the alleged sabotage of the Sundial (Shea Moisture) deal, a potential $50 million per year contract. GT allegedly had someone call a Sundial advisor to falsely claim ShopLink's technology was contested and MV was criminally investigated, causing the deal to be terminated.[1] MV's affidavit also describes GT's alleged interference with MovieCoin, MV's new company, where GT called Christopher Woodrow, the CEO, threatening litigation, slandering MV, and threatening MV's life, leading Woodrow to disassociate.[1]
Furthermore, the London asset freeze incident is on the record in London High Court proceedings, where GT, who confessed to this fact, during his sworn deposition testimony, instigated an "unlawful freeze of MV's assets" by falsely claiming funds were tied to federal litigation in NYC, forcing MV to spend $500,000 to recover them. GT later confirmed his "maniacal hatred" towards MV in his deposition.[1] This

direct interference with business deals and asset freezes demonstrates a pattern of active, malicious sabotage designed to destroy MV's ability to operate any business, extending beyond the initial ShopLink dispute.

The methods used, including false claims of criminal investigation, threats of violence, and false claims of asset ties to litigation, are not standard litigation practices. They are external, extra-judicial actions aimed at causing direct financial harm and reputational damage. GT's admitted "maniacal hatred" provides a clear motive.[1] This constitutes a pattern of "sabotage" and "financial warfare"[1] indicative of a deliberate campaign to destroy MV's financial viability, regardless of the merits of the underlying lawsuits, supporting the characterization of a "criminal enterprise" using illicit means.[1]

## C. Younis Zubchevich's Manipulation and Witness Tampering

Younis Zubchevich (YZ), MV's former trusted business advisor, played a critical role in coordinating the criminal enterpirse scheme.

### 1. Coordination of Takeover Plan

YZ's September 1, 2016, email to DK explicitly outlined "Gary's takeover plan," including admitting DK's "contractual entitlement to 40% of Aum Code has not been perfected".[1] This email was sent shortly before Agnicore's formation and DK's resignation. YZ, along with Frank Hariton, also provided "legal analysis" to GT on how to back out of the APA, which GT then forwarded to DK.[1]

YZ's role as MV's former trusted advisor, now actively coordinating GT's hostile takeover and providing "legal analysis" for contract breach, constitutes a profound breach of trust and a direct proof of the criminal conspiracy. YZ's explicit statements, such as "Gary has asked me to reach out to you" and "I am all in on this plan of Gary's"[1], coupled with his intimate knowledge of MV's affairs and Shoplink's corporate structure and agreements (evidenced by his discussion of DK's "unperfected" entitlement), demonstrate a calculated betrayal. His direct involvement in outlining the plan and providing legal guidance for contract breach makes him a central figure in the "coordinated criminal enterprise"[1], highlighting a severe ethical breach under Rule 8.4 of the ABA Model Rules of Professional Conduct.[5]

### 2. Spreading False Narratives and Maligning MV to Investors

YZ's text messages to Ken Lanyon are "irrefutable proof" of a calculated strategy to undermine MV, involving "deliberately spreading damaging narratives about MV" and "character assassination".[1] YZ claimed to have "run away" from MV after discovering what he was doing and that MV "has hurt a lot of people".[1] YZ's default proves all MV's assertions in a judicially valid admission, confirming that GT and YZ used "confidential information to malign Mr. Vorotyntsev to ShopLink's other investors".[1] ShopLink's counterclaims further assert that YZ contacted ShopLink investors, claiming the company was a "sham".[1] The deliberate dissemination of false and damaging information to investors by a former trusted advisor constitutes a direct attack on the company's goodwill and financial stability, going beyond mere competitive behavior. This conduct aimed to "undermine MV through legal manipulation"[1] and "recruit potential plaintiffs".[1] This directly relates to the court's dismissal of MV's tortious interference claims in

Case No. 1:16-cv-7203-GHW due to "inadmissible hearsay" [1], implying that the alleged tampering made it difficult to present admissible evidence. This constitutes "systematic witness tampering" [1] and "obstruction of justice" [1], designed to manipulate the legal process and prevent the truth from emerging. Such conduct is a direct "fraud on the court" and a violation of Rule 3.4 (Fairness to Opposing Party and Counsel).[7]

### 3. Attempted Manipulation of Legal Proceedings

YZ attempted to manipulate legal proceedings by suggesting a New York Attorney General (NYAG) investigation and encouraging legal action against MV. YZ's text messages to Ken Lanyon explicitly mentioned that "the NY state attorney office is investigating him [MV]" and suggested that if MV were charged, Lanyon could "use that as a defense".[1] This is a clear proof of promotion of "NYAG Fraudulently Instigated Investigatoin" and an attempt to "manipulate legal proceedings".[1] The email from GT to DK in December 2016, with instructions to "forward to Partha for NYAG" investigation which was "fraudulently induced" by GT and YZ.[1]
This fraudulent inducement of a state attorney general investigation and its leveraging in civil litigation represents a severe abuse of both state law enforcement and the federal judicial process. This suggests a deliberate strategy to "corrupt State Law Enforcement" and "weaponize Federal Courts" [1] by manufacturing external pressures and then using them as leverage in civil disputes. This is a profound "perversion of the legal system" [1] and a strong indicator of a "criminal enterprise".[1]

## D. The Agnicore Enterprise: Formation, Launch of "Identical" Product, and Client/Developer Poaching

The formation and subsequent actions of Agnicore LLC represent a direct, coordinated competitive attack based on misappropriated assets and information.

Agnicore LLC was formed by Frank Hariton on behalf of GT, DK, and YZ on September 8, 2016, just three days before DK's resignation from ShopLink.[1] Within six months of its formation, Agnicore launched a product described as "identical" to ShopLink's, under ShopLink's slogan "MYI (Monetize Your Influence)".[1] The Agnicore patent application, filed December 1, 2016, lists Dmitriy Khmaladze as the inventor for a "SYSTEM AND METHOD FOR ENHANCED AND COMBINED ONLINE MARKETING AND SALES".[1]
Agnicore also took ShopLink's only distribution provider, under contract at the time, ReaderLink, and the entire development team. The developers were listed on Agnicore's site with GT's apartment address, within days of DK's resignation.[1]
GT's email to DK on September 11, 2016, titled "Fwd: (no subject)," contained an "ANALYSIS April 15, 2015 Asset Purchase Agreement" detailing breaches by MV and AUM Code, and stating DK was to receive a 40% membership interest in AC, implying he was being induced to betray ShopLink.[1]
The rapid formation of Agnicore and its immediate launch of an "identical" product, coupled with the poaching of ShopLink's sole contracted commercial counter-party and entire development team, demonstrates a direct, coordinated competitive attack based on misappropriated assets and information.

DK's R7 perjury and patent theft confirm that the "identical" product was based on stolen IP. The legal analysis forwarded by GT to DK on how to back out of the APA indicates a plan to sever ties and misappropriate. MV's instruction to DK not to discuss corporate matters with GT highlights the sensitivity of DK's role and the explicit breach of trust when he later shared information.

This is not fair competition but a systematic misappropriation of intellectual property, human capital, and business relationships. The coordinated timing and methods strongly support the existence of a "criminal enterprise" [1] engaged in unfair competition and conversion, further highlighting the "fraud on the court" by concealing the true nature of the IP transfer and competitive actions.

**Table: Key Events in the Coordinated Scheme (Timeline)**

| Date | Event Description | Key Parties Involved | Significance/Impact |
| --- | --- | --- | --- |
| **Aug 23, 2016** | GT sends explicit threat email to DK, YZ, MV | GT, DK, YZ, MV | Indicates intent to aggressively pursue control/assets [1] |
| **Sep 1, 2016** | YZ sends coordination email to DK outlining GT's takeover plan, admitting DK's "contractual entitlement to 40% of Aum Code has not been perfected" | YZ, DK, GT | Reveals pre-planning and contradiction of later "no contract" claims [1] |
| **Sep 6-9, 2016** | GT meets with DK in person in Ohio | GT, DK | Confirms direct, in-person coordination [1] |
| **Sep 8, 2016** | Agnicore LLC is formed by Frank Hariton | GT, DK, YZ, Frank Hariton | Creation of new entity, just three days before DK's resignation, highlights premeditation [1] |
| **Sep 11, 2016** | GT forwards YZ/FH "legal analysis" to DK on how to back out of APA, with message: "It's exactly we are talk about" | GT, DK, YZ, Frank Hariton | Direct evidence of prior coordination and intent to breach contracts [1] |

| Sep 11, 2016 | DK resigns from ShopLink (3:14 PM); blocks MV's access to code repositories (4:46 PM); takes all developers to Agnicore | DK, MV | Immediate, decisive actions to cripple ShopLink and transfer resources [1] |
|---|---|---|---|
| Sep 14, 2016 | DK blocks MV's access to corporate email accounts, having deleted most incriminating emails before resignation | DK, MV | Deliberate obstruction and destruction of evidence [1] |
| Oct 13, 2016 | DK files his perjured complaint, falsely claiming R7 ownership | DK | Initiates fraudulent litigation based on false premises [1] |
| Dec 1, 2016 | Patent theft filing occurs, fraudulently removing MV as inventor and transferring IP to Agnicore | DK, MV | Executes intellectual property misappropriation [1] |
| May 13, 2019 | DK's counsel offers to "give up his claims and walk away entirely," stating he's "no longer challenging the validity of any contracts" | DK's Counsel | Admission that DK's entire lawsuit was fabricated [1] |
| Apr 22, 2022 | DK files false Rule 56.1 statement denying evidence of IP misappropriation | DK | Continues pattern of perjury to conceal theft [1] |

# III. Legal Grounds for Disqualification of Counsel: Breaches of Professional Ethics and Integrity

The actions of GT, DK, and YZ, facilitated or condoned by their legal counsel, constitute severe breaches of professional ethics, warranting disqualification.

## A. Violations of ABA Model Rules of Professional Conduct

### 1. Rule 3.3: Candor Toward the Tribunal

Rule 3.3 prohibits lawyers from knowingly making false statements of fact or law to a tribunal or failing to correct previously made false statements of material fact or law. It emphasizes the lawyer's duty as an officer of the court.[9]
DK's R7 perjury in his complaint (October 13, 2016) and his false Rule 56.1 statement (April 22, 2022) denying IP misappropriation are direct instances of proof of perjury.[1] If counsel presented these knowing falsehoods or failed to correct them upon discovery, they violated Rule 3.3.
The "settlement confession" on May 13, 2019, where DK's counsel offered to "give up his claims" and affirmed the validity of contracts, directly contradicted the core of DK's perjured initial complaint.[1] This suggests counsel's awareness of the baselessness of the claims. If counsel was aware of the contradictions, for example, from DK's own deposition testimony or internal documents[1], their continued advocacy of claims based on those falsehoods, or their failure to take remedial measures, directly implicates Rule 3.3. The "settlement confession" is strong evidence that counsel eventually recognized the claims were "fabricated".[1] This systematic pattern of perjury, maintained through various stages of litigation and eventually exposed by counsel's own admission, suggests a profound breach of the duty of candor, potentially transforming counsel from a zealous advocate into an enabler of fraud on the court.

### 2. Rule 3.4: Fairness to Opposing Party and Counsel

Rule 3.4 prohibits lawyers from unlawfully obstructing access to evidence, altering, destroying, or concealing material, falsifying evidence, counseling false testimony, improperly influencing witnesses, or making frivolous discovery requests or failing to comply with proper requests.[7]
DK's alleged systematic obstruction of evidence, including blocking access to code, deleting incriminating emails, and turning over incomplete code, directly implicates Rule 3.4(a).[1] If counsel was aware of or assisted in these actions, they violated this rule.

GT's and YZ's "systematic witness tampering," including maligning MV to investors and suggesting an NYAG investigation to Ken Lanyon, directly implicates Rule 3.4(b) and (f).[1] Counsel knew of and/or encouraged these actions, hence they violated their duties.
The court's dismissal of MV's tortious interference claims due to "inadmissible hearsay" and "lack of competent evidence"[1] highlights the impact of alleged obstruction and tampering on the discovery process. This suggests a deliberate perversion of the discovery process and a direct interference with the administration of justice (Rule 8.4(d)).[5]

Counsel's failure to prevent and/or report such conduct, or active participation, constitutes a serious ethical breach that directly impacts the fairness of the proceedings.

### 3. Rule 1.2(d): Counseling or Assisting Client in Criminal or Fraudulent Conduct

Rule 1.2(d) states that a lawyer "shall not counsel a client to engage, or assist a client, in conduct that the lawyer knows is criminal or fraudulent".[11]
The patent inventorship theft, where DK fraudulently removed MV as inventor and transferred IP to Agnicore, is characterized as "classic intellectual property misappropriation".[1] As counsel knew and assisted in filing this fraudulent patent application, they violated Rule 1.2(d).
Furthermore, GT forwarding "legal analysis" on "how to back out of the APA" to DK, with the message "It's exactly we are talk about," suggests counsel provided advice to breach a contract in furtherance of the alleged scheme.[1] The " Fraud Analysis Brief H_GHW" explicitly details how the scheme aligns with the definition of a "criminal enterprise" and a "pattern of racketeering activity".[1]
Counsel's involvement in facilitating IP theft and providing advice to breach contracts, in furtherance of a scheme characterized as a "criminal enterprise", directly implicates their duty not to assist client fraud. This moves beyond mere ethical violations to potential complicity in criminal acts, which is a severe breach of professional conduct and a fundamental threat to the integrity of the legal system. This would also trigger the crime-fraud exception to attorney-client privilege.[13]

### 4. Rule 8.4: Misconduct

Rule 8.4 broadly defines professional misconduct to include violating rules of professional conduct, committing criminal acts reflecting adversely on honesty or trustworthiness, engaging in dishonesty, fraud, deceit, or misrepresentation, and engaging in conduct that seriously interferes with the administration of justice.[5]
All previously cited instances of perjury (Rule 3.3 violations), obstruction of evidence and witness tampering (Rule 3.4 violations), and assisting client fraud (Rule 1.2(d) violations) fall under the broad scope of Rule 8.4.

The "Santillo Connection," where YZ's text "She will rep me if I'm served" implies that GT's counsel was "pre-positioned to represent conspiracy members" and abused attorney-client privilege to shield communications, represents direct evidence of perverting the legal system and interfering with the administration of justice.[1] The cumulative effect of these ethical breaches and criminal acts by the clients, facilitated and/or condoned by counsel, paints a picture of systemic misconduct that fundamentally undermines the legal profession's integrity. This level of misconduct, factually proven, by the preponderance of overwhelming evidence, demonstrates a profound unfitness to practice law, warranting the most severe disciplinary actions, including disqualification, to protect the public and the integrity of the judiciary.

**Table: Alleged Ethical Violations by Counsel**

| ABA Model Rule Number | Rule Description | Specific Alleged Violation | Supporting Factual Allegations |
|---|---|---|---|
| **Rule 3.3** | Candor Toward the Tribunal | Knowingly presenting false statements or failing to correct them | DK's R7 perjury in complaint [1]; False Rule 56.1 statement denying IP misappropriation [1]; Counsel's "settlement confession" contradicting initial false claims [1] |
| **Rule 3.4** | Fairness to Opposing Party and Counsel | Unlawful obstruction of evidence; Improperly influencing witnesses | DK blocking access to code/emails, deleting incriminating emails [1]; YZ's "systematic witness tampering" (maligning MV to investors, suggesting NYAG investigation) [1] |
| **Rule 1.2(d)** | Counseling or Assisting Client in Criminal or Fraudulent Conduct | Assisting in IP theft; Advising on contract breach for fraudulent scheme | Patent inventorship theft (DK removing MV as inventor, transferring IP to Agnicore) [1]; GT forwarding "legal analysis" on APA breach [1] |
| **Rule 8.4** | Misconduct (Dishonesty, Fraud, Deceit, Interference with Justice) | Engaging in dishonesty/fraud; Seriously interfering with justice; Abusing privilege | Cumulative effect of Rule 3.3, 3.4, 1.2(d) violations; "Santillo Connection" alleging abuse of attorney-client privilege to shield conspiracy communications [1] |

## B. The "Lawyer as Witness" Rule (Rule 3.7)

Rule 3.7 generally prohibits a lawyer from acting as an advocate at a trial in which the lawyer is likely to be a necessary witness, unless specific exceptions apply.[14]

The "settlement confession" made by DK's counsel on May 13, 2019, is a critical piece of evidence regarding the baselessness of DK's claims.[1] The lawyer who made this admission, and potentially others in the firm aware of the underlying facts, could be a necessary witness to establish counsel's knowledge of the fraud.

Furthermore, the "Santillo Connection," where YZ's text "She will rep me if I'm served" implies that GT's counsel was "pre-positioned" to represent multiple alleged co-conspirators.[1] Counsel was necessarily involved in coordinating the scheme and/or advising on actions like the fraudulent patent filing or obstruction of evidence, their testimony would be necessary. Counsel's direct involvement in communications that are now central to proving the ostentatious "fraud on the court" makes them necessary witnesses, creating an unavoidable conflict between their role as advocate and their potential testimony. This creates an inherent conflict of interest and an appearance of impropriety, as the lawyers would be in a position to vouch for their own credibility or explain their actions, which could prejudice the opposing party and undermine the integrity of the judicial process.

Disqualification is necessary to preserve the fairness and impartiality of the proceedings.

## C. Crime-Fraud Exception to Attorney-Client Privilege

The crime-fraud exception defeats attorney-client privilege for communications made in furtherance of contemplated or ongoing criminal or fraudulent conduct, requiring probable cause that the communication was in furtherance of the crime and intended to facilitate or conceal criminal activity.[13]

The "Santillo Connection" explicitly demonstrates "abuse of attorney-client privilege to shield conspiracy communications" and that counsel was "pre-positioned to represent conspiracy members".[1] The overall scheme must be characterized as a "coordinated criminal enterprise" and a "pattern of racketeering activity".[1] All acts of perjury, IP theft, obstruction, and witness tampering constitute the underlying criminal or fraudulent conduct.

The use of attorney-client privilege to shield communications related to a "criminal enterprise" represents a severe perversion of legal ethics and justifies piercing the privilege to uncover the full extent of the fraud.

When the privilege is used to facilitate or conceal the systematic fraud on the court, it fundamentally undermines the purpose of the privilege and the integrity of the judicial system. Applying the crime-fraud exception is essential to uncover the truth and ensure accountability, demonstrating that the court will not tolerate its processes being weaponized for illicit gain.

## D. Inherent Authority of the Court to Protect Judicial Integrity and Prevent Abuse of Process

Federal courts possess inherent authority to control their docket, prevent abuse of process, and impose

appropriate sanctions, including monetary penalties and orders for financial security.[3] The "fraud on the court" doctrine (Rule 60(d)(3)) is rooted in the court's inherent authority to protect its integrity from corruption and allows courts to vacate judgments obtained through fraud specifically directed at the judicial process, regardless of time limitations.[2]

The entire body of factual evidence, of both proceedings, documents explicitly how GT, YZ, DK, and their counsel "converted federal court process into a racketeering instrument" and "systematically deceived" the court for years, constituting a "perversion of the legal system".[1]

The systematic nature and duration of this fraud, coupled with its impact on multiple cases and the perversion of legal processes, demand the court's exercise of its inherent powers to safeguard its fundamental integrity.

When litigants and their counsel transform the judicial system into an instrument of fraud and extortion, the court's inherent powers become not just discretionary but a necessary tool to protect its institutional integrity, ensure due process for all parties, and maintain public confidence in the administration of justice. This justifies extraordinary relief, including disqualification and significant sanctions.

## IV. Legal Grounds for Immediate Financial Relief and Professional Accountability

This conduct warrants immediate financial relief and professional accountability to deter further misconduct and compensate for damages.

### A. Rule 11 Sanctions

Sanctions are warranted under Rule 11 for filings presented for an improper purpose, lacking factual basis, or causing unnecessary delay or cost.[20] The "settlement confession," where DK's counsel offered to drop claims, admitting their baselessness, is direct evidence that DK "pursued claims he knew were meritless, hoping to extract settlement value through the cost and burden of litigation".[1] This constitutes an improper purpose and a lack of factual foundation.

DK's R7 perjury and false Rule 56.1 statement further demonstrate a lack of factual foundation for his core claims and defenses.[1]

GT's threats of "financial warfare" and using litigation as an "extortion tool" indicate an improper purpose to harass, cause delay, and increase cost.[1]

The admission of baseless claims and the alleged use of litigation for extortionary purposes directly trigger Rule 11 sanctions, demonstrating a deliberate misuse of the court system. Imposing Rule 11 sanctions is not merely punitive but serves to deter similar conduct, compensate the victim for defending frivolous claims, and uphold the integrity of the litigation process.

### B. 28 U.S.C. § 1927: Counsel's Liability for Unreasonably and Vexatiously Multiplying Proceedings

28 U.S.C. § 1927 allows courts to require an attorney who "unreasonably and vexatiously" multiplies

proceedings to personally satisfy the excess costs, expenses, and attorneys' fees incurred because of such conduct.[22]

The " Fraud Analysis Brief H_GHW" documents a "sustained and deliberate campaign of fraud" and a "systematic subversion of truth throughout the litigation," spanning nine years.[1]

The entire body of evidence, preserved by both proceedings, documents a "nine-year conspiracy using court as criminal instrument" and that counsel "converted federal court process into a racketeering instrument".[1]

The London asset freeze and Sundial deal sabotage, all instigated by GT, forced MV to incur significant legal costs.[1] The systematic fraud, spanning multiple years and cases, and involving deliberate obstruction and witness tampering, constitutes an "unreasonable and vexatious multiplication" of proceedings, warranting personal liability for counsel.

The "systematic perjury" and "fraud on the court" directly imply that the proceedings were multiplied not by genuine legal issues but by deliberate deception. The "criminal enterprise" using courts as instruments inherently leads to vexatious litigation.

Imposing sanctions under 28 U.S.C. § 1927 is crucial to deter attorneys from enabling or participating in such prolonged and fraudulent litigation, and to shift the burden of excess costs from the victimized party to those responsible for the abuse.

## C. Inherent Powers of the Court

The court's inherent powers allow it to control its docket, prevent abuse of process, and impose appropriate sanctions, including monetary penalties and orders for financial security.[3] The "fraud on the court" doctrine is rooted in the court's inherent authority to protect its integrity from corruption.[2]

The allegedly factually proven "systematic deception of federal judiciary" and "perversion of the legal system" directly threaten the court's core functions.[1] The extraordinary nature and duration of the alleged "fraud on the court" necessitate the court's exercise of its inherent powers to impose robust financial sanctions and security measures, going beyond statutory limitations. The inherent powers doctrine exists precisely for situations where specific rules might not fully capture the egregious nature of the abuse.

The Supreme Court's *Hazel-Atlas* decision emphasizes the court's duty to act when the administration of justice is tampered with.[2] The "nine-year conspiracy" and the alleged "criminal enterprise" indicate an abuse so profound that it demands the "grand reservoir of equitable power" of the court.[1] The imposition of cash bonds and personal liability, while severe, is a necessary exercise of inherent power to ensure the court's orders are respected, to deter future abuses, and to provide meaningful recourse when the judicial process itself has been so egregiously corrupted.

## D. Justification for Cash Bonds ($1.5 Million Each)

Cash bonds are necessary to secure potential damages, deter further misconduct, and ensure compliance with court orders, given the history of alleged asset manipulation and threats.

The London asset freeze and Sundial deal sabotage demonstrate a clear pattern of financial manipulation and direct interference with MV's ability to generate income or access funds.[1]

GT's explicit threats of "financial warfare" and using litigation to "destroy everything" indicate a high risk

of continued financial harm and asset dissipation.[1]

MV's mediation statement indicates a prior offer to return GT's $1.35 million investment with interest for a total of $1.5 million, which GT rejected, demanding immediate payment.[1] This establishes a baseline for the requested bond amount.

Documents also show ShopLink's historical "not in good standing" status due to unpaid taxes, and ongoing corporate governance issues, which GT was aware of.[1]

The combination of explicit financial threats, documented acts of financial sabotage, and a history of rejecting reasonable settlement offers demonstrates a clear and present danger of asset dissipation and continued vexatious conduct, justifying a substantial cash bond. The purpose of a bond is to secure potential judgments, deter further misconduct, and ensure compliance.

Given the history of proven and self-confessed asset manipulation, direct financial sabotage, and threats of "financial warfare," there is a high risk that any future monetary awards would be difficult to collect or that the parties would continue to engage in financially destructive behavior.

The $1.5 million figure aligns with a prior rejected settlement offer, suggesting it is a known and previously discussed financial benchmark. The historical corporate governance issues also point to a need for financial stability and oversight. The requested bond is not punitive but a necessary protective measure to safeguard the integrity of the judicial process and ensure that the victims of the alleged fraud can obtain meaningful relief, especially given the alleged "criminal enterprise" operating through litigation.

## E. Professional Insurance Disclosure and Personal/Firm Liability

Mandating professional insurance details and imposing personal and firm liability for the bond is essential to ensure accountability for counsel's involvement in the fraudulent scheme and to provide a mechanism for recovery.

While not directly ordering insurance disclosure, rules discussing sanctions for discovery misconduct (Rule 37), attorney-client privilege limitations (Rule 502), and concepts of attorney liability for client fraud (Securities Exchange Act Section 20(a) and Investment Advisers Act Section 206(2)) provide a legal backdrop for imposing accountability on counsel.[24]

The "Santillo Connection" explicitly alleges that GT's counsel was "pre-positioned to represent conspiracy members" and abused attorney-client privilege to shield communications, suggesting direct involvement in the alleged "hybrid criminal-civil conspiracy".[1] The factual evidence shows irrefutably that counsel "perverted Legal System - Officers of court as active conspirators" and "converted federal court process into a racketeering instrument".[1]

If counsel actively participated in or knowingly facilitated a "fraud on the court" and a "criminal enterprise," their professional insurance and personal or firm assets should be directly exposed to liability to ensure full accountability and recovery for damages caused by their alleged misconduct. The role of lawyers as "officers of the court" means they have a heightened duty of integrity.[9] If they abused attorney-client privilege and perverted the legal system, their professional conduct directly led to damages.

Requiring insurance information and imposing personal or firm liability for the bond is a critical step to

ensure that legal professionals are held financially accountable for severe misconduct that undermines the judicial process, thereby reinforcing the ethical obligations of the bar and providing a direct mechanism for victims to recover losses caused by such alleged actions.

## V. Impact of Systemic Fraud on Judicial Process and Prior Rulings

The coordinated scheme fundamentally undermined the court's ability to render just decisions based on truth.

### A. Corruption of the Judicial Process

The coordinated scheme fundamentally undermined the court's ability to render just decisions based on truth.[2] The entire history of both proceedings and contemporaneous factual evidence explicitly document "systematic deception of federal judiciary" and that the federal court process was "weaponized" and "perverted" into a "racketeering instrument".[1]
The systematic nature of this fraud, spanning multiple years and cases, transformed the litigation from a legitimate dispute into a tool for illicit gain, fundamentally eroding the court's capacity for fair adjudication. The core purpose of a court is to ascertain truth and apply law impartially. When one party "systematically manufactures a false factual narrative"[1] through perjury, IP theft, and obstruction, it directly impedes the court's ability to understand the true nature of the dispute.
The "settlement confession" further confirms that the entire lawsuit was "fabricated" from the outset, meaning the court was engaged in adjudicating a false premise. This constitutes a profound "public wrong against the judicial system"[1], demanding robust intervention to protect the system's integrity and public confidence. The court's ability to maintain its role as an impartial arbiter is directly threatened.

### B. Influence on Prior Findings

Previous court findings in both Case No. 1:16-cv-7203-GHW and Case No. 1:16-cv-8029-GHW may have been influenced by the systematic deception, obstruction of evidence by DK, and witness tampering by GT and YZ.
In Case No. 1:16-cv-8029-GHW, the court ruled that ShopLink did not own the software and rescinded the Asset Purchase Agreement (APA).[1] This ruling, which meant the IP reverted to DK's company, may be flawed, based on facts tainted by DK's R7 perjury and patent theft.[1]
In Case No. 1:16-cv-7203-GHW, MV's counterclaims for conversion and unfair competition (misappropriation of software) were dismissed because ShopLink did not own the software.[1] The aiding and abetting fiduciary duty claim against DK was also dismissed because he allegedly did not owe a duty to ShopLink regarding the software.[1] These dismissals are compromised, because the premise of IP ownership was fraudulently established.
Tortious interference claims were dismissed due to "inadmissible hearsay" and "lack of competent evidence".[1] This directly correlates with DK's systematic obstruction of evidence, such as blocking access and deleting emails [1], and GT's and YZ's witness tampering and spreading false narratives.[1]
If evidence was deliberately hidden or made inadmissible through misconduct, the court's finding, while accurate on the record, reflects a corrupted process.

While GT's securities fraud claim was denied summary judgment due to lack of reliance and economic loss [1], the question arises whether the court's assessment of GT's reliance, and indeed the entire case, was fully informed by the manipulative context of his investment.
The court's prior rulings, while procedurally correct based on the evidence presented at the time, may have been fundamentally flawed due to the systematic deception, obstruction, and tampering that has corrupted the evidentiary record. The "fraud on the court" means that the judgments obtained are "tainted by systematic fraud and cannot stand as legitimate outcomes of a fair judicial process".[1] This necessitates a re-evaluation and potential vacation of prior judgments under Rule 60(b) and the inherent powers doctrine.

## C. Need for Comprehensive Adjudication of Rule 60(b) Motions

The interconnected nature of the fraud across both cases necessitates a holistic review and potential vacation of judgments, as the fraud in one case directly impacted the outcome in the other.

Rule 60(b) relief is sought based on "systematic perjury" and "fraud on the court," emphasizing that such claims are not subject to typical time limitations.[1] The need to preserve judicial integrity is paramount.[1] Given the pervasive and interconnected nature of the alleged fraud, a piecemeal approach to Rule 60(b) motions would be insufficient; a comprehensive, coordinated adjudication is required to fully unravel the deception and restore judicial integrity.
The core argument is that the fraud in one case, such as DK's IP claims in Case No. 1:16-cv-8029-GHW, directly impacted the rulings in the other, such as MV's counterclaims in Case No. 1:16-cv-7203-GHW.

The alleged "criminal enterprise" operates across these boundaries. A piecemeal approach risks re-legitimizing parts of a scheme that is alleged to be fundamentally fraudulent. The "fraud on the court" doctrine is concerned with the integrity of the judicial system as a whole. To truly "protect judicial integrity," the court must consider the entirety of the alleged fraudulent scheme and its ripple effects across all affected proceedings.

This necessitates a coordinated and comprehensive adjudication of Rule 60(b) motions in both cases, possibly through consolidation or parallel review, to ensure that no part of the alleged fraud remains unaddressed or implicitly validated.

## VI. Conclusion and Demands for Relief

The evidence presented demonstrates a meticulously documented pattern of systemic fraud on the court, intellectual property theft, abuse of process, and egregious ethical violations perpetrated by Gary Tatintsian, Dmitriy Khmaladze, Younis Zubchevich, and their associated legal counsel. This coordinated scheme, characterized by perjury, obstruction of evidence, witness tampering, and the weaponization of federal courts, has fundamentally corrupted the judicial process and tainted prior judgments.

Based on the foregoing, immediate and decisive action is imperative to protect the integrity of the federal judiciary and ensure that justice can be administered fairly.

**Demands for Relief:**

1. **Immediate Disqualification of Counsel:** Legal counsel for Gary Tatintsian and Dmitriy Khmaladze, and their respective firms, should be immediately disqualified from further representation in both Case No. 1:16-cv-7203-GHW and Case No. 1:16-cv-8029-GHW.
2. **Immediate Relief Ordering Cash Bonds:** Gary Tatintsian and Dmitriy Khmaladze should be ordered to post a $1.5 million cash bond each, to secure potential damages and deter further misconduct.
3. **Immediate Relief Ordering Counsel Bonds and Insurance Disclosure:** Their legal counsel and their respective firms should be ordered to post a similar $1.5 million cash bond. Furthermore, they must provide their professional insurance provider information, and if no professional insurance is available, personal liability should be imposed.
4. **Criminal Referral:** An immediate criminal referral should be made to the United States Attorney for investigation into potential federal crimes, including perjury (18 U.S.C. § 1621), mail and wire fraud (18 U.S.C. §§ 1341, 1343), and racketeering (18 U.S.C. § 1962).[1]
5. **Vacation of Judgments:** All judgments obtained by Dmitriy Khmaladze in Case No. 1:16-cv-8029-GHW should be vacated. Additionally, all rulings influenced by the alleged fraud in Case No. 1:16-cv-7203-GHW should be re-evaluated and potentially vacated.
6. **Appropriate Sanctions:** Appropriate sanctions should be imposed under Federal Rule of Civil Procedure 11, 28 U.S.C. § 1927, and the Court's inherent powers, to deter future misconduct and compensate for damages incurred due to this protracted fraud.
7. **Stay of Proceedings:** Both Case No. 1:16-cv-7203-GHW and Case No. 1:16-cv-8029-GHW should be stayed pending the comprehensive adjudication of these Rule 60(b) motions and any potential criminal investigation, to preserve judicial integrity.

The systematic nature of this misconduct threatens not only the parties to these proceedings but the integrity of the federal judicial system itself. Only immediate and comprehensive action can remedy the corruption that has infected these proceedings and prevent further harm.
Most respectfully submitted,


**MIKHAIL VOROTYNTSEV**
*Pro Se*
Founder, ShopLink Inc.

---

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing letter was served upon all parties of record via the Court's ECF system and/or by email on this 23rd day of June, 2025.

/s/ Mikhail Vorotyntsev
**MIKHAIL VOROTYNTSEV**

**Works cited**

1. MVSL Case in Chief List
2. HAZEL-ATLAS GLASS CO. v. HARTFORD-EMPIRE CO. | Supreme ..., accessed June 22, 2025, https://www.law.cornell.edu/supremecourt/text/322/238
3. BPI SPORTS, LLC v. THERMOLIFE INTERNATIONAL LLC - U.S. Court of Appeals for the Federal Circuit, accessed June 23, 2025, https://www.cafc.uscourts.gov/opinions-orders/23-1068.OPINION.6-16-2025_2530960.pdf
4. Inherent and Ancillary Powers of the Federal Courts - U.S. Constitution - FindLaw, accessed June 23, 2025, https://constitution.findlaw.com/article3/annotation04.html
5. Rules of Professional Conduct - DC Bar, accessed June 23, 2025, https://www.dcbar.org/for-lawyers/legal-ethics/rules-of-professional-conduct/maintaining-the-integrity-of-the-profession/misconduct
6. Rule 8.4 Misconduct - Comment - American Bar Association, accessed June 23, 2025, https://www.americanbar.org/groups/professional_responsibility/publications/model_rules_of_professional_conduct/rule_8_4_misconduct/comment_on_rule_8_4/
7. Rule 3.4: - American Bar Association, accessed June 23, 2025, https://www.americanbar.org/groups/professional_responsibility/policy/ethics_2000_commission/e2k_rule34/
8. Rule 3.4 Fairness to Opposing Party and Counsel - North Carolina State Bar, accessed June 23, 2025, https://www.ncbar.gov/for-lawyers/ethics/rules-of-professional-conduct/rule-34-fairness-to-opposing-party-and-counsel/?ruleSearchTerm=testify
9. Rule 3.3: Candor to Tribunal - DC Bar, accessed June 23, 2025, https://www.dcbar.org/for-lawyers/legal-ethics/rules-of-professional-conduct/advocate/candor-to-tribunal
10. Rule 3.3 - Candor toward the Tribunal, Vt. R. Prof. Cond. 3.3 | Casetext Search + Citator, accessed June 23, 2025, https://casetext.com/rule/vermont-court-rules/vermont-rules-of-professional-conduct/advocate/rule-33-candor-toward-the-tribunal
11. ABA Model Rules of Professional Conduct Rule 1.2 - State Bar of Nevada, accessed June 23, 2025, https://nvbar.org/wp-content/uploads/ABA-50-States-Adoption-of-MRPC-1.2c.pdf
12. Rule 1.2: Scope of Representation & Allocation of Authority Between Client & Lawyer, accessed June 23, 2025, https://www.americanbar.org/groups/professional_responsibility/publications/model_rules_of_professional_conduct/rule_1_2_scope_of_representation_allocation_of_authority_between_client_lawyer/
13. Crime-Fraud Exception Destroys Privilege for Communications Between Former CEO of Public Company and His Outside Lawyer | BCLP - Bryan Cave Leighton Paisner, accessed June 23, 2025, https://www.bclplaw.com/en-US/events-insights-news/crime-fraud-exception-destroys-privilege-for-communications-between-former-ceo-of-public-company-and-his-outside-lawyer.html
14. Rule 3.7: Lawyer as Witness - DC Bar, accessed June 23, 2025, https://www.dcbar.org/for-

lawyers/legal-ethics/rules-of-professional-conduct/advocate/lawyer-as-witness

15. Rule 3.7: Lawyer as Witness - American Bar Association, accessed June 23, 2025, https://www.americanbar.org/groups/professional_responsibility/publications/model_rules_of_professional_conduct/rule_3_7_lawyer_as_witness/
16. A Thoughtful Case on Advocate-Witness Rule | New York Legal Ethics Reporter, accessed June 23, 2025, https://www.newyorklegalethics.com/a-thoughtful-case-on-the-advocate-witness-rule/
17. Can Disqualification Be Avoided? - Morvillo Abramowitz Grand Iason & Anello PC, accessed June 23, 2025, https://www.maglaw.com/publications/articles/2009-12-03-can-disqualification-be-avoided/_res/id=Attachments/index=/070120903Morvillo.pdf
18. ALLOWING FEDERAL COURTS TO IMPOSE NON-COMPENSATORY MONETARY SANCTIONS UPON ERRANT ATTORNEYS WIT - IU Robert H. McKinney School of Law - Indiana University, accessed June 23, 2025, https://mckinneylaw.iu.edu/practice/law-reviews/ilr/pdf/vol33p1045.pdf
19. Civil Procedure - Federal District Courts Have Inherent Power to Sanction Attorneys for Abuse of the Judicial Process - Villanova University Charles Widger School of Law, accessed June 23, 2025, https://digitalcommons.law.villanova.edu/cgi/viewcontent.cgi?article=2558&context=vlr
20. Navigating Rule 11 Sanctions: Examples from Actual Litigation - CompLon Relea, accessed June 23, 2025, https://gumbootrestaurant.com/navigating-rule-11-sanctions-examples-from-actual-litigation/
21. Rule 11 and Factually Frivolous Claims-- The Goal of Cost Minimization and the Client's Duty to Investigate - Scholarship@Vanderbilt Law, accessed June 23, 2025, https://scholarship.law.vanderbilt.edu/cgi/viewcontent.cgi?article=4760&context=vlr
22. 28 U.S. Code § 1927 - Counsel's liability for excessive costs - Law.Cornell.Edu, accessed June 23, 2025, https://www.law.cornell.edu/uscode/text/28/1927
23. THE PROPRIETY OF CONSIDERING AN ATTORNEY'S ABILITY TO PAY UNDER § 1927 - Drake Law Review, accessed June 23, 2025, https://drakelawreview.org/wp-content/uploads/2015/07/irvol61-2_endo.pdf
24. Rule 37. Failure to Make Disclosures or to Cooperate in Discovery; Sanctions, accessed June 23, 2025, https://www.law.cornell.edu/rules/frcp/rule_37
25. Rule 502. Attorney-Client Privilege and Work Product; Limitations on Waiver, accessed June 23, 2025, https://www.law.cornell.edu/rules/fre/rule_502
26. section 20(a) control person liability and promoting gatekeeper behavior among officers and directors - Columbia Library Journals, accessed June 23, 2025, https://journals.library.columbia.edu/index.php/CBLR/article/download/13517/6577/37255
27. 2nd Circ. Adviser Liability Ruling May Shape SEC Enforcement | Insights & Events - Bradley, accessed June 23, 2025, https://www.bradley.com/insights/publications/2024/03/2nd-circ-adviser-liability-ruling-may-shape-sec-enforcement